UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA,  )  **Case No. SA-08-CR-47-OLG**
                           )
            Plaintiff,     )
                           )
VERSUS                     )  San Antonio, Texas
                           )  May 11, 2010
**JACINTO NAVAJAR(1),**        )
**JOSE MARTINEZ(9),**          )
**MIKE GARCIA(20),**           )
                           )
            Defendants.    )
_____)

**Trial on the Merits**
**BEFORE THE HONORABLE ORLANDO L. GARCIA**
**UNITED STATES DISTRICT JUDGE**
And Jury
VOLUME 2 OF 8

<u>APPEARANCES</u>:

For the United States      HONORABLE JOEY CONTRERAS
                           Assistant U.S. Attorney
                           U. S. Attorney's Office
                           601 N.W. Loop 410, Suite 600
                           San Antonio, Texas  78216


For Defendant Navajar      HONORABLE STEVEN P. PRICE
                           Price & Price
                           The Lincoln Center
                           7800 IH-10 West, Suite 521
                           San Antonio, Texas  78230


For Defendant Martinez     HONORABLE KEVIN L. COLLINS
                           Law Offices of Kevin L. Collins
                           600 Navarro Street, Suite 250
                           San Antonio, Texas  78205



        **Captured and transcribed by computer - Xscribe**

APPEARANCES CONT'D

For Defendant Mike Garcia    HONORABLE JOE STENBERG
        722 Euclid Avenue
        San Antonio, Texas  78212


Court Reporter    MAURICE D. WEST
        Official Court Reporter
        655 E. Durango Blvd., Suite 316
        San Antonio, Texas  78206

        * * * * *
        - - - - -

**(May 11, 2010 - Jury out.)**

THE COURT: Mr. Stenberg, do you need to put something on the record now or during the next recess?

MR. STENBERG: Now, please.

THE COURT: Go ahead.

MR. STENBERG: Joe Stenberg, representing Mike Garcia. I apologize to the Court about yesterday. I was not prepared to make really hard objections, fully developed objections.

THE COURT: Can you speak up a little bit louder?

MR. STENBERG: Yes, sir. On opinion testimony by Mike Carlisle about the truthfulness of people, I object to that. He's at best a fact witness. He's not -- the opinion of truthfulness has never been allowed, shouldn't be allowed in this case. He's not qualified, not a PhD, a psychiatrist, an MD. They're not qualified either on truthfulness. So with respect to that I object to him in the future saying anything about truthfulness. And the second thing I object to, which I didn't raise the objection and it was my fault, but just so I hopefully won't have this problem in the future, the bolstering thereafter, after I made my objection, he said that he closes the case if he finds out they're not telling the truth. Well, you know, poppycock, Your Honor.

This whole case, my client's defense is going to rest upon the truthfulness of these witnesses and I don't need Mike

Carlisle telling the jury they've been truthful. For instance, the jury could think that Mike Carlisle has some evidence that we don't know about, the jury doesn't know about and therefore after a two-week trial, three-week trial, they're going to think, "There's something we don't know about that Mike Carlisle knows about because Mike Carlisle thinks they're telling the truth."

So I object to anything about truthfulness of the witness coming from any Government witness. And the bolstering I also object to.

THE COURT: Well, this is his testimony. The jury will have to weigh that against the testimony of the other witnesses. The jury can make that assessment and so your objection is overruled. Anything else?

MR. STENBERG: Yes, I would like to have an instruction to the jury that they are to -- because I believe you gave it to them earlier, they are the sole determiners of the credibility --

THE COURT: Right.

MR. STENBERG: -- of the witnesses. But after --

THE COURT: I made that very clear to them and that language will be fully contained in the charge.

MR. STENBERG: Well, please note my objection to my improper work yesterday.

THE COURT: Sure. Okay, thank you.

MR. STENBERG:  Thank you.

THE COURT:  Agent Carlisle, you may come to the witness stand.

**(Jury in.)**

THE COURT:  Members of the jury, we begin on time. If you see that we begin a few minutes after or ten minutes, that's because we're covering other matters that does not require your presence.  I like to -- because your time is valuable as well as the parties', we like to begin on time. So if you're not here precisely the hour I say it's because we're covering other matters.  The Government may continue. Yes, Mr. Stenberg?

MR. STENBERG:  I'm sorry, but just to clarify for the record, I don't have recollection of Mr. Carlisle being sworn in yesterday.  Was he?

THE WITNESS:  I was.

THE COURT:  He was.

MR. STENBERG:  All right, thank you.

THE COURT:  Thank you.  Go ahead.

MR. CONTRERAS:  Thank you, Your Honor.

**MICHAEL CARLISLE, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN**

**DIRECT EXAMINATION CONTINUED**

**BY MR. CONTRERAS:**

Q   Agent Carlisle, to refresh everyone's memory, we were going through -- began going through Exhibits 1 through 41,

you recall?

A    That's correct.

Q    And these are a series of photographs.  Can you just bring us up to speed what they're pictures of?

A    Yeah, these are just individuals that you'll be hearing their names over and over in this trial.

Q    And each one of these exhibits has an exhibit number and a name, sometimes a nickname.  And have you determined those are the actual names and nicknames of the persons depicted?

A    I have.

Q    And these exhibits if they have a Page 2 or Page 3, what will those represent?

A    They'll represent tattoos that are common in Mexican Mafia.

Q    Tattoos of who?

A    Of that individual, of the individual that's referenced, and then it'll be some kind of Mafia-related tattoo.

Q    Government's Exhibit No. 6, please.  I believe this is where we left off, Agent Carlisle.

A    I believe it is.  Yes, Ruben Garcia known as Chorre.

Q    And he is a known Mafia member?

A    He is.

Q    Go to Page 2 of Exhibit 6.

A    Right.  You'll see imbedded in the rest of the tattoos the number 13.  As I mentioned yesterday, it's symbolic of the

13th letter of the alphabet being an M.

Q   And Page 3 of Government's Exhibit No. 6?

A   It's a tattoo just indicating what he's known as on the street.

Q   His --

A   His street name.

Q   Try to use the name.  You say his, who are you talking about?

A   I'm sorry, Ruben Garcia, Chorre.  It's just his street name.

MR. CONTRERAS:  And show Government's Exhibit No. 7, please, Ms. McCowsky.

Q   And this person?

A   Ted Ansualda, known as Porky.

Q   And is he a confirmed member?

A   A confirmed member, yes.

MR. CONTRERAS:  Show Page 2 of Government's Exhibit No. 7.

A   If you will notice underneath the initials at the top, there's a smaller tattoo at the bottom, and it actually says e-m-e or eme.

Q   Let's have Ms. McCowsky blow that up if she can.

A   You'll notice under whatever the line is under the monogram at the top, it say says e-m-e at the bottom for eme, and that's indicative of a Mexican Mafia tattoo.

Q    Eme?

A    Eme.

Q    Okay.

         MR. CONTRERAS:  Show Government's Exhibit No. 8, please?

Q    What are we seeing here?

A    That's Frankie Longoria known as Franky.  He's a confirmed Mexican Mafia member.

         MR. CONTRERAS:  Show Page 2 of Government's Exhibit No. 8, please.

Q    And what are we seeing here?

A    At the top across just under his --

Q    Just generally first.

A    Oh, yeah, this is Franky Longoria's upper torso, chest, and if you'll notice right under his chin across the top of his chest, there's the word Mexikano with a K, and that's very common Mexican Mafia tattoo.

Q    Okay, stop right there.

         MR. CONTRERAS:  Blow up that upper chest writing.

Q    And you see a word there?

A    It's Mexikano.

Q    And is that the actual proper spelling of the word Mexicano?

A    It is not.

Q    Okay, what is different?

A    It has a K instead of a C.

Q    And what's the significance of that?

A    That is, that is common with members of the Mexican Mafia. They will spell it with a K, it'll be in their tattoos.  You will see some with a C, it's not exclusive, but anytime you see it with a K, it's associated with the Mexican Mafia.

Q    And Mexicano is a Spanish word.  Do you know what it means in English?

A    Mexican.

Q    And Page 3 of Government's Exhibit No. 8?

A    If you'll notice at the bottom --

Q    First tell us what that is.

A    This is the lower portion of Frankie Longoria's chest area.

Q    And we're going to focus on the bottom.  Do you see something that is relevant?

A    Yeah, just above the naval --

Q    Hold on, let her blow it up first.  We're going to focus in on the bottom part.  Do you see something that is relevant?

A    Yeah, I do.  The tattoo that says San Anto and the dice.

Q    Pause right there.  What does the term San Anto mean?

A    It's he's from San Antonio.

Q    And why is it not San Antonio?

A    It's just that's the normal nomenclature the Mafia uses when they talk about where they're from, San Anto, that's

the --

Q    Okay, the jury might not understand it.

A    Yeah, I'm sorry.  This is what you'll see often in a tattoo.  The most important thing on this tattoo are the dice in the middle, though, because if you'll count the dots on the dice, you'll notice that there are 13 dots on the dice.

Q    And 13?

A    Representing again the 13th letter of the alphabet being an M.  So 13 is a common tattoo that has Mafia significance.

Q    Agent Carlisle --

        MR. CONTRERAS:  May I bring him this laser, Judge?

        THE COURT:  Yes, of course.

Q    Feel free to use this laser if you think it's helpful.

A    Sure.

Q    Okay.  Now let's look at Government's Exhibit No. 9.

A    This is Trinidad Gomez, a/k/a Trini Boy or Boy. Gomez, he's a Mexican Mafia member from here in San Antonio.

Q    Did he have rank?

A    He did.  He was a sergeant I believe.

Q    Let's look at Page 2 of Government's Exhibit No. 9, and just generally what is this?

A    This is, this is Trinidad Gomez' upper chest area, right about the sternum.

Q    Okay.  Any relevance to this tattoo?

A    This is a classic -- we talked about yesterday the stampa,

or the Mexican Mafia tattoo. This is a very, very good example of that stampa.

Q   You're using the stampa, please refresh our memory. What do you mean by stampa?

A   That is "the" tattoo of the Mexican Mafia. It will look like this almost every time. You'll see variations on the theme.

Q   Okay, pause there.

MR. CONTRERAS:  Please show Page 2 of Government's Exhibit No. 1. Go to Government's Exhibit No. 1, please? And go to the second page of that. Focus in on the tattoo on the upper chest.

Q   Do you see that?

A   Yes, it's very similar, another version of the stampa.

Q   Okay.

MR. CONTRERAS:  Now go back to Government's Exhibit No. 9, Page 2.

Q   Okay. On the top of that what is the word written?

A   Mexikanemi.

Q   And spelled with a K?

A   With a K.

Q   Okay. And right above the shield, the upper part of the shield what do we see? Would you use the laser also so you could tell us what you're talking about?

A   Sure. Okay, here you see the word Mexikanemi. Then you

see the shield here.  This is a two-headed snake and what it represents is that there's only a way in, that there's no way out.  And that's a code of the this organization: there is no way -- once you're a member, you're a member for life.

Q    The snake has no end?

A    The snake has no end.

Q    Only a beginning?

A    Exactly.

Q    Is there a Spanish term that the membership uses to describe that?

A    I've already described it, it's the lufa.

Q    Lufa, l-u-f-a?

A    L-u-f-a, yeah.

Q    Okay, and below the snake what do we see?

A    You'll see the Aztec or Mayan kind of symbolism here.  You'll see the -- a lot of times you'll see the temple here and the sun rising over the mountains.  This is the eagle.  It's a little hard to make out but it's the eagle with the snake in its mouth on the cactus, and that's taken from the flag of Mexico.  And then behind you'll see this often, are the crossed daggers behind the shield.

Q    Agent, will you pause there?

        MR. CONTRERAS:  Go to Exhibit No. 3 -- go to Page 3 of Exhibit No. 2.

Q    What do we see there?

A    It's the eagle again with a snake in its mouth sitting on a cactus.

MR. CONTRERAS:  Now return to Page 2 of Government's Exhibit  No. 9.

Q   And what else do you see?

A    Again, you see the same symbolism there with the eagle with the snake in its mouth on the cactus.

MR. CONTRERAS:  Let's go to Page 3 of Government's Exhibit No. 9.

Q   Do you see anything there that attracts your attention?

A    If you'll notice this female in the headband?  You'll see e-m-e again, eme, which is the letter M for Mexican Mafia.

MR. CONTRERAS:  And now go to the third page of Government's Exhibit No. 9.

MS. McCOWSKY:  Fourth page?

MR. CONTRERAS:  Is it four?  Fourth page.

A    This is under the ear of the same individual, Trinidad Gomez.  It's another version of exactly what you saw on his chest, just a smaller version.  You'll notice the Mexikanemi here, the crossed daggers.  Harder to see, but the two-headed snake, the shield, the eagle and the snake sitting on the cactus.

Q   Okay.  Let's look at Government's Exhibit No. 10, Agent Carlisle.  Do you recognize this person?  Who is it?

A    I do.  This is Jesse Ramirez, a/k/a Chuy.  He was a

ranking member of the Texas Mexican Mafia here in San Antonio.

Q    Highest rank?

A    Yes.

Q    Highest rank he achieved?

A    He was assistant general.

MR. CONTRERAS:  Let's look at Page 2 of Government's Exhibit No. 10.

Q    Is there anything about that tattoo that stands out?

A    There is.  This is a little different variation on theme, but if you'll notice right --

Q    Okay, pause there, let her blow that up.

A    Right here in the middle of his arm.

Q    She's going to blow that up.

A    It's Minnie Mouse holding a pistol -- actually, holding a revolver.  Minnie Mouse, two M's, Mexikanemi.

MR. CONTRERAS:  Go to Page 3 of Government's Exhibit No. 10.

Q    What are we looking at here?

A    You're looking at the chest and stomach area of Jesse Ramirez.

Q    The assistant general?

A    Assistant general.  And if you'll notice here, the same Mexikano with a K, and the same stampa that I explained before.

MR. CONTRERAS:  Let's look at Page 4 of Government's

Exhibit No. 10.

Q   Do you see anything that she should zoom in on?

A   If you'll look almost right in the middle of his arm.  And sometimes they're a little hard to see but again you'll notice the number 13 on the headband of the female depicted here.  Again, the significance of the 13 being the letter M.

Q   Agent Carlisle, in the course of your investigation have you seen the practice of burying or hiding Mafia tattoos in other larger tattoos?

A   Yes.

Q   Why is that done?

A   At one point it -- when an inmate goes to jail or goes to prison, they're classified as a Mafia member and many times that means that they're treated different.  They can be put in solitary confinement, lock down, segregation, things like that, and some members try to hide the tattoos so that it's harder to classify them as a gang member.

        MR. CONTRERAS:  Let's go to Government's Exhibit No. 12.

Q   Who is this person?

A   Jimmy Mendoza, known as Capone.  He is a known ranking member here in San Antonio.

        MR. CONTRERAS:  Let's look at the second page of Government's Exhibit No. 12.

Q   Now, Agent Carlisle, look carefully.  Do you see

something -- point to something that maybe Ms. McCowsky should blow up.

A    Okay, if you'll look at the Indian here?  If you'll please blow up the headdress right around his ear?

Q    What do we see?

A    Included in the headdress is the letter M.  It's not very -- unless you know what you're looking, it's not very easy to see, but that's the letter M.  And if you'll back back out, this is also a little difficult to see.  This is an eagle's head here.  This is the snake here on the cactus. The same nomenclature from the -- I mean the same symbolism you see from the flag.  And then the talon here is oftentimes in the shape of an M.

         MR. CONTRERAS:  Ms. McCowsky, please show us Government's Exhibit 14?

Q    Who is this, Agent Carlisle?

A    This is Vidal Longoria, a/k/a Corky.  He was a ranking member here in San Antonio.

         MR. CONTRERAS:  Go to the second page of Exhibit 14.

A    Again, here is -- if Ms. McCowsky can zoom in on the middle of his arm, but you can see the female here with the headdress again and the number 13.

Q    And Page 3 of Government's Exhibit No. 14?

A    The eagle with the snake in its mouth on the cactus again.

         MR. CONTRERAS:  Go to Government's Exhibit 17,

please?

Q   Tell us who we're looking at?

A   This is Jesse Ozuna, a/k/a Low.  He was a ranking member here in San Antonio.

Q   What rank?

A   Lieutenant of lieutenants.

MR. CONTRERAS:  Go to Page 2 of Government's Exhibit 17.

A   I realize it's kind of a busy picture.  If you'll look up at the top, Ms. McCowsky, right at his neck line?  Yeah. You'll see a very elaborate M depicted there.

Q   And what sort of imagery surrounds or is that M made up of?

A   It's the same Aztec imagery that see quite often with an eagle's head there in the middle forming the middle point of the M.

Q   Let's go to Government's Exhibit 25, please.  Who is this?

A   This is Frank Velasquez, a/k/a Frosty.  He was a lieutenant here in San Antonio.

MR. CONTRERAS:  And Page 2 of Exhibit 25.  Blow that up, Ms. McCowsky.

A   Roman Numeral for the number 13, representative of the letter M.

Q   And Page 3 of Government's Exhibit 25?

A   That's the other hand, same tattoo, same symbolism.

MR. CONTRERAS: Now let's go to Government's Exhibit 27.

A    Rudy Garza, a/k/a Bugsy.  He was a lieutenant here in San Antonio.

MR. CONTRERAS: Now let's go to Page 2 of 27.

Q    Point to the area that you think Ms. McCowsky should blow up.

A    Again, a little difficult to see but if you'll -- the inside of his arm here closest to his stomach.  This is the -- you can only read half of it, but this is the -- this is the upper part of an E-m-e, again for Eme.

Q    And Government's Exhibit 28?

A    Michael Badillo, a/k/a V.L.  He was a sergeant here in San Antonio.

Q    Page 2 of that exhibit?

A    If you'll look at the bottom here, there's actually two words.  If you'll notice there's Mexicano here spelled with a C; San Anto here, but underneath that -- if you would, Ms. McCowsky, right there -- it's again the word Mexikanemi spelled with a K.

MR. CONTRERAS: Go to Government's Exhibit 32, please?

Q    Who is this?

A    This is Jesse Rodriguez, a/k/a Chuy.  He was a lieutenant that actually ran Pearsall, Texas.

Q   Can you explain that?  That's outside of San Antonio, how would that operation have worked?

A    It is the smaller towns will have their own rank structure.  They don't report directly to a lieutenant in San Antonio.  I mentioned yesterday that San Antonio is divided into four corners.  Each of those corners will have a lieutenant, but you'll have -- you can have Floresville, Pearsall, Hondo, Seguin, San Marcos, Austin, they'll all have their own rank structure.  And smaller towns usually will have an lieutenant that runs that town.  Larger towns can actually have a captain that will run that town.

Q   Okay, so Mr. Rodriguez here ran what town?

A   He ran Pearsall.

Q   Okay, let's look at Page 2 of Exhibit 32.

A   This is Chuy's stomach area obviously, and you'll notice this is a little different variation on the stampa that we talked about earlier.  If you can just zoom in on his stomach, just on that large tattoo there in the middle.  It's single dagger and -- if you can back out, Ms. McCowsky, please?

Q   What is on the hilt of that sword?

A   Yeah, it wasn't -- the hilt here shows an M.  Obviously for Mafia.  You've got the eagle with the snake on the cactus.  And if you can back out, please?  In this particular version the two-headed snake is blow the stampa here.  But the same meaning, same symbolism.

Q    You had talked earlier about the founder of the Texas Mexican Mafia, do you recall that?

A    I do.

Q    What's his name?

A    Herb Huerta.

        MR. CONTRERAS:  Can you show us Exhibit 35?

Q    Who is this?

A    That's Herb Huerta.

Q    And what are his other names he is known by?

A    Chipato Muelas.

Q    And you talked about the second in command and founding member.

A    Oh, yes, Benito Alonzo.

Q    Look at Government Exhibit 36, please?

A    You'll hear him called El Viejito or grandpa.

Q    Do you know what El Viejito means?

A    Yeah, old one.

Q    Okay.  Agent Carlisle, in the course of your investigation have you investigated homicides that you believe are related to the Texas Mexican Mafia?

A    I have.

Q    And are there a number of homicides that you have focused in on and that are going to be presented in this trial?

A    There are.

Q    And you're familiar with all the victims in this case?

A    I am.

Q    And have you obtained photographs of these people?

A    I have.

Q    Okay.

        MR. CONTRERAS:  May I approach, Your Honor?

Q    Agent Carlisle, look at Government's Exhibit V1 through 26.  Are you familiar with those pictures?

A    I am.

Q    In fact, did you produce those for us?

A    I did.

Q    And in a nutshell, what are Government's Exhibit 1 through 26A?

A    They are, they're pictures of the victims of the homicides that we have investigated.

Q    And these are all accurate pictures you've --

A    They are.

Q    You've made sure that these are accurate photographs of these persons?

A    I have.

        MR. CONTRERAS:  The Government offers Government's Exhibits V1 through V26A.

        THE COURT:  Any objections?

        MR. COLLINS:  No objections.

        MR. STENBERG:  No, Your Honor.

        THE COURT:  Mr. Price?

MR. PRICE:  No.

THE COURT:  Those are admitted.

MR. CONTRERAS:  Thank you, Your Honor.  Ms. McCowsky, can we begin with V1, please?

Q   Who is this person?

A   It's a photograph of Florencio Vasquez, known as Lencho.

Q   Let me switch up things for you before we go through those.  Have you also obtained copies of the autopsy reports of all of these victims?

A   I have.

MR. CONTRERAS:  May I approach one more time?

THE COURT:  Yes, of course.

Q   I'm going to show you Government's Exhibits -- and these are admitted already under stipulation.  Why don't we do this? You go through, read the exhibit number and the name of the autopsy, of the victim that it relates to?

A   Certainly.  This is Government's Exhibit RA100.  It is the autopsy report for Florencio Vasquez.

Q   Okay, the first one was -- the full name of the victim, please?

A   Florencio Vasquez.

MR. CONTRERAS:  Show us V1.

Q   Does Exhibit V1 on the screen here relate to the autopsy you hold in your hand?

A   It is.

Q    Okay.

A    That's a picture of Florencio Vasquez.

Q    What is the date of that autopsy?

A    September 17th of the year 2000.

Q    Okay.  And in investigating all these, Agent Carlisle, is that autopsy date roughly around, give or take a day or two, the date of death?

A    In this case it is.

Q    All right.  Let's look at the second autopsy you have there.  Read me that exhibit number?

A    It is Government's Exhibit RA200.

Q    And who does that autopsy relate to?

A    Anthony Blanco.

         MR. CONTRERAS:  Show me V2.

A    And that's a picture of Anthony Blanco.

Q    And what is the date of that autopsy?

A    This autopsy is dated November the 9th of 2000.

Q    And let me back up a little bit.  Going back to Valencio Vasquez, what was the manner of death?  You don't have to read it but just tell me.

A    He was shot.

Q    Shot to death?

A    Shot to death.

Q    Okay, and Tony Blanco?

A    Shot to death.

Q   Now let's look at the next autopsy you hold, and read me that exhibit number?

A   It's RA400.

Q   And that relates to who?

A   Michael Lewis Sanchez.

MR. CONTRERAS:  Show us V4, please?

Q   And V4 represents the person whose autopsy you're holding in your hands?

A   It does.  Autopsy report dated March 27th, 2001.

Q   And what was the manner of Michael Sanchez's death?

A   He was shot to death.

Q   The next autopsy?

A   It's Ruben Hernandez.

Q   Start by reading the exhibit number, please?

A   I'm sorry.  RA500.  Name is Ruben Hernandez, dated January 30th, 2002.

MR. CONTRERAS:  Show me V5, please?

Q   And does V5 represent that same victim?

A   It does.

Q   And what was his manner of death?

A   He was shot to death.

Q   Next autopsy?

A   It's RA700.  This is for Ernest Guzman.

Q   Date?

A   May the 15th, 2002.

MR. CONTRERAS:   Show me V7.

A    And that's a picture of Ernest Guzman.

Q    And what was he also known by on the streets?

A    Fatboy.

Q    And how did he die?

A    He was shot to death.

Q    Next autopsy?

A    Is RA800 for Jose Luis Moreno, dated October the 16th, 2003.

Q    Show me V8.   Is this that victim?

A    That is Jose Moreno, Arte.

Q    And how did he die?

A    He was shot to death.

Q    Now, before we go any further.   You had read that autopsy date?

A    I did.

Q    Is that a good indicator of when this person's death occurred?

A    It is not.

Q    Why is that?

A    His body was buried at the time of his death and then we recovered that body sometime after, and so this is more -- it relates to when his body was recovered not when he was killed.

Q    Got it.   And what was the condition of the body when it was recovered?

A    It was a partial body and it was skeletonized.

Q    Okay, so that speaks for itself.  The next autopsy?

A    Is Government's Exhibit 900 for Henry Cantu, dated December 11th, 2002.

Q    And show me V9.

A    And he's known as Wero.

Q    Did you do some investigation of Wero Cantu?

A    I did.

Q    Did he have any membership in any certain group?

A    He was.  He was a member of the Bandito Motorcycle Club.

Q    What is the Bandito Motorcycle Club?

A    It's another gang, motorcycle gang here.  I mean it's fairly well known here in south Texas.

Q    Well, not to everyone.

A    Sorry.

Q    Tell us what it is.

A    It is another -- it is a motorcycle gang.  They also deal in narcotics here in San Antonio and they have -- they are established enough that they have an agreement with the Mexican Mafia on how business will be done between the two gangs here.  It's a manifesto, if you will.  And they're allowed --

Q    Hold on.  They don't know what -- what is a manifesto?

A    These are highly organized groups and they will actually get together and form what can best be described as peace

treaties or rules of engagement, if you will, on how business is going to be conducted in an area.  The Mexican Mafia controls San Antonio.  This is their area.

Q   Let me walk you through this.  Does the Bandito Nation or Bandito Motorcycle Club have a presence in San Antonio?

A   They do.

Q   And what sort of reputation do the Banditos have?

A   They're a violent motorcycle gang.

Q   So we have two groups?

A   We have two violent groups.

Q   And to prevent their killing each other, is an accommodation reached?

A   It is.

Q   And you called it a treaty?

A   Yes.

Q   In a nutshell what does a treaty indicate?  How will they conduct their affairs without there being conflict?

A   Yes, it is more of an understanding of respect that the Banditos can come into San Antonio and they can -- personally they can sell drugs and they can conduct their business in San Antonio without having to pay the dime.  However, they can't then contract out or have other people sell drugs on their behalf.  So it allows them personally to conduct business but nobody else under their wing.

Q   And Mr. Cantu, you have his autopsy there?

A    I do.

Q    What happened to him?

A    He was shot to death.

Q    Okay.  And let's look at the next autopsy, sir?

A    It's Government's Exhibit RA1000.  The date and time of the autopsy, October the 28th, 2005, and it's for an Augustin Macias.

        MR. CONTRERAS:  Show us V10, Ms. McCowsky.

Q    And who is that?

A    That is Augustin Macias, who was known as Augie on the street.

Q    And how did he die?

A    He was shot to death.

Q    Now is his autopsy date -- what was that date again?

A    The date of the autopsy is October 28th, 2005.

Q    Is that representative of around the time of death?

A    No.

Q    And why is that?

A    Yeah, this was another individual, he was buried, body recovered, and then this date is more indicative of when his body was recovered.

Q    Okay.  Now show us the next autopsy.

A    Should be Government's Exhibit 1100, which is the autopsy report for Jaime Lopez, and it is dated July the 8th, 2005.

Q    And were you involved in the recovery of that body?

A    I was.

Q    And that date, I'm sorry, give it to me again?

A    July the 8th, 2005.

Q    Is that a good indicator of the time of death?

A    No.  Again, it's an indicator of when his body was recovered.

Q    How was his -- what condition was the -- how and what condition was his body recovered?

A    His skeletonized remains were -- we recovered them with our evidence recovery team.

Q    Okay.  Show me V11.  And who is this represented in V11?

A    That's Jaime Lopez, a/k/a Speedy.

Q    And how did Speedy Lopez die?

A    He was beaten with a hammer and then shot.

Q    And you were present when the body was recovered --

A    I was.

Q    -- and saw what was recovered?

A    I was.

Q    And was there damage to the body?

A    There was.  The body was complete, the skeleton was complete.  It was wrapped in a blanket.  The skull, the entire face section was basically missing, and then there were -- and then we recovered actual slugs from the skull.

Q    What is a slug?

A    Bullets, spent bullets.

Q    What's the next autopsy you have?

A    RA1200 for Raymond Rodriguez, dated September the 13th, 2003.

Q    Show us V12.  And who is depicted in V12?

A    That's Raymond Rodriguez who was known both as Mon and Nochipa.

Q    And what was the manner of death for Mr. Rodriguez?

A    He was shot to death.

Q    Next autopsy?

A    Is RA1100A.  It's dated February the 19th, 2004, and it's for Jesus Medina.  1300A.  Did I mis-speak?  I'm sorry if I did.  RA1300A.

Q    Okay, I'm sorry, it completely threw me off.  What is the number of that?

A    If I mis-spoke, I apologize.  It's Government's Exhibit RA1300A.

Q    Okay, and that relates to who?

A    Jesus Medina.

Q    Okay.  Show us V13.

A    Yeah, that's Jessie or Jesus Medina, a/k/a Psych.  And it was dated February the 19th, 2004.

Q    Okay, and is that a good representation of around when he died?

A    Yes.

Q    Okay, within a day or two?

A    Yes.

Q    And how did he die?

A    He was beaten and shot.

Q    Beaten what?

A    He was beaten and shot.  Shot to death.

Q    Okay.  And how was he beaten?

A    He was beaten severely.  I know he was hit with a brick at one point.

Q    Okay, let's leave it at that.  And shot as well?

A    And shot as well.

Q    The next autopsy?

A    Is RA1400.  It's dated March the 16th, 2004, and it is for a Robert Gleason.

        MR. CONTRERAS:  Ms. McCowsky, show me V14.

A    And that is Robert Gleason who was known as Beto on the street.

Q    And how was he killed, or how did he die?

A    He was shot to death.

Q    And Exhibit 1500?  You have that?

A    I do.  Government's Exhibit 1500 is an autopsy report for Roberto Fernandez dated August the 3rd, 2004.

Q    Show V15.

A    It is, that's a picture of Robert Fernandez who was known as "Robe."

Q    And how did he die?

A    He was shot, shot to death with a shotgun.

Q    Shotgun?

A    Shotgun.

Q    Just a quick lesson, some people may not be real familiar with firearms.  A shotgun as opposed to what?

A    There'll be -- a shotgun as opposed to either a pistol or a revolver.  A pistol being semiautomatic, revolver having a -- obviously, a revolver having a revolver cylinder, and then a shotgun being a longer long-barrel weapon.

Q    And does a shotgun discharge something different from a pistol?

A    It does.  A shotgun can either eject a single slug, you'll hear about that, usually about one ounce of lead, or buckshot or shot, which would be basically smaller pellets that come out and -- at the same time.

Q    Okay, so one big fat bullet?

A    Or a bunch of little bullets.

Q    Or a bunch of little bullets.  And could you determine what was fired at Robe Fernandez?

A    A bunch of little bullets.

Q    Buckshot?

A    Buckshot.

Q    Look at Exhibit 1600?

A    Government's Exhibit 1600 is the autopsy report Jesse Guevara dated August the 8th, 2004.

MR. CONTRERAS: V16, please?

A   And that is Jesse Guevara, who was known as Pelon.

Q   And what happened to Pelon Guevara?

A   Pelon was shot to death.

Q   Did you examine the pictures of his body?

A   I did.

Q   And were there any other telltale signs that were relevant?

A   There was.  He had ligature marks on his wrists as if he had been bound.

Q   Look at V17?

A   Government's Exhibit 1700 is the autopsy report for Mercy Brooks dated September the 19th, 2004.

Q   And how was he killed?

A   He was shot to death.

Q   V18?

A   Government's Exhibit 1800 is the autopsy report for Tony Rodriguez.  The date of the report is November the 3rd, 2004. That's a picture of Tony.

Q   Can you give us a little -- we're going to hear more, but I want you to give me a little backdrop.  This Tony Rodriguez, was he a significant member for certain reasons?

A   He was.  Tony is the brother of a former general, Carlos Rodriguez, Carlos Wero Rodriguez, who you will --

Q   Okay, let me walk you through this.  Carlos Wero Rodriguez

was a general of the Mafia?

A    Was the general of the Mexican Mafia.

Q    Roughly what years?

A    2000 --

Q    Just roughly.

A    Yeah, early 2000's up to 2003 -- 2002, excuse me.

Q    And at a certain point did Carlos Wero Rodriguez cease to be the general of the Mafia?

A    He did.

Q    And do you know why?

A    I do.  He was shot to death outside a methadone clinic here in the middle of San Antonio where the Mexican Mafia basically shot him with an assault rifle at lunchtime in the middle of San Antonio.

Q    And the brother of Wero Rodriguez is this person depicted in V18?

A    This is.  This is Wero Rodriguez' brother, Tony.

Q    How did Tony react to the death of his brother?

A    Tony wanted -- basically claimed and sought revenge for his brother's death.

Q    Got it.

        MR. CONTRERAS:  V19, please?

Q    Who is depicted in V19, Agent Carlisle?

A    Government's Exhibit 1900 is -- oh, I'm sorry.  It's Juan Perez, who is known as Green.

Q   And tell us the date of that -- what is that you have in your hands there?

A   The autopsy report for Juan Perez dated December the 6th, 2004.

Q   And at the time of his death did Mr. Green Perez have any sort of affiliation with a group?

A   He did.  He was a gang member in a local gang known as the LA Boys.  That's capital L, capital A Boys.  They're a local gang here in town.

Q   When you say a local gang, do you say that to distinguish it from something else?

A   Well, many of the gangs we've talked about so far, the Texas Mexican Mafia, the Banditos Motorcycle Club, have a much broader presence either throughout the state of Texas or national.  This is a gang that's indicative just to San Antonio.

Q   And you called them the LA Boys?

A   Yes.

Q   Okay.  And were the LA Boys affiliated in turn with another group?

A   They were.  They are affiliated with or considered a subset of the Texas Syndicate, another gang here in Texas.

Q   Okay, and in a nutshell can you describe what is the Texas Syndicate?

A   It is a rival enterprise, prison enterprise similar to the

Mexican Mafia but with different leadership, different rules.
But they are a rival gang to the Texas Mexican Mafia.

Q    If San Antonio is the stronghold of the Mafia, does the
Texas Syndicate have a stronghold?

A    They do, Houston.

Q    Okay.  And so are there Texas Syndicate members in San
Antonio?

A    Yes, there are.

Q    And what is the relationship between members of both
organizations?

A    It is, it is similar to what I described earlier with the
Banditos.  They have worked out a manifesto, if you will, a
peace treaty or an understanding how business will be
conducted between the two groups.  That's to keep there from
being constant strife between the two.  And that exists here
between the Texas Syndicate and the Texas Mexican Mafia.

Q    You called it a manifesto?

A    Yes.

Q    Does that manifesto cover the LA Boys since they're
affiliated with the Texas Syndicate?

A    The Mexican Mafia says no.

Q    And the Texas Syndicate say?

A    The Texas Syndicate says yes.  Which became a problem.

Q    For whom?

A    For Mr. Perez, because --

Q    What happened to Mr. Perez?

A    Mr. Perez was shot and killed in a nightclub here in San Antonio by a member of the Mexican Mafia.

Q    And was there any more tension between the Mafia and the LA Boys after that point that you're aware of?

A    There was not.

Q    Okay.  And Mr. Perez, did he have rank or anything?

A    Yeah, he was the leader of the LA Boys.

Q    Okay, look at V20, please?

A    Government's Exhibit 2000 is an autopsy report for Roy Vera dated December 22nd, 2004.

Q    And what happened to Mr. Vera?

A    He was shot and killed.

Q    While we have the picture here, can you look under the shirt, can you see any distinctive tattoos?

A    I can see the two M's on his shoulders.  If you'll --

Q    Can you point them out to the jury?

A    If you'll notice here and here.  And he was a known member of the Texas Mexican Mafia.

Q    And roughly when was he killed?

A    I'm sorry.

Q    And how?

A    December 22nd, 2004 is the date of the autopsy, and he was shot and killed.

Q    And are you aware of whether he associated with any of the

other members that come to mind?

A    I do.  He was a close associate of Tony Rodriguez that I mentioned earlier.

Q    V18?

A    Yes.

Q    Angry Tony Rodriguez?

A    Carlos' brother, yes.

Q    Okay.  Let's look at V21.

A    V21 is an autopsy report dated January the 5th, 2005 of a Rudy Contreras known as Scooby.

Q    And was he affiliated with any group?

A    He was.  He was a member of the Texas Mexican Mafia.

Q    And what happened to Scooby Contreras?

A    He was shot and killed.

Q    Roughly when?

A    January the 5th, 2005.

Q    Do you know why he was killed?

A    He was an ex-member of the Mexican Mafia.

Q    V22?

A    22 is an autopsy report --

Q    Your 2200.

A    I'm sorry.  Government's Exhibit 2200 is an autopsy report for a Joe Santos dated November the 28th, 2004.

Q    And V22 is that person?

A    That is a picture of Joe Santos.

Q    And what happened to Joe Santos?

A    He was shot and killed.  And actually he was shot and --
he was shot and killed in Austin, Texas.

Q    Austin, Texas?

A    Yes.

Q    And show V24, please?  And, Agent Carlisle, look at
Exhibit 2400?

A    Okay.  Government's Exhibit 2400 is the autopsy report for
Robert Sanchez dated April the 23rd, 2005.  And that's a
picture of Robert Sanchez.

Q    Was he affiliated with any group?

A    He was.  He was a prospect with the Texas Mexican Mafia.

Q    Back up a little bit.  What is a prospect?

A    A prospect is a member -- is someone who is trying to gain
membership to the Mafia.  He hasn't become a full-blown member
yet.  He is affiliated with the Mafia and working to become a
member.

Q    And he's called a prospect?

A    A prospecto or a prospect, yes.

Q    Prospecto, Spanish for prospect?

A    Yes.

Q    Okay.  And is there anybody who oversees him?

A    Yes.  I think I mentioned yesterday the word padrino or
sponsor.  That's somebody who is going to bring you into the
group and is responsible for your actions.

Q    As a matter of fact, refresh our memory on the Texas
Mexican Mafia constitution, there was some language about
that?

A    There was.  It's very specific about if your -- one of
your duties as a member is to recruit other members to
increase the strength of the gang.  Your role is if you bring
that person in, you're responsible both if they are a member
that works out and acts with honor and respect, I believe was
the term used.  You're also responsible if their actions are
disrespectful and you have to take care of that individual.

Q    What does that mean?

A    If they mess up, you're responsible for killing them.

Q    And Mr. Robert Sanchez, he was killed?

A    He was.

Q    How was he killed?

A    He was shot in the back of the head.

Q    And you said he was a prospecto or prospect.  Who was his
padrino or sponsor?

A    It was a gentleman by the name of Michael Hernandez was
his padrino.

Q    Do you know who killed Robert Sanchez?

A    I do.

Q    Who?

A    Michael Hernandez.

Q    And will the jury hear from Michael Hernandez?

A    They will.

          MR. CONTRERAS:    Show us Government's Exhibit V25.

A    That's a picture of Ernest Rodriguez known as Neto.

Q    And did he have any association of affiliation?

A    He was a member of the Texas Mexican Mafia.

Q    Okay.  And do you know of whether at some point he fell out of favor?

A    He did.

Q    Now you don't have an autopsy for him?

A    No, he's still alive.

Q    He's alive and well?

A    Yes.

Q    Okay.  But he did fall out of favor?

A    He did.  He was thought to be an informant.

Q    Thought to be an informant?

A    Yes.

Q    And why is that?

A    He was associated with another member.  They got involved in some other criminal activity outside the organization and it was thought that they were providing information about each other, they were informing on one another.

Q    So just telling on your co-defendant is considered a snitch?

A    Yes.

Q    Okay, we don't have his nickname up there -- oh, mine

doesn't, but it's Neto?

A    Neto, yeah.

Q    And was an attempt made on him?

A    It was.  An attempt was made in prison to kill him.

Q    For snitching on his co-defendant?

A    For snitching on his co-defendant, yes.

Q    And who was his co-defendant?

A    A gentleman by the name of Joe Tamayo, known as JT on the street.

Q    Joe Tamayo?

A    Yes.

Q    And do you know what his present condition is?

A    I do.  Joe was killed a couple of years ago here in San Antonio.

Q    Okay.  An attempt was made on Neto Rodriguez?

A    It was.

Q    While he was behind bars?

A    Yes.  In Three Rivers, in Three Rivers, Texas.

Q    What is Three Rivers?

A    A prison here in Texas.

Q    Okay.  And what did the attempt consist of?

A    It consisted of other members of the Texas Mexican Mafia stabbing -- or you've heard of shanking, stabbing, they're homemade knives, of trying to shank him and stab him to death.

Q    And were you able to get your hands on some recordings

from or to the prison that bear on this attempt?

A   I was.   Any call that's made, I think I explained this earlier, from a prison from an inmate outside is recorded. And we did pull recordings that were made on phone calls from Three Rivers to the free world involving the hit on Neto Rodriguez.

Q   You've heard -- listened to them and read the translations?

A   I have.

Q   And who authorized the attempt, the murder of Neto Rodriguez?

A   Jacinto Navajar.

Q   Do you see him in the courtroom?

A   Yes.

Q   Could you identify him, please?

A   The defendant, second from the left at the table.

Q   You've identified Jacinto Navajar, a/k/a?

A   Cache.

Q   Okay.  And the jury's going to hear that recording?

A   They will.

Q   Okay.  The autopsy numbers, we don't have to go through all of them, but they're RA and the number you have read out, right?

A   It is.

        MR. CONTRERAS:  Show us V26, please?

Q    Who is depicted in V26?

A    Gilbert Enriquez, a/k/a Solo.

Q    And did he have an affiliation?

A    He was a member of the Texas Mexican Mafia.

          MR. CONTRERAS:  Show us V26A.

Q    What is V26A?

A    That's a crime scene photo of Gilbert Enriquez, Solo.

Q    And what is his condition there?

A    He has been shot to death.  You can notice the tattoo there on his neck.

          MR. CONTRERAS:  Would you please blow that up, Ms. McCowsky.

A    For identification purposes it's -- yeah, you can see the word Solo.

          MR. CONTRERAS:  And please go back to V26.

A    And you can see the same tattoo.

          MR. CONTRERAS:  Blow up that neck shot, please?

Q    Solo.

A    Same tattoo.

Q    And what affiliation did he have?

A    A member of the Texas Mexican Mafia.

Q    Do you know why he was killed?

A    He fell out of favor with one of the higher-ranking members.

Q    Okay.  880.1.  These victims that we went through, Agent

Carlisle, you had said a couple of them -- at least a couple of them were actually buried?

A    Yes.

Q    And were you present when the bodies were recovered?

A    I was.

Q    And are you familiar with the location known on Trumbo Sands?

A    I am.

Q    What is Trumbo Sands?

A    It's a piece of property out in the outlying areas here in San Antonio.

Q    Is it in Bexar County?

A    It is.

Q    And do you recall which body was recovered there?

A    Arte Moreno.

Q    I'm sorry?

A    Arte Moreno.

        MR. CONTRERAS:  Can you show us his picture?  May I approach this witness, Your Honor?

        THE COURT:  Yes.

Q    Agent Carlisle, in the course of preparing were you asked to get some records relating to Trumbo Sands?

A    I was.

Q    And relating to the property where Arte Moreno's body was recovered?

A    I was.

Q    And look at RA0880.1  What is that?

A    This is Bexar County tax records for that piece of property.

Q    And give us the exact property address?

A    It is 23261 Trumbo Sands, San Antonio, Texas, 78264.

Q    Okay.  And that is the address from where Jose Moreno, depicted in V8, was dug up?

A    It is.

Q    Okay.

        MR. CONTRERAS:  Offer Government's Exhibit 0880.1.

        THE COURT:  Any objections?

        MR. PRICE:  No objection, Your Honor.

        MR. COLLINS:  No objections.

        MR. STENBERG:  No objection, Your Honor.

        THE COURT:  All right, it's in.

        MR. CONTRERAS:  Ms. McCowsky, can you show the jury a blowup, RA0880.1?

Q    Okay, in a nutshell, Agent Carlisle, what is it?  It's some property records?

A    Property tax records for the property where the body was recovered.

Q    Okay.  And there in yellow we've highlighted the top portion and that name.  What does that indicate, the relationship between that name and this property?

A    The owner.

Q    The owner.  And that is?

A    Tomas H. Carrasco.

Q    Okay.  And, again, go to Page --

            MR. CONTRERAS:  We also offer RA0880.2, which is just the second page of this.

            THE COURT:  All right.

            MR. CONTRERAS:  Can we go to Page 2?  Page 3?  Zoom in the top left.

Q    The bottom line, Agent Carlisle, who owned that property?

A    Tomas Carrasco.

Q    And do you know who that person is?

A    I do.

Q    Does he have a relationship to any of the faces we showed today and yesterday, Exhibits 1 through 41?

A    Yes, he's related to Ray Carrasco and you've seen a picture of Mr. Carrasco earlier.

Q    Let me pull up that picture of Ray Carrasco.  Who is Ray Carrasco?

A    He is a member of the Texas Mexican Mafia here San Antonio.

Q    And that property owned by his father is where Arte Moreno's body was recovered?

A    It was.

Q    Got it.  Agent Carlisle, are you familiar with what's been

marked as Government's Exhibit 2294?

A    I am.

Q    Okay.

        MR. CONTRERAS:  May I approach this witness, Your Honor?

        THE COURT:  Yes.

Q    I'll show to be safe.  Are you familiar with it?

A    I am.

Q    What is it?

A    It's North American Arms five-shot derringer.

Q    Okay.  And where did you get it?  Did you seize this?

A    I did.

Q    From who or where?

A    The arrest of Jimmy Mendoza.

Q    And Jimmy Mendoza, who is Jimmy Mendoza?

A    He was a ranking member of the Texas Mexican Mafia.

Q    Okay.  And you took this from him?

A    I did.

Q    Do you remember roughly when that was?

A    Depending on if it was before or after midnight, either December 29th or December 30th of 2004.

Q    What is the relevance of this gun, in a nutshell?

A    Yeah.  It was taken off of another Mexican Mafia member who had been killed.

Q    Who did this gun belong to before Jimmy Mendoza had it?

A    Joe Santos.

Q    Joe Santos, one of the victims?

A    One of the murder victims.

        MR. CONTRERAS:  We offer Government's Exhibit 2294.

        THE COURT:  All right.  No objections?

        MR. PRICE:  No objection, Your Honor.

        MR. COLLINS:  No objection.

        MR. STENBERG:  No objection.

        THE COURT:  All right, admitted.

Q    Could you hold it up and show the jury, please?

A    Sure.  It's just a very small five-shot revolver.  It's a .22 caliber.

        MR. CONTRERAS:  I don't know if I could hand it to the jury?

        THE COURT:  No, it's not necessary.

        MR. CONTRERAS:  Okay.

Q    Just to be sure, is this a real gun?

A    Yes.

Q    It's very small?

A    Yes.

Q    What is this gun typically known as?  What's it called?

A    What, a derringer?

Q    Derringer?

A    Yes.  Very small, just fits in your pocket; easy to conceal.

Q   Okay.  And what kind of caliber gun is it?

A   It's a .22.

Q   And it'll do the job?

A   It will.

Q   Agent Carlisle, are you familiar with Government's Exhibit 1294 -- well, a map we had you make?

A   I am.

Q   Okay.  Do you recognize it?

A   I do.

Q   And what's the significance of this map?

A   It's to orient -- it relates to a crime scene involving the murder of Raymond Rodriguez, Nochipa or Mon.

        MR. CONTRERAS:  We offer Government's Exhibit 1294.

        THE COURT:  All right.

        MR. PRICE:  No objection.

        MR. STENBERG:  No objection.

        MR. COLLINS:  No objection.

        THE COURT:  All right, we're going to take a brief recess.

    **(Recess; resuming - Jury in.)**

        THE COURT:  Okay, we can begin.

        MR. CONTRERAS:  May I continue, Your Honor?

Q   Agent Carlisle, I think that RA1294 was admitted?

A   It was.

Q   Okay.

MR. CONTRERAS:  Ms. McCowsky, could you show 1294, please?

A    This will relate to the crime scene where Raymond Nochipa Rodriguez was killed.  This is A&M Body Shop, which you'll hear testimony about.  It's at the corner of Lombrano and Zarzamora.

Q    And you said the name Raymond Nochipa.  That's V12?

A    It is.

Q    And on RA1294 there's a little -- you called it A&M Body Shop?

A    A&M Body Shop, yes.

Q    Who was connected to that body shop, if anyone?

A    A Mexican Mafia member by the name of Alfredo Martinez.

Q    Alfredo Martinez?

A    Yes.

Q    And what was his connection to that body shop?

A    He owned it, it was his shop.

Q    Okay.  And one homicide at that shop as well?

A    Yes, there was a homicide at that shop.

Q    Nochipa?

A    Nochipa's.

Q    Okay, Agent Carlisle, are you familiar with another map that we've marked RA1190.15 that we asked you to produce for us?

A    I am.

Q   And what's the relevance of that?

A   It is the location where the body of Jaime Speedy Lopez was recovered.

MR. CONTRERAS:  We offer RA1190.15.

MR. PRICE:  No objection.

MR. COLLINS:  No objection.

MR. STENBERG:  No objection.

THE COURT:  All right, it's in.

MR. CONTRERAS:  Ms. McCowsky, please show RA1190.15

A   This is, this is Gillette Avenue on the south side of San Antonio and Rockwell.

Q   Hold on.  When you look at RA1190.15, there's a street going from left to right.  What is the name of that street?

A   This is Gillette.

Q   In the middle of the picture?

A   In the middle of the picture.

Q   Okay.

A   Going up and down is Rockwell.

Q   On the left side of the picture, the street that goes up and down, what's the name of it?

A   Rockwell.

Q   Okay.  Are there any residences depicted in that exhibit that are of any interest?

A   There are.  This home here is where one of the girlfriends of the assistant general of the Mafia, Jesse Ramirez, lived.

Q   Okay.  We need to indicate where on the exhibit you're talking about.

A   I'm sorry, I'm sorry.

Q   Let me walk you through it.

A   I'm using the laser pointer.

Q   Let me walk you through it.  There is an intersection on the left side of the picture?

A   Correct.

Q   Right.  And the street running up and down you said was?

A   Rockwell.

Q   And right at the left is Gillette?

A   Is Gillette.

Q   If we go right from that intersection on the exhibit, there's one, two, and a third, or perhaps second lot, is that right?

A   Correct.

Q   And there is a dark something square there.  What is that?

A   That's the house.

Q   Okay.  And then the green in front of it is a lot?

A   Yes.

Q   Okay, and if continue to go to the right, is there anything else there?

A   There is a vacant lot here to the right.

Q   Okay.  And was there a body recovered from this area?

A   There was.

Q    Where?

A    If you'll notice here to the right, or towards the middle, these are railroad tracks here.

Q    So in the middle of the exhibit, running up and down in the middle of the photograph there's a line.  Those are railroad tracks?

A    Those are railroad tracks.

Q    Not a street?

A    That's correct.

Q    Okay, so if we go down on the railroad tracks, that is Gillette?

A    Yes.  If you come down past Gillette, go down the railroad tracks and then turn in, the body was recovered right here by a tree.

Q    Is there something on that exhibit that marks the place?

A    There is.  We've added a small red arrow just to indicate where the body was recovered.

Q    And which body was that?

A    Jaime Speedy Lopez.

Q    Okay.  And the residence you were indicating before, where is it?  That was of interest?

A    Right there.

Q    Whose residence is that?

A    That's a girl named Lisa.  She was a girlfriend of Jesse Ramirez.

Q    And Jesse Ramirez, did he also live at that location on Gillette?

A    He did.

Q    Okay.  And we're showing Exhibit No. 10.  That is Jesse Ramirez you were describing who lived on Gillette?

A    It is.

Q    Okay, and what was his association?

A    He was one of the highest ranking members of the Texas Mexican Mafia at the time.

Q    Okay.  That burial site and the home of Jesse Ramirez, roughly, if you walked it from his house to that burial site, what sort of distance are we talking about?

A    Fifty or 60 yards, maybe.  Not far at all.

Q    A couple of houses over?

A    Couple of houses over, a couple of lots over.

Q    Okay.

          MR. CONTRERAS:  May I approach the witness, Your Honor?

          THE COURT:  Yes.

Q    Agent Carlisle, I want to show you what's been marked as 2230.1 and ask you if you recognize it?

A    I do.

Q    What is -- what is that number?

A    2230.1.  It's a copy of a business card that was in the possession of Joe Santos when he was killed.

Q    Okay.

        MR. CONTRERAS:  We offer Government's Exhibit 2230.1.

        MR. PRICE:  No objection.

        MR. STENBERG:  No objection.

        MR. COLLINS:  No objection, Your Honor.

        THE COURT:  All right, it's in.

        MR. CONTRERAS:  Okay, Ms. McCowsky, would you show us RA2230.1?

Q    Now, Agent Carlisle, you said this was recovered from the body of Joe Santos?

A    Yes, it was.

Q    Okay, and that was one of the bodies that you said -- persons that was killed where?

A    In Austin, Texas.

Q    Okay.  And we are displaying it now.  Three names from the bottom, what do we see there?

A    The name Bam.

Q    And what else?

A    The phone number beside the name, 913-8322.

Q    And to be clear, this was taken from the body -- this piece of paper was taken from the body of V22, the body of Joe Santos?

A    It was.

Q    And "Bam, 913-8322," does that mean anything?

A    It's the phone number related to Bam.

Q    Well, who's Bam?

A    Bam Bam.  It's the street name for Jose Martinez.

Q    Okay.  You're talking about the defendant.  Could you point to who in the court you're talking about?

A    I am.  Mr. Martinez is sitting second end on the table facing the jury.

Q    Now, Agent Carlisle, Bam, couldn't that relate to another Bam, somebody else who goes by that name?

A    Not in this case.  There are other people that are referred to as Bam, but we have had -- this phone number has come up multiple times in this investigation.

Q    Okay, hold on.  You're saying that phone number -- that's a phone number listed to the word Bam?

A    Yes.

Q    And what about it have you discovered?

A    It is a phone number that has been intercepted in a Title 3, excuse me, a wiretap related to Mr. Martinez.

Q    Okay, that's very vague.  What do you mean?

A    It's his phone number.

Q    How do you know?

A    We have subscriber records from a wiretap that relate it to Mr. Martinez.

Q    Did you intercept a phone call where Mr. Bam Martinez was talking --

A    Yes.

Q    -- that used that phone number?

A    We did.

Q    Okay.

A    Sorry.

Q    And have you seen that name, Bam, and that phone number in other lists you've recovered?

A    I have.

Q    Do you know of any other person named Bam from 2000 to the present active in the Texas Mexican Mafia?

A    From 2000 to the present?

Q    Yes.

A    Yes.

Q    Okay, there's another one.

A    There is.

Q    Who is the other Bam?

A    A gentleman by the name of Victor Berlanga.

Q    And where is he?

A    We recovered his body in 2003.

Q    So safe to say that that was not Victor Berlanga's number or name?

A    That's correct.

Q    Okay.  Agent, in the course of this investigation have there been certain terms, unique terms, maybe not in English, perhaps Spanish or a variation of Spanish, that have come up often, frequently in the course of your investigation?

A    There has.

Q    And that do not have common meanings, they have very particularized meanings?

A    That is correct.

Q    Okay, give me an example.

A    You'll get terms that are used that are specific to this particular gang and it'll involve their activity.  For example, the leadership of the Mafia, if you're only talking about the general, the captains, lieutenants, things of that nature, will be called the mesa or the table.  That's the people that run this organization.

Q    So an equivalent English word, leadership?

A    Leadership, exactly.

Q    Okay, and that's mesa.

A    That's the mesa, absolutely.  You'll hear the word canton used.  And basically that means the house or the gang.  So if you hear money is taken for the canton, it's taken for the gang itself.  You will hear the word, we've talked about padrino being sponsor, prospecto being prospect.  You will hear the word junto.  Junto is a meeting and it can have different meanings --

Q    Let me stop you.  Junto is j-u-n-t-o?

A    J-u-n-t-o.

Q    Okay, junto.

A    Junto.

Q    And what does junto mean?

A    In the gang it means a meeting, a gathering, and it can be of the leadership. You can have a junto of the mesa, if you will, to put two terms together. You can also have it of a corner where all the soldiers from that side are called by the lieutenant. But it's a gathering of some membership of the gang.

Q    These juntos, have you through your investigation, investigation of fellow agents, done a lot of investigation on how these things take place?

A    We have.

Q    Is it easy to catch a junto in progress?

A    It is not.

Q    Why not?

A    They will go to great lengths to -- not only to hide from us but to hide from the membership where these are going to be. And we've seen examples where members will be called and told there's going to be a junto and they are to meet at a certain place and it'll be -- I mean it can be anything from an HEB parking lot to a park or whatever, and they'll show up there. And they will not know where the junto is going to be. And they are taken from there, then they're told, "Follow us." And then they're taken to a spot where the junto will actually occur. And when they get there, upon trying to enter the junto, they will have their cell phone taken away, their car

keys taken away, and many times they're actually strip searched to make sure they're not wearing any kind of a recording device. And they're brought in at that point and then the junto begins.

Q   Okay. And so have you ever had a -- were you able to get an agent, an undercover agent or anything to actually attend a junto?

A   No.

Q   Unheard of?

A   It would be impossible.

Q   Never happen?

A   Never happen.

Q   Let me show you RAX47. Are you familiar with that?

A   I am.

Q   Let's move on to something else. Getting back to the -- have you heard of the word cameo?

A   I have.

Q   How would you spell it?

A   C-a-m-e-o, cameo.

Q   Cameo. Do you know what that word means?

A   It means your -- it actually translated means your work or a job is the literal translation. Within the gang it has a different meaning. It usually means, a cameo is an assignment that you've been given and that you are to complete.

Q   Okay, and how does that word relate to the Texas Mexican

Mafia?

A   You're given a cameo or an assignment, and it can have different meanings, but normally it means --

Q   Who's given a cameo?

A   It can be different people.  I mean it can be -- one member is given a job by the leadership to carry out.  It can be -- and normally it's a crime of, it's a crime of violence.  Normally it's either an assault or a murder.  That's what it relates to.

Q   And let me ask you this.  As a general matter, do you know what the requirements are to join the Texas Mexican Mafia?

A   Certainly.  You're recruited.  You're recruited in by a padrino.  You come into the gang as a prospect.

Q   Generally, where does recruitment occur?

A   Normally recruits occur in prison.  Can occur in the free world as well but normally in prison.

Q   And typically what sort of persons would be recruited?

A   Usually someone who's in prison who is thought to be, you know, someone who could further the gang's criminal activity either through selling drugs, muscle, things of that nature.

Q   Okay.  And what is the threshold requirement?

A   The requirement is, like I say, you have to be, you have to be sought out.  You have to be brought in.  Then you become a prospect.  The prospects then -- the prospects carry out whatever orders they're given.  They aren't full members.

They cannot be -- they're not allowed to be privy to a lot of the Mafia business. They're basically there to follow orders. They're told what to do. They are to report. Like a normal member they report to their padrino or they report to a sponsor, or sometimes to a sergeant. And they're there to -- you've heard about the dime collection, for example. They're not going to go on the first meeting normally to a house, that's normally -- but if the second meeting comes where they need people kick the doors and go in, a prospect can do that at the behest of someone else in the gang.

Q   Let's get back to the juntos. You were talking about the very covert nature of them?

A   Yes.

Q   And when these meetings are held does the membership take any other measures to insure that they're not being watched, or even in the vicinity, that there's no law enforcement anywhere near there?

A   They do. They will actually employ lookouts actually that will drive the area looking for, looking for surveillance, looking for either marked units or unmarked units. Closer in we have recovered bug detectors actually, like you get at a spy shop, where they're actually looking for concealed recording equipment.

Q   Okay, so let me -- so you can't send an informant wearing some recording device?

A    No.

Q    Okay, because they'll either be stripped down or --

A    Or it'll be discovered electronically.

Q    Okay.  You as an agent, Agent Carlisle, can't go park out in front?

A    No, because they'll see that and call off.  They'll peel off and stop the meeting.

Q    As a matter of fact, if anybody they don't know drives up and parks in front will the meeting continue?

A    No, it'll stop.

Q    Okay.  And would you call it counter-surveillance?

A    Yes.

Q    These members are on foot or in cars?

A    They can be both; normally in cars.

Q    So you don't even get close enough to take a picture or video?

A    It's very, very difficult.

Q    Let me show you Government's Exhibit RAX47.  Are you familiar with this?

A    I am.

Q    Is this about as close as you've ever come to filming a junto?

A    It is the only time I know of that we filmed a junto, yes.

Q    This is a Mexican Mafia junto filmed from --

A    It is, from Eagle 1, the SAPD helicopter.

MR. CONTRERAS:  Offer Government's Exhibit RAX47.

THE COURT:  All right, it's in.

Q   Okay.  And Eagle 1, what's the closest Eagle 1 could get to this meeting?

A   Well, not very close because it had to fly high because it was going to -- obviously it's very loud and you can hear it, so we had to get very, very high to get close enough to be able to get any pictures at all.

Q   So before we show a little blurb of this, were you agents able to determine at least some of the people who are depicted in this RAX47?

A   Yes.  We knew that Mr. Navajar was leading the meeting. It was a meeting of the leadership, but it was as close as we could -- this was as close as we could get.

MR. CONTRERAS:  Show RAX47.

**(Videotape playing.)**

A   What you're seeing is a house on San Fernando Street here in San Antonio.  The meeting is taking place in the backyard. You can see a couple of individuals now.  Obviously you can't see their faces but --

Q   Let me ask you this.  Why would the meeting be held in a backyard?  Very quickly.

A   They'll try to get a way where there is no possibility of a microphone being around.  And it's easy to conceal in a house, impossible to conceal in a backyard.

Q   And this house on San Fernando, which house should we focus on?

A   The white house there in the middle of the frame.

Q   There's a laser there in front of you.

A   Sorry.  This white house here, this little --

Q   And who does that house belong to?

A   Ralph Mousy Abrego.

Q   And does he have any affiliation to anything, anybody?

A   He is a member of the Texas Mexican Mafia.

Q   Would he have any particular position at the time this video was made?  And when was this video made?

A   This was made in February of 2006.  Yes, he was at the time what we refer to as a cable man or the person who's responsible for communications between the Mexican Mafia in the prison system and the Mexican Mafia in the free world.  As Eagle 1 moves around, you're going to start being able to see a group of individuals and if I can direct you to right behind this little white frame house.  And you'll start seeing movement and start -- it becomes clearer.  But, again, Eagle 1 is -- just by the nature of being a helicopter is very loud and so he had to be at a very high altitude to try to get these photographs.

Q   And is that about the most we're going to see?

A   That is.  That's what you're going to see.

Q   You're not going to be able to recognize anyone?

A    No.

Q    But can you see people there?

A    Now you can.  You can start to see this group of individuals here, and you'll see some movement, just normal.

Q    So, Agent, what we're seeing right now is the junto?

A    Yes.

        MR. CONTRERAS:  That's enough.

**(Videotape stopped.)**

Q    And, again, you said one of the persons that was -- the person conducting that junto was?

A    Mr. Navajar.

Q    What rank did he have at that time?

A    General.

Q    The top man?

A    The top man.

Q    Okay.

        MR. CONTRERAS:  May I approach the witness, Your Honor?

        THE COURT:  Yes.

Q    I'm going to show you RAX46A and B.  Do you recognize these photographs?

A    I do.

Q    And who are they pictures of?

A    They're pictures of Jacinto Navajar, Cache; Billy Silva --

Q    Okay, let's just -- Navajar and other Mafia members?

A    And other Mafia members.

Q    And do you know where the photograph was taken?

A    At a bar.

Q    As best you can tell?

A    Yes.  It appears to be from a bar known as Good Times.

Q    And does that bar have a connection to any association that you're aware of?

A    Yes, it's a known Mexican Mafia bar.

Q    Who owns that bar?

A    The Mexican Mafia.

MR. CONTRERAS:  Offer Government's Exhibit RAX46A and 46B.

MR. PRICE:  No objection.

MR. STENBERG:  No objection by Mike Garcia.

MR. COLLINS:  No objection, Your Honor.

THE COURT:  All right, it's in.

MR. CONTRERAS:  Ms. McCowsky, can you show first Government's Exhibit RAX46A?

Q    And, Agent Carlisle, using your laser tell us what we're looking at in RAX46A?

A    These are five, five males, obviously.  In the middle is Jacinto Navajar, Cache.  To his left is an individual who is also a member of the Texas Mexican Mafia, Roger Cano.  To his left is another individual whose picture you've seen before, Billy Silva.

Q    He was one of the group of 1 through 41?

A    He was.

Q    Okay.  And beside him you said was Roger Cano?

A    This is Mr. Cano here just beside Mr. Navajar.

Q    What is the highest rank Mr. Cano held in the Texas Mexican Mafia?

A    He was general.  He became general after Mr. Navajar was arrested.

Q    Was charged in this case?

A    Yes, was charged in this case.  Yes.

Q    And just a little side note here.  If a Mexican Mafia member has rank, even high rank, if he's arrested, what happens to that rank?

A    His rank is -- he loses his rank immediately.

Q    Even a general?

A    Even a general.  Somebody else takes over in the free world.

Q    Okay, and let's look at RAX46B?

A    It's the same three individuals.  Mr. Navajar here in the middle, Mr. Cano to my right, and Mr. Silva to my left.

Q    And you said that was the Good Times?

A    Good Times Bar.

Q    Where is that bar?

A    On the south side of -- on Somerset Road in San Antonio.

          MR. CONTRERAS:  May I approach the witness, Your

Honor?

THE COURT:  Yes.

Q   Do you recognize this RA2751 exhibit?

A   I do.

Q   What is it?

A   It's a ballistics report prepared by the FBI laboratory.

Q   And tell us the process, just briefly, the process that went in the production of this FBI firearms report?

A   The homicides which this case focused, we gathered all the ballistics evidence and we sent it to the FBI lab for testing all at the same time by the same, by the same firearms examiner.

Q   And he examined it and this is the report?

A   Exactly.

Q   And later, we will get into the contents of it later when it's more understandable?

A   Yes, sir.

MR. CONTRERAS:  Pass the witness.

MR. PRICE:  Your Honor, if it please the Court, opposing counsel.

**CROSS-EXAMINATION**

**BY MR. PRICE:**

Q   Agent Carlisle, you know I represent Mr. Navajar, right?

A   I do.

Q   Okay.  You're familiar with Mr. Navajar's arrest record,

is that correct?

A    I am.

Q    And in fact you provided that to me, is that correct?

A    I did.

Q    Mr. Navajar was in prison from '71 through '79?

A    He was.

Q    Okay.  What was he in prison for?

A    I'm not sure without looking at the record.  I believe it was a drug offense at the beginning.  I know he had drug offense and theft, I'm not sure which one that was.

Q    Right.  And then '81-'83, he was in prison as well?

A    Like I say, I remember him being in prison at various times, yes.

Q    And then '89-2001?

A    I think that's correct.

Q    And then probably January 2001 through October 2005?

A    I believe he would have been out before October 2005.

Q    Somewhere around there, though?

A    I believe it would have been -- it might have been October 2004.

Q    Okay.  My client ever been arrested for a violent offense?

A    I don't believe so.

Q    Murder?

A    I believe, I believe his record was all drug offenses and thefts and burglary, but I'd have to see his criminal record

to tell you exactly.

Q   But based on your recollection that's what --

A   Yeah, just my recollection, no.

Q   Okay.  And in regards to that meeting in 2006, how do you know that was conducted by Mr. Navajar?

A   I received a phone call from one of my task force officers saying that a meeting was going on, that the leadership was coming in and that Cache would be there.  And so we got, we got a helicopter up and, sure enough, a meeting was going on.

Q   You mentioned earlier and on more than one occasion that when someone's arrested that they lose their rank.  Is that correct every time?

A   Yes.

Q   So in these prison times, my client, he had no rank?

A   And I should verify.  When you're in the free world and you have rank and you go into the prison system, your free-world rank is gone.  There will also be ranking members inside of the prison system as well, and it could be a local jail, it can be a lock-up.  So here in San Antonio, for example, there will be a Mexican Mafia member that runs Geo, which is the federal holding facility for prisoners.  You'll also have a member that runs Bexar County Jail, the local lock-up, and they'll be responsible for the membership in those facilities and communication with the outside world.

Q   Okay, but your authority is limited to where you're

physically at?

A    Yes.

Q    Okay.

A    And when you say authority, you'll be responsible for that area but, for example, you can be in prison and order someone in the free world to be killed.  That happens routinely.

        MR. PRICE:  I'm going to object to the answer, narrative and non-responsive in nature, Your Honor.

        THE COURT:  That's all right.  Overruled.  Let's go.

        MR. PRICE:  Pass the witness, Your Honor.

**CROSS-EXAMINATION**

**BY MR. COLLINS:**

Q    Agent Carlisle, I think you told the jury, it may have been yesterday, that you would never file a case or believe somebody based on one, one criminal or one criminal informant. Is that what you told the jury?

A    I believe what we said was we would never file a case based solely on the statement of one informant; that's correct.

Q    How about solely based on the testimony of two informants?

A    Solely based on the testimony with no corroboration, no, sir.

Q    Three?

A    I'm not sure you would ever have a situation where you would have solely the testimony of individuals without trying

to corroborate with the crime scene or anything else.  But speaking hypothetically, it's hard to say.

Q   Okay.  And so you're forced to deal with these individuals, I guess, who have these very lengthy criminal records.  You would agree with that, correct?

A   Yes.

Q   And in fact in this case a lot of the people that deals have been made with were the shooters, correct?

A   That's correct.

Q   In fact most of them?

A   In many cases they were the shooters, yes.

Q   Okay.  And then I think in this Government's Exhibit RA2230.1, the phone list we just talked about?

A   Yes.

Q   That has a whole bunch of names on it, doesn't it, a whole bunch of numbers?

A   It does.

Q   And some of those people are informants like -- or like this Frosty, people that are going to be perhaps testifying?

A   Yes, some of those people will testify.

Q   And, for example, that might be one, a shooter, or could be?

A   Could be.

Q   Okay.

A   In that case it's not, but you will hear from shooters,

certainly.

Q    All right.  All right.  Thank you.

THE COURT:  Mr. Stenberg?

MR. STENBERG:  I reserve.

THE COURT:  All right.

MR. CONTRERAS:  Real quickly.

**REDIRECT EXAMINATION**

**BY MR. CONTRERAS:**

Q    You said that he will only have control over where he's located?

A    He would only have authority over where he's located as far as --

Q    What about Blackie Anguillano?

A    -- the membership.  Blackie Anguillano is -- and let me clarify.

Q    Do you want to just clarify your answer?

A    Okay.  If you're at that rank, there are generals within the prison system.  Blackie Anguillano controls the federal prison system.  So he would have authority over inmates in all of the prisons.  And when I say authority, I'm talking about direct control over individuals.  But he does have control over the entire prison system.  Daniel Leza would have control over, you know, his part of the prison system.  There are generals and assistant generals within the prison system that do affect those as well, yes.

MR. CONTRERAS:  Nothing further.

MR. PRICE:  Nothing further at this time.

MR. COLLINS:  Nothing at this time, Your Honor.

MR. STENBERG:  Nothing.

THE COURT:  All right.  You may step down, Agent.

THE WITNESS:  Thank you.

THE COURT:  If you'll call your next witness, or do we need time?

MR. CONTRERAS:  He is in custody.  He said 20 seconds, Judge, I don't know if you want to take a break or just sit.

THE COURT:  Oh, okay.

**ALFONSO FLORES, GOVERNMENT'S WITNESS, SWORN**

MR. CONTRERAS:  May I proceed, Your Honor.

THE COURT:  Yes.

**DIRECT EXAMINATION**

**BY MR. CONTRERAS:**

Q    Tell us your name, please?

A    Alfonso Flores.

Q    Mr. Flores, do you also go by or do other people in your past call you by a nickname?

A    Yes, sir.

Q    What is that?

A    Little Guero.

Q    Anything else?

A    Casper.

Q    So you're Little Guero Casper Flores?

A    Yeah.

Q    How old are you, sir?

A    I'm 44, sir.

Q    And you're wearing an orange jumpsuit.  You're in custody?

A    That's correct.

Q    What are you in custody for right now?

A    RICO racketeering case.

Q    You've been found guilty of that?

A    Yes, sir, I pleaded guilty.

Q    Where are you from, sir?

A    Originally I'm from Chicago, Illinois.

Q    Where did you grow up?

A    San Antonio, Texas.

Q    What part of town?

A    Northwest side and west side.

Q    How old were you the first time you got in trouble with the law?

A    Eighteen years old.

Q    How old were you the first time you went to prison?

A    Eighteen years old.

Q    What did you go to prison for?

A    Burglaries, robbery, theft.

Q    Were you a heroin addict or something?

A    Heroin addict.

Q    What year was that, sir, roughly?

A    Latter part of the '80s.

Q    Do you remember when you got out?

A    Yes, sir.

Q    When was that?

A    It was sometime like around '88, I think, '87, something like that.

Q    And did you go back to prison?

A    Yes, sir.

Q    You got in trouble.  What did you get in trouble for?

A    Same thing, burglaries.

Q    You were hooked on heroin?

A    Yes, sir.

Q    Basically you're stealing every day to support your habit?

A    That's correct.

Q    Okay, so you went back to prison, state prison, in roughly what year?

A    Like around '89.

Q    Okay.  And where did you end up being housed or sent to to serve out your sentence in the state prison system?

A    I've been in several prisons.  Beto 1, Ellis 1 unit, also at one time it was a death row unit, maximum security, retrieve unit, Bill Clemens in Amarillo.

Q    Are you familiar with something known as the Texas Mexican

Mafia?

A    Yes, sir.

Q    Is there another name that you're aware of for that organization?

A    Eme.

Q    Anything else?

A    Mexikanemi.

Q    Mexikanemi?

A    Yes, sir.

Q    Were you ever a member?

A    Yes, sir, I was.

Q    What is the highest rank you reached as the member of the Eme?

A    General.

Q    When did you become a member of the Texas Mexican Mafia?

A    1990.

Q    Where were you?

A    Beto 1 unit.

Q    Okay, and you're saying B-e-t-o unit?

A    Yes, sir.

Q    Beto.  And that's a prison unit?

A    Yeah, Tennessee Colony, Texas.

Q    Okay.  When you were in that prison unit was there a Mexican Mafia presence?

A    Definitely.

Q How strong a presence?

A Very strong; controlled the unit.

Q They controlled it?

A Yes, sir.

Q And what does that mean they controlled it?

A Well, drugs, extortion, prostitution, you name it. Any illegal activity that was -- that occurred in that, in that prison, they had a strong hold on it.

Q Did you become a member?

A Yes, sir.

Q When?

A During that time.

Q Do you know roughly about what year when you became a member?

A '90.

Q '90? Can you describe to the jury what it takes, what the procedure is to become a member of the Texas Mexican Mafia?

A You need a padrino. You need somebody that -- a padrino is like a god father, somebody that asks you to join the Eme. You know, you just can't go and say, "Hey, I want to volunteer," you know? They ask you and, you know, if you tell them yes, they want to know why, you know, and you know. A lot of people, you know, they expect the answer to be that it comes from the heart, you know, you wholeheartedly want to give yourself to these people. And that's basically it.

Q   Well, generally what sort of a person would the membership be looking for to recruit?

A   Somebody that can follow orders.  Somebody that's going to, you know, sacrifice his life, you know.  For instance, you know, once you become a member, you know, each and every Mexikanemi member must be willing to sacrifice his life or take the life of another whenever an honorable act becomes necessary.  It's an honor to become a merecido, a member of the Mexican Mafia.

Q   You just used the term merecido.  You know Spanish, don't you?

A   Yes, sir.

Q   Can you spell it for us?

A   Not off the top of my head.  M-e-r-d-i-c --

Q   Let me give it shot and tell me if this sounds right.  M-e-r-e-c-i-d-o?

A   Correct.

Q   What does that term merecido mean?

A   That's when you become a full-fledged member, you know.

Q   Can anybody who is not a full-fledged member call themself a merecido, the streets of San Antonio or behind bars?

A   Well, you're not supposed to but, you know, some people call themselves merecido because they don't know the full term, they haven't been educated.  You know, they're members

but, you know, their padrino might have not taught them right, you know? But, you know, there is a difference between a carnal and a merecido.

Q Well, what I'm getting to is there a penalty for someone who is not a full Texas Mexican Mafia member to claim to be a member when he is not?

A Oh, yeah, definitely.

Q What is that?

A You can get killed over it. You can get beat up. You can have some bones broken, you know. But, you know, you can't, you can't represent something like that, you know, because when I was a member, you know, it was something serious, you know. You represent something like that, you know, and if you're not a member, you know, something will -- something can be done to you.

Q When you were at Beto and these other units and you were a member of the Texas Mexican Mafia, were there other famas?

A Yes, sir.

Q Tell the jury what a fama is, f-a-m-a.

A A fama is a family. It's a criminal organization. We're a criminal organization, so that's a family. It's considered a group of guys, you know, that deal in crime, organized crime.

Q What other families or organizations are found behind bars in TDC, the state prison?

A    You got the Aryan Brotherhood.  You got the Texas Syndicate.  You got the Pistoleros, La Raza Unida, the Aztecas.  You know, there's several.  Those are about it.

Q    And of all the families or organizations, who's on top?

A    Well, when I was, when I was in the Eme, and the units I've been on, the Eme.

Q    The Eme.  Are you familiar with the -- something known as the Texas Mexican Mafia constitution?

A    Yes, sir.

        MR. CONTRERAS:  Show Government's Exhibit 100.

Q    Do you see what's being projected on the screen there?

A    Yes, sir.

Q    What is that?

        MR. CONTRERAS:  Blow up the top quarter, Ms. McCowsky.

Q    Can you see it clearly now?

A    Yes, sir.

Q    Mr. Flores, you don't need to read it to us, but tell us what this document represents?  What does it mean?  What did it mean to you when you became a member?

A    That constitution explains to you the rank and file of the Mexican Mafia, the responsibilities.  You know, it tells you about the president, the general -- the president, the vice president, the general, and then you got the lieutenants, the sergeants, and you got the soldados.  And it deals in

extortion. It tells you what it deals in. Anything that deals with making money illegally.

MR. CONTRERAS: Go to Page 3, Section 3 of the business.

Q   We're showing Part 3 under the Business section of the constitution. What does that mean?

A   That right there, you know, what it basically -- what it says, as you-all can see, that we deal in organized criminal activity, which is murder, extortion, drugs, prostitution, robberies. We can get paid for contract killings, you know? Basically anything that's going to further the advancement of the Mexican Mafia.

Q   Mr. Flores, when you became a member did you have to study this document?

A   Yes, sir.

Q   Become familiar with it?

A   Yes, sir.

Q   And did you learn about the origin of the Mexikanemi?

A   Yeah. A lot of the, a lot of the schooling was -- you learned it in lock-down, the lock-down unit. I was never in the lock-down unit, I was in the streets. Being the streets is I was in population. I was under cover, you know, I hadn't been -- they had never confirmed me in the prison system. So, you know, I was dealing -- I was in the outside with the prison population, you know, and we also conducted a lot of

criminal activity.

Q    Who is the top member of the Texas Mexican Mafia?

A    Herb Huerta.

Q    Where is he?

A    He's in Florence, Colorado.

Q    A federal prison?

A    Yes, sir.

Q    And do you see Government's Exhibit 35?

A    Yes, sir.

Q    Who is that?

A    Herb Huerta.

Q    How is he able to run the organization from behind bars?

A    When I was out there I was in charge of his personal finances, his take every week, you know, as far as from the dime, from the ten percent that we collected, the street tax. That's money we extorted from people that would sell drugs. And I would speak to him once a month on the phone at his ex-wife's house, by the name of --

Q    He was allowed to make very rare calls?

A    Yes, sir.

Q    And would he use coded language?

A    That's correct.

Q    Give me an example of a code for an order or an instruction?

A    Let me see.  Like he wouldn't call me carnal.

Q    He would not call you carnal?

A    Yeah.

Q    What does the term carnal mean to you?

A    Brother, you know, Mexican Mafia member.  He would call me by the name of Primo and he would say, for instance, like when he needed the money, you know, he goes, "Hey," he goes, "Nieto dinero," [phonetic] for instance, like the properties that he had out there, you know.  He wouldn't say, "You know what?  I need money from the dime."  He goes [speaks Spanish].

Q    Mr. Flores, I'm sorry to interrupt you.  But can you try to stick with English because we're making a --

A    Okay.  What he would say is that, you know, if there was any way, you know, somebody could help him, you know, fix up a property out there that he was renting.  You know, and he wouldn't say I need money from the ten percent, you know, he would kind of try to keep it clean, you know.  Just something, you know, he was very careful what he said, you know?  You know, I already knew what was expected of me.  You know?

Q    Got it.  So it wasn't hard to figure out the message?

A    No.

Q    And who was the number two man?

A    Benito Alonzo.

Q    Okay, and will they be number one and two for as long as they're alive?

A    Oh, yes.

Q   You were talking about behind prison that the Eme ran things and you mentioned a couple of areas.  Let's go with one area: narcotics.  Are there narcotics behind bars in the state prison?

A   Yes, sir.

Q   What are we talking about?

A   When I was in there I dealt in heroin.

Q   And who controlled the heroin behind bars in state prison?

A   The Mexican Mafia.

Q   How much heroin are we talking about?  Roughly?

A   Well, when I was in population we're talking ounces of heroin, you know?  I used to bring in two ounces of heroin a month, you know, and that's a lot because, you know, it costs a lot more and the amount is a lot smaller.  So two ounces of heroin, it brings you in a lot of money, you know?

A   Let me interrupt you.  An ounce of heroin on the street in San Antonio roughly would cost what back then?

A   Well, if it ain't cut, anywhere from six to $700.

Q   For uncut?

A   No, if it's cut it costs like six or $700.

Q   Why don't we educate the jury real quick.  Heroin comes in how many different forms?

A   It comes in black tar, pure heroin, and it comes in a powder form.

Q   Okay, what's the difference between black tar heroin and

powder heroin?

A   Well, black tar heroin, if you get one ounce of black tar heroin, you can make four ounces of powder heroin.  You add a cut called lactose, and you put it in a blender and you mix it up and you get four ounces.  If you buy it in the powder form, well, it's already ready for the streets, you know?

Q   Just let me clarify that.  Tar is pure, uncut heroin?

A   Yes, sir.

Q   Street or powder has already been diluted four times, maybe with lactose?

A   Yes, sir.

Q   Okay.  How much does an ounce of black tar pure heroin cost around that time, an ounce?

A   Well, if you have a straight connection from the other side of the border, you can pay up to $800.  But in San Antonio we regulated the price and it would go for anywhere from 12 to $1300.

Q   And in prison would you-all get pure or street cut heroin?

A   I personally would get street cut.

Q   Okay.  And you were doing two ounces of heroin a month?

A   Uh-huh.

Q   Okay.  And were any other of the families, Texas Syndicate so on, allowed to participate in this heroin distribution in the state prison?

A   Yes, sir.

Q   And did the Mafia exert any authority at all, any participation in that?

A   Well, I mean, there was times when we couldn't get something and we'd deal with them, you know, and they in turn would do the same with us.

Q   Were they allowed to do that by the Texas Mexican Mafia?

A   Yes, sir.

Q   Okay.  What other area of crime was the Mafia involved in behind bars?

A   Extortion.

Q   What is that?

A   Basically they would target white people because they're considered a minority in prison, you know, and what would happen was that you'd see a white guy.  He'd get there and automatically they would jam him.  They would approach him and they would tell him, you know, "You're going to have to pay protection," you know?  Or they'd prostitute him, you know? And sometimes, you know, they do it willingly or unwilling, but, you know, eventually they'd have to do it, you know? They'd have to either pay or, you know?

Q   You're saying these were white people?

A   Yes, sir.

Q   White guys?

A   There was Mexicans too, I mean, you know, but the majority they targeted were white people.

Q   And if the white guy was affiliated with another familia, would that change things?

A   Yeah.  Yeah, you know, a lot of times it was like -- like when I was at Beto 1 and the Texas Syndicate was there, you know, it was like one for one.  You know, like they'd approach one and then it'd be our turn to get one, you know.  And mainly what we did was, it was we'd extort them for the money because there was a lot of carnales that wouldn't have money in there.  And, you know, we'd make these guys, you know, buy us commissary, tennis shoes, fans, radios, and, you know, it was to help the carnales that didn't have money in there.

Q   And the proceeds from the drug sales, who did that benefit?

A   Well, the Eme.

Q   All of the members behind bars?

A   Yeah.

Q   Okay.

A   Oh, all the members.  Yeah, everybody got something.

Q   Okay.  Let's move forward a little bit.  When did you get out of TDC?

A   When I got out in '90 I lasted five months and I went right back.

Q   And how long did you stay in?

A   When I came back?

Q   Yes.

A   Well, I came back in '91 and I had a 20-year sentence.  I was supposed to do 26 months on it and I picked up a drug case in there, a dirty UA, and I ended up doing nine years on that 20-year sentence.

Q   Okay.

A   Close to nine years.

Q   And during that nine years that you were behind bars were you active in the Mafia also?

A   Yes, sir.

Q   Did you have any rank?

A   At the Roach unit I had a rank.

Q   How does rank structure work behind bars in state prison?

A   Well, you have a sergeant in population and you have the lieutenant in the lock-down unit, you know, in the back, you know, he's in charge of the unit, and then you have your soldiers.

Q   What do you mean -- when you say lieutenant who's in charge, in charge of what?  What authority does he have and what does he use it for?

A   Well, he makes sure things run smoothly in there, you know.

Q   Well, like what sort of problems, give me an example, would he have to deal with?

A   People that would disrespect us.  You know, you know, people that want to step on our feet, you know.  For instance,

it could be over, it could be over drug-trafficking, you know --

Q   Give me an example.  Give me a real example of some beef that arose over some drugs behind bars?

A   Well, maybe somebody got there.

Q   Somebody what?

A   Somebody would get there that was in debt, you know, from the streets, or, you know, he had snitched on a carnal or something like that.

Q   He had what?

A   Snitched on a carnal.

Q   And are we talking about a member or a nonmember?

A   A member.

Q   A member, okay.

A   You know, and we'd have to take care of it, you know.

Q   So you're talking about a Mafia member who's in bad standing?

A   Yes, sir.

Q   And he arrives at the unit?

A   Yes, sir.

Q   How will you-all find out that he's done bad things?

A   Well, we would get word from the streets.

Q   Do you always get word?

A   Yes, sir.

Q   On who is a carnal and what his status is?

A    Yes, sir.

Q    And if someone's in -- what sort of things would put a member in bad favor?  You said snitching.  Anything else?

A    Snitching.  He was in debt.

Q    How would he get himself in debt?

A    Well, I mean, you know, like out in the streets when we get our drugs we distribute them amongst the ranks, and it goes down from the ranks to the -- like, for instance, if I was to get -- I'm the assistant general or the general.  I pass it to the captain, the captain passes it to lieutenants and it goes down, and the soldiers and so forth.  And it might not even be a soldier in the Mexican Mafia, it might be just a regular person, you know?  For instance, like you, you're not a member and I give you drugs and you take off on me and then you eventually get busted and you get to that unit.

Q    And you didn't pay for the drugs?

A    Yes, sir.

Q    Okay, and so when that person arrives owing money or snitching or something, how is he going to be dealt with?

A    It depends on the severity of the situation.  You know, you can get killed, you can get beat up, you can get stabbed.

Q    Let's just back up a little bit.  That heroin that you said two ounces a month, was that Mafia heroin or your heroin?

A    Well, it originated from the Mafia, you know.

Q    And the proceeds went to the Mafia?

A    Yes, sir.

Q    Okay.  When did you get out after that stint in prison?

A    '99, October of '99.

Q    October of '99?  Okay.  And where did you report to?

A    South side.

Q    No, what city did you go to?

A    San Antonio.

Q    San Antonio.  When you get out of prison and you're a Mafia member, like you, Mr. Flores?

A    Uh-huh.

Q    Is there a responsibility or duty of what you're supposed to do when a Mafia gets out from custody?

A    Yeah.  When I go report I'm supposed to -- they'll tell me, you know, I'll check in, you know, and they'll tell me, "Write to prison, let them know you're out."  And I get a letter and the letter, I can't open it.

Q    You're going too fast.  When an inmate gets out of prison --

A    Yeah, you have --

Q    Hold on.  You said you're supposed to report.  To who?

A    To the lieutenant.

Q    To a lieutenant in San Antonio?

A    Yeah, one of the lieutenants of the four corners of San Antonio.

Q    So there are four corners and four lieutenants?

A    Yeah, north side, south side, west side and east side.

Q    When you say report, what does that mean?

A    You gotta check in.  You gotta let them know that you're out and they, they in turn, you know, they give you a run down on what's going on, you know.  They ask you for a letter when you first go report.

Q    What is this letter you're talking about?

A    The letter is to clear you.

Q    Okay, what does the term clear mean?  In the context of the Mexican Mafia does that word have a special meaning?

A    Yeah, that means that you're good, you're a good member, you're in good standing.

Q    Good standing.  Okay, so when you get out, who sends the letter or how does it come out -- get out to the free world?

A    You write to your prison unit that you're paroled from and that letter -- they already know, they already know that -- what they need to do.  And they'll say, you know, in that letter, it'll be coded.  You know, they might say, you know, I wish you the best, you know, you know, when you were, you know, you know, everything was, you know, we had some good times, you know, and, you know, tota machin [phonetic], you know --

Q    Tota machin, what does that mean?

A    Everything's good.  Everything is good with you.

Q    Who sends the letter from prison to wherever it needs to

go?

A    The one that's in charge of that unit.

Q    Okay, and it could be a coded letter?

A    Yes, sir.

Q    But the purpose is to say you're okay?

A    Yeah, and I can't open that letter.  When I get that letter, I gotta take it to the corner, which is either the north side, south side, west side or east side.

Q    How do you know which corner to report to?

A    Well, for instance, like when I got out I knew a carnal that was already out and he took me to the south side.  I was living in the north side but I was reporting to the south side.

Q    Okay.  So, and did the letter arrive for you?

A    Yes, sir.

Q    You knew not to open it?

A    Knew not to open it.

Q    Until that letter arrives and gets to where it needs to go, are you in some kind of -- what's your status then?

A    I'm in the dark.

Q    In the dark?

A    Yeah.  I mean, you know, I can't go to juntos, which are Mexican Mafia meetings.  I'm not allowed to know the business of the Eme until that letter arrives and I'm cleared.

Q    They don't want to share that with somebody that may be a

traitor?

A    Yes, sir.

Q    Okay.  You said in the dark.  That's what, the term they use?

A    Yes, sir.

Q    Any other term?

A    He might have the glafas for now.  He might have the sunglasses.

Q    You said the word g-a-f-a, gafas?

A    Glafas.

Q    I'm sorry?

A    Glasses.

Q    Okay.  And that means the same thing?

A    Yes, sir.

Q    Okay.  And once the letter arrives, and then what is your status?

A    You report once a month -- I mean once a week and they let you know when the juntos are at, you know -- you report -- you check, you check in, you know, and if they need something for you to do, you know, you know, they'll tell you.  Or you can just go and you go and you check in and all right.  And maybe like me, I used to report to this bar called Guzman's.

Q    Okay, let's hold on.  Which corner did you start reporting to?

A    South side.

Q    South side.  Who was the lieutenant of the south side?

A    Lencho.

Q    Okay, and so what rank would Lencho have had?

A    He was a lieutenant.

Q    Okay, of the south side?

A    That's correct.

Q    And what rank would you have had?  Did you have a rank at all?

A    When I first got out, no, sir.

Q    What are you known as, just a carnal or something?

A    Yes, sir.

Q    Okay.

A    Soldier.

Q    Soldier, okay.  And is there a Spanish term for that?

A    Soldado.

Q    Soldado?

A    Yes, sir.

Q    Okay.  Did you become active with -- I'm sorry.  We're showing V1.  Do you recognize that?

A    Yes, I recognize that.

Q    And who is that?

A    That's Lencho.

Q    That was your lieutenant when you got out?

A    Yes, sir.

Q    And I'm sorry, about what year are we talking about?

A    October of '99.

Q    '99.  At some point did you start becoming active in the Texas Mexican Mafia?

A    Yes, sir.

Q    When was that, roughly?

A    When I really got really active was after he got killed.

Q    I'm sorry?

A    After he got killed.

Q    Okay.  Before then you were not active?

A    Yes, I was active, I was reporting, you know --

Q    Nothing else?

A    Just going out having a good time with the carnales, partying.

Q    No, you didn't go collect any money or anything on behalf of the organization?

A    No, sir.

Q    You weren't required to?

A    I just wasn't called up to the -- up to bat so to speak, you know.

Q    Got it.

A    They had me on standby.

Q    You were on standby.  And what was the rank structure at the latter part of '99, early 2000?  Who was the top man in San Antonio?

A    Wero Carlos Rodriguez.

Q   Wero Rodriguez?

A   Yes, sir.

Q   And who was under him?

A   That would be Alex Guerrero, Loco Machine.

Q   Do you recognize Exhibit 40?

A   Yes, sir.

Q   Who is that?

A   That's Wero Rodriguez.

Q   He was the general at the time you got out?

A   Yes, sir.

Q   And the person right beneath him?  Do you recognize --

A   That's Loco Machine.

Q   -- Government's Exhibit No. 30?

A   That's Loco Machine.

Q   And Alex Guerrero is his real name?

A   Yes, sir.

Q   And what formal rank, title did he have?

A   Well, he was also -- he was the assistant general.

Q   Assistant general?

A   Yeah.

Q   Okay, let's leave it at that for now.  You mentioned this Lencho Vasquez, his death?

A   Yes, sir.

Q   Let's back up.  You knew him, you reported to him?

A   Yes, sir.

Q    How did he get along with Wero Rodriguez that we just showed before?

A    At the time when I was -- when Lencho was alive I didn't -- I wasn't aware that there was an internal struggle between the two.

Q    But later a struggle arose?

A    Yes, sir.

Q    What did it evolve around?

A    It was a power struggle.  They wanted -- they didn't like the way Wero was running things so they wanted to kill Wero.

Q    You're saying they.  Who did?

A    Lencho.  Lencho and some other members.

Q    So Lencho was a threat to Wero Rodriguez, and what ended up happening to Lencho Vasquez?

A    He ended up getting killed.

Q    Okay.  And when he was killed did you have any sort of rank or any authority at all?

A    No, sir.

Q    Okay.  When did you assume some importance in the organization?

A    Right after he got killed, a few weeks after he got killed.

Q    And who approached you and how did that happen?

A    I had met with a drug connection and I was introduced to a carnal from Laredo.  And that carnal, he spoke to Wero

Rodriguez that night and he told him that he had spoken to me and Wero Rodriguez asked him for my number. And he called me and I met with him at the Mall House and -- here in San Antonio, it's a restaurant, and --

Q    Over on Zarzamora?

A    Yes, sir. And I was approached about having rank.

Q    And you were face-to-face with Wero Rodriguez?

A    Yes, sir.

Q    Now you went down to Laredo to meet a drug connection you said?

A    The drug connection would come down from Laredo to San Antonio.

Q    Explain to the jury what a drug connection is.

A    They used to drop off black tar heroin to me. They supplied me with large amounts of drugs, you know? Lots of drugs.

Q    And what came of that face-to-face meeting between you and Wero Rodriguez?

A    He already knew of me. I did time with his brother at the Ellis 1 unit. I kind of helped out his brother get out of a jam.

Q    Which brother?

A    Bobby Rodriguez.

Q    Bobby? Okay.

A    And plus he had heard about me, you know, and he knew my

father, and just basically, you know, word of mouth, you know?
He knew I was a good -- I was a good dude.

Q   So what came of the meeting?

A   He put me in charge of the south side.

Q   What rank did you have?

A   I started out as sergeant at first but it wasn't long --
it wasn't long at all they made lieutenant of the south side.

Q   Roughly what year are we talking about?

A   I think, what, Lencho got killed in 2000.

Q   It was after Lencho's death?

A   That's correct.

Q   But not too much time after?

A   No, sir.

Q   Okay.  And you were a lieutenant.  Tell us what a
lieutenant did.

A   He maintained order on the south side and he was in charge
of collecting the dime, ten percent.

Q   You've used the term carnales.  I think the jury knows
what that means, but when you use it do you always mean Texas
Mexican Mafia members?

A   Yes, sir.

Q   Okay.  You maintained order.  How many members did you
supervise from the south side?  Roughly.

A   About 40.

Q   Forty?

A    Fifty.

Q    And are these active members?

A    Yes, sir.

Q    Okay.  You supervised them, and then you started to talk about collecting?

A    Yeah.  I had a sergeant and we would collect the ten percent, the dime.

Q    What is the dime?

A    The dime is for every ounce of heroin or cocaine that a person sells out on the streets of San Antonio, they got to pay a tax of $100.  So if you're selling two or three ounces a week, three ounces a week, you're going to pay $300, a hundred dollars on each ounce.

Q    And that's any drug dealer around in San Antonio?

A    That's any drug dealer.

Q    Now you're talking about San Antonio.  Did the Mafia have a presence in other cities besides San Antonio?

A    Oh, yes, sir.

Q    Give us some of the cities.

A    Every city in Texas.

Q    And did every one of those cities collect the dime?

A    To my knowledge, no, not every city.

Q    What cities mainly besides San Antonio collected?

A    You had Dallas, Dallas, Texas.  You know, a lot of the times they would -- a lot of these cities, they would supply

drugs to San Antonio, you know and those proceeds, what would happen was that the profit of those proceeds would help the carnales in prison, the prison system.  But, I mean, there wasn't too many -- the dime was mainly enforced in San Antonio, you know.

Q   Mainly San Antonio.  What about south of San Antonio?

A   You mean like Laredo?

Q   Pearsall.

A   Pearsall.  Oh, yeah, we had the surrounding counties like Seguin.

Q   My point is --

A   Corpus Christi.

Q   -- dealers in all these southern cities had to pay?

A   Yes, sir.

Q   Okay.  And let's focus on San Antonio, the south side. You were a lieutenant, right?

A   Yes, sir.

Q   You were responsible.  How many dope dealers did you collect from?

A   I'd say about -- at a all time high it was like about 20, 25.

Q   Just 20?  There's only 20 people on the south side that are selling drugs?

A   No, sir.

Q   Explain that.

A    That's just the south side.  You know, I had reign over all over Texas.  I could collect the dime anywhere else too, you know.  If I found a store --

Q    What's a store?

A    A store is where you sold drugs out of.  It's a drug dealer, you know.  If I found a drug dealer, you know, it was like finders keepers, you know.  They would have to pay me. You know, it didn't matter what side of town you were at, you know.

Q    So the south side membership could collect all over?

A    All over.

Q    And were you -- how often did you go looking for drug dealers, or stores as you said?

A    Monday through Thursday.

Q    You were always looking on those days?

A    It was like a job.

Q    This list of people who are dealing and paying, does it change very often?

A    Yes, sir, because some of the drug connections, they get hit, you know.  What I mean they get hit, they get raided by Sheriff's department, you know, SAPD, FBI, you know, and but that would fluctuate.

Q    So it's constantly changing?

A    Yes, sir.

Q    And so how do you go and find people who are selling?

A   For instance, like the prostitutes in San Antonio, you know, nine times out of ten a prostitute, the only reason she's going to be out there in the street selling her body is because she has a drug habit to support.  And what would happen is that we might get one of these prostitutes and we'll approach them and we'll ask them, "Hey, where are you scoring?" and they'll tell you, you know.  And for us to confirm that, you know, so we don't go on hearsay, we might give her ten, $20 to go score.  And she'll go to that dope house and she'll score.  And then I in turn, being that the actual dope house is on the west side, I'll call every lieutenant --

Q   Is a dope house the same as a dope store?

A   Yes, sir.

Q   Okay, go ahead.

A   And each lieutenant has a list of their stores and if that place is not on that list that means they're not paying the dime.  And that's -- then we know to approach them people and let them know that we know that they're selling.

Q   And this little procedure you use with the prostitute, you're doing this every day, various methods?

A   Yes, sir.

Q   Okay.  And --

A   And carnales will turn in stores, too.  Soldiers, it was their job to let us know, you know.  When we would have

meetings, you know, "Hey, we need stores, man, we need people that are selling and that are not paying the dime," and they would report those places to us.

Q   And were a lot of the carnales drug users also?

A   Yes, sir.

Q   Okay.  Most, some?

A   Most, some, you know, I mean --

Q   So they weren't new to the drug business?

A   No, not at all.

Q   And those that were paying the tax, was there a special term or anything for that?  The houses or stores?

A   The daime?

Q   Yeah, but did those taxpayers, were they like on a certain list or certain term used to mean that they're okay, they're paying?

A   Yes, sir.

Q   What is that?

A   They were on a list and that list -- everybody has a list, each corner.  And that list, you know, if you're on that list that means you're paying so that means you're in good standing and you're being protected by the Eme.

Q   What do you mean being protected?

A   Well, if anybody tries to go over there and, you know, strong-arm them, you know, and try to, "Hey, you know what?" You know, "You're going to give me drugs, I don't have enough

money," you know, take it away.  They'd go over there, you know, give them a hard time?  It was our job to make sure that that didn't happen, you know.  We'd send, we'd send a carnal over there, a member, Mexican Mafia member, a soldier and we'd have him stand guard there at those houses.  Or we'd have those people call us once that person showed up and we would, we would get there and we'd handle the situation.

Q   Well, let me ask you this, Mr. Flores.  These people who are strong-arming or trying to jack these stores, they might be some tough people, right?

A   Yeah, but we're tough too.

Q   Well, you post a carnal out there.  Is he going to be armed?

A   Oh, definitely.

Q   What's to say that this guy is not going to submit to this carnal and just listen to him?

A   He's going to get hurt.  You know, nine times out of ten there's going to be, there's going to be several carnales, it's just not going to be one.  You know, they're going to talk to him, "You know what, man?  When you come, you know, you gotta have the right amount of money."  You know, they're going to talk to him.  They're going to give him a warning, you know, especially of anything that serious.  And if he continues to do this, well, then, he might get a beating.

Q   Just, I guess what I'm getting at do the carnales

generally, do they ever back down?  Are they allowed to ever back down?

A    No, sir.

Q    In prison will a carnal ever back down?

A    No, sir.

Q    Allow himself to be disrepsected?

A    No, sir.

        THE COURT:  Mr. Contreras?

        MR. CONTRERAS:  Yes, sir.

        THE COURT:  Mr. Contreras, have we covered the history now?  I think everybody knows the deal.

        MR. CONTRERAS:  Okay.

Q    When you find out someone is selling and they're not on the list, tell us what the procedure is.

A    Well, we'll go -- I'll go, for instance, I'll go and -- I'll go and I'll tell him, "Representante Mexikanemi, Mafia Mexicana [phonetic], I'm a representative of the Mexican Mafia and it's been brought to our attention that you're selling drugs."

Q    Now, Mr. Flores, would you go by yourself?

A    No, I'd go with other carnales.  I'd go with my sergeant and his third man, maybe a couple of soldiers.

Q    And what would your tone be?

A    I would go talk to them right, you know.  It would vary, you know, it depends, you know.  But like on the situation, on

the example I'm giving you now, we'd go and we'd speak to 'em and we'd tell 'em, you know, "It's been brought to our attention that you're selling drugs out of this house."  And if they denied it, basically we tell them, "Look, we know you're selling.  You know, if we bring the person over here that just came over here and bought drugs from you, you know, we're going to end up taking everything away from you," you know.  "We're going to, we're going to tax you.  You know, we're going to tax you, we're going to -- in other words, we're going to give you a fine.  You know, you're going to have to pay a fine and you're going to have to pay weekly or you just might lose all your drugs, your money and everything that's in that house, cars, you know, jewelry, so forth."

Q    That was the first visit?

A    Yes, sir.

Q    And did people, the dealers usually pay the tax or the dime after that?

A    Yeah.

Q    And then what would be the method for collecting the tax?

A    Every Friday, every Friday they would call these stores. And the way I would do it, I would have them meet me somewheres.  I would never try to go close to a dope connection because there's a lot of heat, you know.

THE COURT:  Let me ask you something so we can move this thing along.  How would you verify, once you went to a

house and gave a warning and then you went back to collect the tax, how would you verify how much they owed you?  What proof would you have that the dealer or seller had sold so many ounces versus so many kilos?

THE WITNESS:  Well, we talk to them.  They'd tell us.  You know, nine times out of ten they'd be honest.  You know, they'd be intimated.

THE COURT:  Okay, then if they were honest that's fine.  And then if they failed to do that the first time, what would you do the second time?

THE WITNESS:  We'd have somebody go do a home invasion.

THE COURT:  Okay.  Now, how many days or weeks or months or years would you wait to go the second time?

THE WITNESS:  Not very long, a few days.

THE COURT:  Not very long meaning what, a week?

THE WITNESS:  Less.

THE COURT:  Less?

THE WITNESS:  Yes, sir.

THE COURT:  So you gave a person a warning, they didn't do anything for 72 or 96 hours, then you would do something?

THE WITNESS:  Yes, sir.

THE COURT:  What would you?  What's the typical example of what would you do?

THE WITNESS:  We'd go in there and we'd kick the door down and we'd have everybody at gun point.  You know, we'd all go armed.

THE COURT:  Okay, fine.  You went armed and everything else.  And after that did these people, these criminals, did they then start to do something?

THE WITNESS:  Some of them would, some of them would just shut down, or they'd say they would and they'd leave.

THE COURT:  And how do you know they would -- okay, fine.  How would you they shut down?  I guess you keep surveillance on them or something?

THE WITNESS:  Well, I mean nobody would be at that house after that.  You know, they'd move out.

THE COURT:  Okay, fine.  Then would you try to locate these people if they moved out?

THE WITNESS:  Eventually they would show up if they were doing the same thing.

THE COURT:  Okay, fine.  And then after that what would you do to them, kill them, rape them, what?

THE WITNESS:  No, we'd go in there and we'd tie everybody up, we'd ransack the house and find the drugs, the money, you know, and so forth.

THE COURT:  Okay, fine.  And then after that what would you do?  Would you then leave them alone, would you find out that they quit?

THE WITNESS:  We'd take everything from them and, you know, a lot of times what would happen was that, you know, sometimes we wouldn't go and say that we were Eme, you know? We would make it look like a home invasion.  And then sometimes these people would get back to like a mediator, somebody -- a go-between and say, "Hey, man, you know, we just got" --

THE COURT:  You would try to reason with them?

THE WITNESS:  -- "we just got robbed."

THE COURT:  After you committed some violence?

THE WITNESS:  Yeah, and we'd tell them --

THE COURT:  Okay, fine.  Did you ever find the time or it become necessary to kill one or more of these people?

THE WITNESS:  Excuse me?

THE COURT:  Did you, have you ever killed a person?

THE WITNESS:  No, sir.

THE COURT:  Okay, fine.  Did you ever direct someone to kill somebody?

THE WITNESS:  Yes, sir.

THE COURT:  How many people as a result of your direction were people murdered?

THE WITNESS:  Four.

THE COURT:  Okay, fine.  And then did you ever harm any children in these invasions?

THE WITNESS:  No, sir.

THE COURT:  That's because?

THE WITNESS:  They were children.

THE COURT:  Okay, well, that's honorable.  Okay, fine.  And then you killed a few, and now, Mr. Contreras, you can take it from there and let's try to wrap it up with this witness.

Q   Just getting back to what the Judge asked, was there ever really a need for a third visit?  The Judge was asking, you were discussing the second visit, the guns and all that.  After that second visit did almost everyone comply?

A   Yes, sir.

Q   Okay, or else stop selling dope?

A   Yes, sir.

Q   Okay.  You said you were a lieutenant.  At some point did you reach a higher rank?

A   Yes.

Q   And what rank was that?

A   Teniente los tenientes.

Q   And what does that mean?

A   Lieutenant.  I would oversee all four lieutenants and all four corners.

Q   You said a Spanish term, can you say it in English, please?

A   Lieutenant of the lieutenants.

Q   Okay.  And what was your job?

A    I would oversee all four -- I would oversee all four corners.

Q    So did the money that was collected by each corner, where did it go?

A    It went to the general.

Q    Okay, did you participate in that collection?

A    Yes, sir.

Q    How much money was being collected by the membership?

A    It fluctuated, you know.

Q    Give us a range.

A    Thirty thousand, 40,000.

Q    How often?

A    A week.

Q    Thirty to 40,000 a week?

A    Yes, sir.

Q    And divided by a hundred is the number of ounces you were authorizing sellers to sell?

A    Excuse me?

Q    And that's in a hundred dollar increments?

A    Yes, sir.

Q    Okay.

          THE COURT:  And what would you use this money for?

          THE WITNESS:  It varied.  We would send money to the prison system, to the people that were in charge of the lock-down units and we'd send them money, you know, to help

the carnales that -- the members that didn't have anything in there, you know, as far as for commissary and so forth. Or maybe a car would break down, you know, and needed to be fixed because, you know, you have to get around all over San Antonio. So we'd have bills to pay, you know, as far as, you know, getting titles changed, fixing cars.

THE COURT: Okay, it was used for a variety of things that the members needed?

THE WITNESS: Yeah, like a business.

THE COURT: Does the typical member have a job outside of this conduct?

THE WITNESS: Yeah, some of them hold a job.

THE COURT: Like, as an example, what does -- as an example, what kind of job?

THE WITNESS: Construction worker or --

THE COURT: Construction worker. Okay, fine. How many active -- at the time that you were lieutenant of lieutenants, how many active members were in the community, the San Antonio area? Roughly.

THE WITNESS: About 200.

THE COURT: Okay, and, Mr. Contreras, go ahead.

Q   Okay. And are you just -- the 200, are those the most active members? Or is there a distinction or is there not one?

A   Well, you know, a lot of times some of the members, they

won't report when they get out.

Q   Okay.

THE COURT:  And that's because?

THE WITNESS:  They lose faith in the Eme, you know, they just pretty much just kind of fall back into the shadows.

THE COURT:  Okay, go ahead.

Q   You started to talk about what some of the money went to. Did some of the carnales behind bars get a different amount or more money?

A   Yes, sir.

Q   Who?

A   Herb and Benito, the president and the vice president.

Q   And how much would they get?

A   Herb would get like about $5,000 a week.

THE COURT:  Let me ask you something.  What is the purpose of sending money to a person in a federal prison that is serving a life sentence?  Or is this something you just blindly did?

THE WITNESS:  Well, a lot of the money would go to his family, you know.  We wouldn't send him a whole $5,000, you know.  We would give it to somebody in his family and they would be in charge of his, you know --

THE COURT:  I see.  Okay, go ahead.

Q   Okay.  And generally how much was him or his family getting a month?

A   Well, it would vary.  Like, for instance, he'd get $5,000 a week, but just say like his son one time picked up a drug charge and we ended up paying for his lawyer.  So that cost a little bit more money.  So, you know, we'd have to hire a lawyer for his son and so forth.

Q   And is any of that money apportioned over for the soldiers who actually collect it?  How does that work?

A   You keep a percentage of everything you collect.  For every hundred dollars you pick up, you get 20 to $25.

Q   Let me ask you this.  After being lieutenant of lieutenants, did you get promoted?

A   Yes, sir.

Q   To what rank?

A   Captain.

Q   And what does a captain do?

A   Basically, he gets with the general and the assistant general and they give him the orders, you know, and he passes them down to the lieutenant of lieutenants, and the lieutenant of lieutenants passes it down to the lieutenants and so forth.

Q   And were meetings ever held for the leadership?

A   Yes, sir.

Q   And is there a name for these meetings?

A   The junto, get-together.

MR. CONTRERAS:  May I approach the witness, Your Honor?

THE COURT:  Yes.

Q   Mr. Flores, I want to show you some pictures and ask you if you recognize them?

A   Yes, sir.

Q   Okay, look at all of them, make sure you recognize them.

A   Uh-huh.  Yes, sir.

Q   Just briefly, what are those pictures of?

A   That was a major junto from all over Texas.

Q   Of the leadership?

A   Yes, sir.

Q   And where was the -- where were these pictures taken?

A   That was in the Dallas area.

Q   You know who took these?  Somebody who attended?

A   Yes, sir.

MR. CONTRERAS:  Offer Government's Exhibits RAX45A, 45D, E and F.

THE COURT:  Okay.

MR. PRICE:  No objection, Your Honor.

THE COURT:  All right.  Mr. Contreras, how were these pictures obtained, through a search warrant?

MR. CONTRERAS:  They were obtained from a member, yes, Your Honor.

THE COURT:  Okay.  All right.

MR. COLLINS:  No objection, Your Honor.

THE COURT:  All right, they're in.

MR. CONTRERAS:  Thank you, Your Honor.

MR. CONTRERAS:  Can I show the first one, please, Ms. Mccowsky?

Q    Okay, could you tell us who's in that picture, please?

A    I'm in that picture.

Q    Okay, first of all, you're looking at RAX45A?

A    Yes, sir.

Q    Do you see that thing right in front of you, Mr. Flores, that looks like a pen?  That's a laser.

A    Okay.

Q    Okay, use that to point and tell us -- using that laser, identify the people in RAX45A.

A    That one right there in the corner is --

THE COURT:  Let's do this.  Just mention all the names in that picture then ask the witness the names you mentioned, are they in the picture.

Q    Well, can you go through who's listed?  I don't know all the names.

A    You got Low.

Q    Okay.

A    You got myself.  You got Carlos Rodriguez.  You got Ray Carrasco.  And the other members, I forget their names.

Q    Where are you located in this picture?

A    I'm hugging that carnal right there in the middle.

Q    In the middle?

A   I'm right there in the corner, I mean, third from the corner on the left-hand side.  I got a jacket and like a light-brown shirt, beige.

Q   Try to use that laser.

THE COURT:  Why don't you point him out.

A   I'm right there.  That's me.

Q   Thank you.  Point to yourself with the laser.  Okay, that's you?

A   Yes, sir.

Q   Okay, and where is Wero Rodriguez?

A   Right there.

Q   Okay, what was his rank at that time?

A   He was a general.

Q   Okay, and who else did you name?  Carrasco you said?

A   Ray Carrasco.

Q   Okay.  Who else can you identify that had rank?

A   That's Low.

Q   Which Low?  Do you know his real name?

A   No, sir.

Q   Okay.  And where was this picture taken?

A   It was like a banquet hall at a hotel.

Q   What city though?

A   In Dallas.

Q   In Dallas.  Okay, go to RAX45D.  And are these the same people, some of the same people you identified?

A    Yes, except that one right there, that looks like Aldo.  I can't see him --

Q    Okay.  RAX45E?

A    It might not be him, yeah.

Q    What?

A    Might not be him.  I think it's him.

Q    Okay.  Well, don't guess.  If you don't know that's all right.

A    Okay.

Q    RAX45E, who is that person?

A    That's Ray Carrasco.

Q    Okay.  And what's he doing there?

A    Gambling.

Q    RAX45F.  Same persons?

A    You got Mundo right there.

Q    Okay.  Mundo, do you know his real name?

A    No, sir.

Q    Okay.  Do you know what rank he was?

A    At that time I believe he was, he was a captain I think.

Q    Okay, and anybody else you haven't mentioned already in those pictures?

A    No.  I'm familiar with the other individuals, I just can't recall their names.

Q    Mr. Flores, do you -- what was the purpose of this junto, this meeting in Dallas?

A    Basically we were trying to -- we were trying to establish a line of communication between all the, all the cities and surrounding counties and form a structure to where everybody would be in contact with everybody.  We had a traveling general.

Q    What is a traveling general?

A    A traveling general is a person that wherever he's at he's, he gots the rank, he gots the rank of general.  He has the authority, you know, to make decisions.

Q    Well, now is that different from Wero Rodriguez?

A    Yeah, because when he comes to San Antonio he automatically relinquishes his position.

Q    Okay.  And who was the traveling general?

A    Low.

Q    Okay, that person you identified as Low?

A    Yes, sir.

Q    Did you know a Mafia member by the name or Ruben Rodriguez?

A    Yes, sir.

Q    Okay.  Who was that person?

A    He was a Mexican Mafia member.

Q    I'm sorry, Ruben Hernandez.  Ruben Hernandez?

A    Okay, I know him too.

Q    Okay.  Let's clarify.  Ruben Hernandez and Ruben Rodriguez.  Was there a relationship between the two?

A    Yes, sir, father and son.

Q    Okay, and which one was in the Mafia?

A    Both of them.

Q    Okay, is this the father or the son?

A    That's the father.

Q    Okay.  The father's name was Rodriguez or Hernandez?

A    Hernandez.

Q    Okay, do you know if there was a problem between this Ruben and any other member of the Mexican Mafia?

A    I mean, I had been told by Wero Rodriguez and that he had been talking about a family member of mine and that he was in a --

Q    Ruben had?

A    Yeah.

Q    Okay.

A    And that he was --

Q    I'm sorry, the father or the son?

A    The father.

Q    Okay.

A    That he was bad-mouthing somebody in my family and, you know, they wanted him dead because of other things.  I didn't ask why or what, you know --

Q    Who wanted who dead?

A    Wero wanted Ruben Hernandez dead.

Q    The father?

A    Yes, sir.

Q    Why?

A    It had to do something with they believed he was an informant, you know.  I didn't know all the details, you know, I just know that they wanted him dead and it needed to get done.

Q    And do you know where the order originated?

A    No, sir.

Q    Okay, but did you say Wero Rodriguez, the general, wanted him dead?

A    Yes, sir.

Q    And how did word get to you?  Who conveyed this to you?

A    The general.

Q    Who was that?

A    Alex Guerrero.

Q    I'm sorry?

A    Alex Guerrero.

Q    Alex Guerrero.  What's his nickname?

A    Loco Machine.

Q    Okay, what did Loco Machine tell you?

A    That -- well, I talked to him and Wero Rodriguez actually and --

Q    You talked to both of them?

A    Yes, sir.

Q    Okay.  And what was the purpose of the meeting?

A    That they wanted him killed.

Q    Let's make sure we're talking about the same person. Government's Exhibit 30, is this the Loco Machine you're talking about?

A    Yes, sir.

Q    Okay.  And was any plans discussed about dealing with this issue?

A    Well, the way it went down was that, you know, I jumped the gun.  What I did I approached this person, Ruben the father, and I confronted him and he told me, he goes, "Well, whoever's talking bad about me or whatever," he goes he will take care of it, you know, "Bring that person to me and I'll take care of it."

         So when I reported this back to Loco Machine and Carlos Rodriguez they were upset because they said that I had spoiled the element of surprise.  In other words, they wanted him dead, you know, that was, that was the bottom line, you know.

         THE COURT:  They wanted who dead?

         THE WITNESS:  The father.

         THE COURT:  I see.  Okay.

Q    And they thought you jumped the gun?

A    Yes, sir.

Q    So what happened after they felt you jumped the gun?  What plan was initiated?

A    Well, I went to his house.

Q    Whose house, Ruben's?

A    Yes, sir.  And I talked to him and I told him, "Look, man, you know, there's been a mistake, you know, apparently, you know, the person that was talking bad about you, you know, we found out that he was lying.  We're going to take care of it." You know, I told him, you know, "You know, I'm man enough to admit when I'm wrong, you know, all we ask of you is, you know, don't lose faith, you know, don't lose faith in the Eme, you know, just keep on reporting, you know," and so forth.  We kind of made amends.  We kind of, you know, we talked and, you know, he said that a lot of people were jealous of him and so forth like that because, you know, he moved a lot of drugs as well.

Q    And what ended up happening to him?

A    We ended up trying to kill him after that.

Q    He was killed?

A    No, he wasn't killed.

Q    An attempt was made?

A    An attempt was made.

Q    Was anybody given the assignment to do it or the cameo?

A    Yes, sir.

Q    Who?

A    Gibby.

Q    Who is Gibby?

A    Gibby Hernandez.

Q    A Mafia member?

A    Yes, sir.

Q    And why was he given that assignment?

A    He was just given -- you know, it was just assigned to him, you know.

Q    Okay.

A    There's no particular reason.

Q    And what corner was he attached to?

A    South side.

Q    And was he to do this by himself?

A    No, sir.

Q    Who else was to do it with him?

A    It was Belmon, and two other carnales, Sweet Pea, and I believe it was Chuy Ramirez.

Q    Were these all south side members that you just named?

A    Yes, sir.

Q    Okay.  Look at Government's Exhibit 41.  Do you recognize that photograph?

A    That's Sweet Pea.

Q    That's Sweet Pea.  South side member?

A    Yes, sir.

Q    And they made an attempt to kill Ruben the father?

A    Yes, sir.

Q    And do you know if anybody ended up getting killed?

A    The son.

Q    Why?

A    Well, we knew nine times out of ten if we were to meet with the father the son was going to be there, but the deal was to kill the father not the son.  The only way the son would get hurt was if he interfered.  And the son ended up interfering and he ended up getting killed.

THE COURT:  Mr. Contreras, we're going to take a recess till 1:30.

**(Recess; resuming - Jury in.)**

MR. CONTRERAS:  May I proceed, Your Honor?

THE COURT:  Yes.

Q    In around 2003 what rank -- were you still active with the Mafia?

A    Yes, sir.

Q    And what was your rank at that time?

A    2003?

Q    Around there?

A    Assistant general.

Q    What did the assistant general do?

A    I assisted the general.

Q    Who was?

A    Loco Machine.

Q    Okay.  Were you familiar with a member by the name of Arte Moreno?

A    Yes, sir.

Q    Who was he?  Let me back up, that's a --

MR. CONTRERAS:  May I approach the witness, Your Honor?

THE COURT:  Yes, you may.

Q    Look at Government's Exhibit RA0881.  Do you recognize that?

A    Yes, sir.

Q    Okay, do you know what that's a picture of?  You're familiar with that picture?

A    There's carnales in there.  There's Mexican Mafia members there.

Q    Okay.  This is a photograph of Mexican Mafia members?

A    Yes, sir.

MR. CONTRERAS:  Okay, offer Government's Exhibit RA0881.

MR. PRICE:  No objection, Your Honor.

THE COURT:  All right.

MR. STENBERG:  No objection by Mike Garcia.

THE COURT:  Thank you.

MR. COLLINS:  No objection.

THE COURT:  All right, it's in.

MR. CONTRERAS:  Ms. McCowsky, would you publish RA0881?

Q    Use that laser.  Okay, using the laser can you identify

who these people are in this picture?

A    That's Frankie Arte Moreno.

Q    Okay, that person, the last person just mentioned, what's his full name?

A    Arte.  It's Arte Moreno.

Q    Okay.  And do you know what rank, if any, Arte Moreno had reached in the Mafia?

A    Lieutenant.

Q    Do you know what corner?

A    North side.

Q    At some point did a problem arise with Arte Moreno's standing in the Texas Mexican Mafia?

A    Yes, sir.

Q    What was the problem?

A    He got in debt and he got arrested.  They considered him a threat.  They didn't think he was going to -- they thought he was going to turn and he was --

Q    Pull that mike up.  I'm having a little trouble hearing you.  Can you pull the microphone a little closer to you?

A    They, they --

Q    Let's slow down a little bit.  You said he got in debt.  What kind of debt are you talking about?

A    Drug debt.

Q    How did he incur a drug debt?

A    He used to use, you know.  He spent money that he owed --

that didn't belong to him.

Q   But why would the members of the Mexican Mafia care about a drug debt?  Elaborate on that?

A   Well --

Q   Who did he owe the money to?

A   To the canton, to the house, to the table.

Q   How would -- explain briefly.  How would he have been able to run up a drug debt with the Mexican Mafia canton?

A   Well, he had access to the drugs that the Mexican Mafia were distributing and he also -- it was rumored that he was keeping money from home invasions.

Q   The dime?

A   Yes, sir.

Q   And did the Mexican Mafia supply its members at this time?

A   Yes, sir.

Q   How much narcotics was the canton or the Mafia supplying its members weekly, monthly?

A   Jesus.  To just one member or just --

Q   The whole membership.  Just give me a ball park, give me an idea.

A   Thirty, 40 ounces.

Q   Of?

A   Of black tar heroin.

Q   How often?  Thirty, 40 ounces how often?

A   Within a week to two-week span.

Q   Okay.  And was it just heroin?

A   No, sir.

Q   What else?

A   Cocaine.

Q   About how much cocaine was being distributed to the membership?

A   We're talking about kilos.  Each lieutenant was entitled to at least a kilo.

Q   How often?

A   However long it took him to sell it.  It could be a week, two weeks.

Q   A week or two weeks?

A   Month.

Q   And I have you focusing on 2003.  Was this true from 2002 up to 2003 generally?

A   Yes, sir.

Q   Okay.  And Mr. Moreno, Arte Moreno, what was his drug that he sold?

A   Heroin and cocaine.

Q   Do you know how much of a debt he had incurred to the house or the Mafia?

A   No, sir.

Q   And that's -- just to make sure we're talking about the same person, that's V8?

A   Yes, sir, that's him.

Q   Okay.  And when did this first become a problem?  How did you become aware it was a problem?

A   He had already got himself in debt several times and he'd been bailed out.  You know, somebody had helped him pay the debt off and then, you know, he'd catch up.  He'd catch up in the sense that, for instance, like maybe I helped him out.  I'll use myself as an example.  And I helped him pay off the drug debt, clear it so he wouldn't stay in bad standing.  And then in turn he would pay me in small increments, you know, back until he was paid up.  But he did this about two or three times and, you know, he started falling out of favor with the hierarchy of the Mexican Mafia.

Q   And you'd mentioned an arrest also.  Did you, or did I hear you right?

A   Yes, sir.

Q   Okay, what happened, what was that about?

A   He got raided.  He got raided at home and --

Q   When you say raided, are you talking about a search warrant was run on his house?

A   Yes, sir.

Q   Okay.

A   And he was in the county jail and they thought he was going to turn so they wanted him bailed out so they could kill him.

Q   When you say they, who did?

A    The mesa.

Q    And the mesa, it means what?

A    Lieutenants on up.

Q    The leadership?

A    Yes, sir.

Q    They wanted him bailed out of jail?

A    Yes, sir.

Q    Why?

A    Because they wanted to have him killed.

Q    Who made the decision to have him killed?

A    Wero Rodriguez.  Well, we all voted on it.

Q    Who participated and approved of the decision to have him killed?

A    That I recall it was Wero Rodriguez.  It was myself.  It was Loco Machine.  And you had Jimmy Panzon Zavala.  You had, I believe it was, what, Chuy Ramirez was there.

Q    Slow down.  Show me Exhibit No. 39.  Do you see that?

A    Yes, sir.

Q    Is that the Jimmy Zavala you're referring to?

A    Yes, sir.

Q    Show me Government's Exhibit 10.  Is that the Chuy you referred to?

A    Yes, sir.

Q    And did you all meet and decide that Arte had to be killed?

A    Yes, sir.

Q    And what was done next?  Was anybody assigned a role?

A    Yes, sir.

Q    Were you assigned a role?

A    Was I assigned a role?

Q    Yes.

A    No, I was told to give the order to a certain person.

Q    And did you give the order?

A    Yes, sir.

Q    Who did you give the order to?

A    Jimmy Panzon Zavala.

Q    Okay, and what was his rank at the time?

A    Two thousand -- I believe he was, he was a lieutenant of lieutenants.

Q    Okay.  And after you gave him the order, did you have any further involvement in the murder of Arte Moreno?

A    Yes, sir.

Q    What was your involvement?

A    After Jimmy had killed him, me, Billy Silva and Ray Carrasco went to the house where he was killed and we put him in the back of a truck and took him to a ranch and buried him.

Q    What house was it?  Where was he killed?

A    It was, I think it was Indian Creek, out there.

Q    He was in a house, though?

A    Yes, sir.

Q    Do you know whose house it was?

A    One of Jimmy Panzon Zavalas's girlfriends.

Q    And when you got there what was the condition of Arte Moreno?

A    He had a bag over his head so the blood wouldn't spill all over the house.

Q    Was he dead?

A    Yes, sir.

Q    And did you-all move him from that house?

A    Yes, sir.

Q    Who all did that?

A    Ray, Billy and myself.

Q    Ray who?

A    Carrasco.

Q    And Government's Exhibit No. 5, is that the person to whom you're referring?

A    Yes, sir.

Q    And you said Billy.  No. 11.  Is this the Billy you're talking about?

A    Wild Bill Silva.

Q    Okay.  You all three went to the house where the body was and you-all put him in what vehicle?

A    We put him in Arte's vehicle.

Q    In his own vehicle?

A    It was a rental.

Q    And then what did you-all do?

A    We drove to the ranch.

Q    Which ranch?

A    The ranch of Ray Carrasco.

Q    Do you know where that ranch was located?

A    It was Atascosa.  On the outskirts of San Antonio.

          MR. CONTRERAS:  May I approach, Your Honor?

          THE COURT:  Yes.

Q    Tell me if you recognize Government's Exhibit RA811.2, 811.3?

A    Yes, sir.

Q    What are they?

A    That's the ranch.

          MR. CONTRERAS:  Offer Government's Exhibit RA811.2 and .3

          MR. PRICE:  No objection, Your Honor.

          MR. STENBERG:  No objection.

          MR. COLLINS:  No objection, Your Honor.

          THE COURT:  All right, admitted.

          MR. CONTRERAS:  May I publish?

          THE COURT:  Yes.

Q    Is that the front of the ranch, Mr. Flores?

A    Yes, that's the entrance.

Q    Okay, and whose ranch was that?

A    It belonged to Ray Carrasco, his family.

Q    And when you-all got the Carrasco ranch, what did you-all do?

A    We drove the Blazer, it was like a Blazer type vehicle, we drove it to the back of -- it was a utility vehicle.  We drove it to the back of the ranch, the back of the house of the ranch and we all stood around and talked a little bit, you know, and then we decided that I would ride a tractor and they would take it to the hole.

Q    What hole?

A    A hole had been previously dug out.

Q    On the ranch?

A    Yes, sir.

Q    When had the hole been dug?

A    A few days prior.

Q    Who dug the hole?

A    Me, Billy and Ray.

Q    Did you-all know what you-all were digging the hole for?

A    Yes, sir.

Q    Once you-all got there to the hole with the body, what did you-all do?

A    They drove the utility vehicle to the hole.  I could see from where I was at cutting the grass.  I was as a lookout because there's other houses around there.  Not many.  I think it was, what, two houses at the time, and I was looking to make sure the neighbors weren't, weren't watching or anything

like that. And they proceeded to put Arte in the hole and bury him.

Q Did they remove anything from the body?

A Before, before he was driven to the hole, we took all his clothes and left him in his boxers, his briefs, boxer underwears, and left his jewelry on him.

Q Was the bag still on his head?

A Yes, sir.

Q Do you remember if his jewelry was removed?

A It stayed on.

Q And who shot Arte?

A Jimmy Panzon Zavala.

Q Why? Why him?

A It was his final initiation into the Mexican Mafia. It was his first contract killing.

Q At some point later, Mr. Flores, did you and the membership start to get nervous about that body you-all had buried, Arte's body?

A Yes, sir.

Q Why?

A After Wero Rodriguez got killed, Loco Machine got picked up. But even before then we were kind of nervous because they had him as a suspect in the murder of Lencho. And but when Wero got killed, you know, we were afraid that he was going to turn.

Q    That Loco Machine was going to turn?

A    Yes, sir.

Q    Now Wero Rodriguez was already dead at the time of Arte's murder?

A    Yes, sir.

Q    Okay.  So what did you-all do in response to this worry?

A    Well, I went to go talk to Billy and to Ray Carrasco.

Q    Those two folks whose pictures we just saw?

A    That's correct, sir.  I told Billy -- I told them both separately.  First I went to Billy's house and I -- no, I went to Ray's house and I talked to him about it, and I told him, "We're going to have to dig that body out, you know, because Wero and" -- Wero was dead but at the time Wero and Loco knew where that body was.  But they didn't know the exact location, they just knew it was on the ranch.  And the ranch ain't very big.  And so we -- I went and talked to Ray and Ray agreed that we had to dig it out.  And then I went to go talk to Billy Silva and he said he was going to go back.  He got scared.  He said that he would pay --

Q    Who did?

A    He would pay Ray.

Q    Who said that, Billy?

A    Billy.  You know, that he would give him money, and myself money to, you know, dig the body out.  I didn't want no money, I just wanted the body out of there.  So I in turn went back

to Ray and I told him what Billy had said, and Ray wanted to go by himself and somebody else, he didn't say who. And I told him, "No," I go, "It's imperative that I go too," because I wanted to make sure that the body was out. And I told him we had to act fast because it was only a matter of time before Loco, Loco gave us up. And then one night I got a call and it was like around -- it was dark, it was like around 9:30, ten o'clock at night.

Q And who called you?

A Ray Carrasco.

Q What did he say?

A Told me he had to speak to me in person.

Q And did you-all meet that night?

A I went to his house.

Q And what happened once you got there?

A He told me he had dug out the body.

Q And did he show you anything?

A He asked me if I wanted to see the body and I told him no that I believed him, but, you know, he had taken off a necklace off of Arte, and if you've ever smelt a dead body, it has a smell to it that, you know, it stays in your nose, you know, it stays in your -- it's an awful smell.

Q And the necklace?

A The necklace, I recognized it.

Q Did it have the smell?

A    Yes, sir.  And I knew that it was Arte because I recognized his -- I recognized the necklace.

Q    What happened to the gun that was used to kill Arte?

A    We torched it, disposed of it.

Q    Did the Mafia have a general policy about what to do with guns used?

A    Yes, sir.  We had a soldering tank and basically any weapons that were used in hits were disposed by getting torched to where there was nothing left.

Q    Is that what was done here in the case of the gun used to kill Arte?

A    That and everyone's clothes.

Q    Did you know somebody by the name of Ernest Guzman?

A    Yes, sir.

Q    And was he associated with the Mafia?

A    Yes, sir.

Q    At some point -- is this I'm showing you V7, is that -- are we talking about the same person?

A    Yes.

Q    Okay.  At some point did he fall out of favor with the Mafia?

A    Yes, sir.

Q    Why?

A    I'm not sure, I didn't know him.

Q    Okay.  Did you ever hear any official talk amongst the

leadership that he was in trouble, anything like that?

A    He was an informant.

Q    What?

A    Informant.

Q    He was an informant?

A    Yes.

Q    And what happens to Mafia members who are informants?

A    They get killed.

Q    Any exceptions to that?

A    There's no exceptions to the rule.

Q    Okay.  At some point did you receive some word about Mr. Guzman and that the time was near for him?

A    I got a call one evening by a fellow Mexican Mafia member by the name of Faqundo Yanez.

Q    Do you know Faqundo Yanez?

A    Yes, sir.  And he told me that Fat Boy Guzman had the green light.

Q    Okay.  What rank were you at the time?  Just to make sure, is this Exhibit No. 34 the same Faqundo Yanez?

A    Yes, sir, that's him.

Q    Okay.  He told you what?

A    That he had --

Q    Oh, I asked you what rank you were first?

A    I was assistant general.

Q    Okay, so this is before -- was this before or after the

murder of Arte?

A    Oh --

Q    That's okay, don't worry about the sequence.

A    I think it was before.

Q    Okay.  He called you and said what?

A    That he had spotted him and he knew where he was at.

Q    Who?

A    Faqundo told me that he knew where Guzman was at.

Q    Fat Boy Guzman?

A    Yes, sir.

Q    Okay, where did he say he was?

A    At the tire shop.

Q    Where?

A    On Highway 90.

Q    On 90.  And what was the purpose of his call?

A    Carry out the hit.

Q    To carry out the hit?

A    Yeah.  Well, I mean, he wanted to have him killed because he had the green light, you know?  He told me that he was an informant.

Q    Who told you that, Faqundo?

A    Faqundo.

Q    Okay.  So he tells you, "I see him."  And what's the purpose of the call, why is he telling you this?

A    He wanted me to give the okay.

Q    Okay.  And what was your response?

A    I told him I couldn't.

Q    Why?

A    Because I didn't know -- I didn't know Fat Boy Guzman. You know, a lot of times, you know, there's carnales that fall out of favor with other carnales.  Maybe one carnal was locked up, the other one was having an affair with his wife, something to that effect, and they have it in for each other. So I mean it could have been something else.  He might have not been an informant.

Q    You didn't know?

A    I didn't know.  I had to get the okay with somebody that did know.

Q    So what did you do in response to that call from Faqundo Yanez?

A    I got together with Wero Rodriguez and Loco Machine.

Q    And what was the result of that discussion?

A    To carry it out.

Q    What did you do once you received that word?

A    They told me to get another member by the name of Joe Tamayo and to go with Faqundo Yanez to get it taken care of. And I didn't know all the details of exactly who did what, who killed who, but the job got done that night.

Q    Did you direct Joe Tamayo to go help Faqundo?

A    That's correct, sir.

Q    And Fay Boy Guzman was killed?

A    Yes, sir.

Q    And what happened after that?

A    Supposably Faqundo Yanez got ahold of me and told me that they had recognized his truck, somebody had seen the truck.

Q    Faqundo's truck?

A    Yeah.  And he thought they had gotten the license plate. And he had to leave town because of that.  You know, he thought they were on to him.

Q    And did he leave town?

A    Yes, sir.

Q    Where did he go?

A    Mexico.

Q    And did he stay there?

A    Yes, sir.

Q    And while he was in Mexico did he do anything that was Mafia related?

A    Yes, sir.

Q    What did he do from Mexico?

A    He sent drugs.

Q    What kind of drugs?

A    Heroin.

Q    Small amounts or large quantities?

A    Large amounts.

Q    How much was he sending and how often?

A   He was sending to his brother Puppet and other family members of his, you know.  I wasn't familiar with the other family members.  I was aware of them but I had never dealt with them directly.  But with Puppet, you know, I knew he was sending them kilos of heroin.

Q   And did Faqundo then become the primary or a major source of heroin for the canton?

A   One of them.

Q   One of them.  And who are the other sources?

A   The remanas [phonetic], the Flores sisters.

Q   The Flores sisters?

A   The witches.  They call them the witches.

Q   The witches.  What was their operation consist of and --

A   They were crossing heroin from across the border.  They would, they would get other girls with, girls with no criminal background and what they would do, they would have them cross -- shoes.  They would wear shoes, women's shoes, sandals, and these sandals, in the heels of the sandals there was heroin, black tar heroin.  And the women would walk across the border and they in turn would get to San -- once they would cross the border from Mexico what would happen was that there'd be somebody on the other side waiting for them and they'd be driven back to San Antonio, Texas, you know.  They might go in two, three different cars.  And once there, it would be distributed to the Mexican Mafia.

Q    And what was the connection with the Mafia and the
sisters?  Did it get divided, or what was the relationship?

A    Ray Carrasco was married to one of the sisters.

Q    The same Ray Carrasco whose ranch you were talking about?

A    That's correct, sir.

Q    Okay.  With Faqundo and the sisters, the witches, as you
call them, together, how much heroin was being distributed by
the Mexican Mafia?

A    From the sisters I myself was getting anywhere from five,
ten ounces a week, you know, and there was other Mexican Mafia
members that were getting just the same, you know.  But a lot
of times, you know, Flaco Rodriguez was in charge of taking
care of that heroin and he was another Mexican Mafia member.

Q    Okay.

A    And at the time he held no rank but was in charge of all
the drugs and the money, the proceeds from the drugs.  If you
went and picked up two ounces of heroin from him, well, then
you owed him $2400, you know, $1200 an ounce.  And once all
the heroin was distributed and paid for, well, we'd go again,
you know.

Q    What money was used to buy this heroin for the
organization?

A    That heroin right there, they would front it to us, you
know, at a lower price of course, at their price.  And we in
turn would distribute it and sell it and make a profit.

Q    For the organization?

A    Yes, sir.

Q    Okay.  What was the relationship between the Mafia and other similar groups in San Antonio?  Let's speak about the Bandidos.  Are you familiar with the Bandidos?

A    Yes, sir.

Q    Was there a relationship between the Bandidos and -- or an understanding between the two groups?

A    Yeah, but there was a disagreement.

Q    What was the original understanding before the disagreement?

A    The original understanding was that they could sell drugs in San Antonio without being charged the ten percent, the tax, because they'd been around San Antonio for many years before the Eme even started.  So they had our respect, you know?  But anybody that dealt with them, dealt for them that weren't members of the Bandidos, had to pay.

Q    What's the term for it?

A    Their drug pushers.

Q    Okay.  Is there another term you-all use for that?

A    Drug peddlers, people that work for them, you know.  Maybe just friends, friends of theirs that were Bandido supporters, you know.

Q    They had to pay?

A    Yes, sir.

Q    And tell us about the disagreement?

A    We had a sit-down with them at a restaurant.  We rented out the whole restaurant.  And we were supposed to meet the Bandidos and we were supposed to discuss the problem at hand, which was that their -- they didn't have to pay the dime but their workers had to.  And they wanted to see if they could come to some type of resolution, you know, as far as them not having to pay the dime.

Q    And let's move on to a specific person, Guero Cantu.  Did you know that person?

A    Yes, sir.

Q    And who was he with?

A    The Bandidos.

Q    And did he get caught up in this disagreement?

A    Yes, sir.

Q    And was a decision made by your organization to deal with it?

A    Yes, sir.

Q    What was the decision?

A    Have him killed.

Q    To have him killed.  Wouldn't that cause a problem with the Bandidos?

A    Yeah, but he wasn't going to know that it was us.

Q    And was a plan put in place to deal with it?

A    Yes, sir.

Q    What was the plan?

A    Chuy had a -- one night I got a call by Jimmy Panzon Zavala and --

Q    Okay, and we just showed his picture, Jimmy Zavala.

A    Yes.  And he told me that Chuy Ramirez had been -- was in debt with 16 and I told him -- I asked him how much, he goes, "16."

I go, "Well, you pay 800 and I'll pay 800."

And he goes, "No, $16,000."

And well, you know, that's a no-no.  But he wanted -- Jimmy wanted to know if there was anything Chuy could do to clear that drug debt.

Q    Just to be clear.  Who did he owe the money to, the canton?

A    The organization.  He owed a kilo of cocaine to the, to the organization.

Q    A kilo.  Okay.

A    And I told him that I would talk to the ones in charge, which was Wero Rodriguez and Loco Machine.  And that job was up, so as far as -- to have Wero killed.  So they said that if Chuy would get it done as soon as possible that his drug debt would be cleared.

Q    Chuy was allowed to wipe the slate clean if he killed the Bandido?

A    That's correct.

Q    And did he do it?

A    Yes, sir.

Q    Do you know who he did it with?

A    I know --

Q    That's okay, I don't want you to guess.  Was his debt wiped clean after that?

A    Yes, sir.

Q    Okay.  I want to talk about how you came to be here.  You had said earlier that you had pled guilty?

A    Yes, sir.

Q    And do you know what sort of punishment you're facing?

A    With the Eme?

Q    No.  Well, from the Court?

A    To life in prison.

Q    You face up to life in prison?

A    Yes, sir.

Q    But you, you mentioned from the Eme.  What did you mean by that?

A    Well, there's a contract hit out on me.

Q    And how long will that be in existence?

A    Until I'm killed.

Q    So why are you here?  I'm sorry?

A    Well, there's various reasons.  I'm doing it because it's the right thing to do to begin with.  But, you know, when Wero Rodriguez got killed, I had been called to my parole officer

to go see my parole officer and there was some agents there, and by law, if you're life's in immediate danger, there's a hit out on you something, they've heard about it from the streets from informants or whatever, by law they have to let you know. And they let me know that there was a contract hit out on me and --

Q   And why was there a green -- well, first of all, what we do mean by green light?

A   A green light, that means that I was supposed to be killed.

Q   Why did they put the light on you?

A   Well, at first I didn't -- at first I -- in my heart I knew I hadn't done anything wrong, you know. I didn't believe them. You know, I thought they were trying to shake me, rattle me, you know, and I didn't go for it, you know? I still kept on reporting and so forth, you know, with the encargals.

Q   What does encargal mean?

A   The people in charge after Wero Rodriguez got killed. And, you know, I had heard from different people, you know, that they believed that I was working with the federal government, I was an informant, and that after Wero Rodriguez got killed I had taken a certain amount of money from the dime, and which wasn't true. And then one time I ran into -- I was at Fiesta Texas with my family and Herb Huerta, the

president of the Mexican Mafia has a son by the name of Ralphie Pena. I ran into him there at Fiesta Texas and we spoke and we were dealing with each other, you know, I used to sell him heroin, ounces of heroin and so forth, and he told me that there was a hit out on me and because they thought that I was working with the feds. And I told him it wasn't true.

Q And you weren't?

A No. No, sir, I wasn't.

Q But when they believed you did --

A It didn't matter.

Q It didn't matter. Do you know any of the defendants seated here in the courtroom?

A I know two of them.

Q Who?

A I know Cache.

Q Who do you know him? Jacinto Navajar?

A Yes, sir.

Q How do you know him?

A He was my lieutenant in the south side.

Q When?

A In 2001.

Q I thought Lencho was.

A Oh, wait, I take that back. Hold on. When he got -- I forget what year he got out. Lencho got killed in 2000. I believe Cache got out in 2001. And when he got out he was

assigned lieutenant to the south side and --

Q   Navajar was?

A   Yeah, and Gibby Hernandez was his sergeant.

Q   Okay.  And do you remember when he got out?  Not the date, but do you remember that event when he got out?

A   Yes, sir.

Q   And did you do anything for him when he got -- or did the organization do anything for him when he got out?

A   Yes, sir.  He was highly recommended when he came out.  He held lieutenant at the Connelly unit, in lock-down unit.

Q   I'm listening.  He held the lieutenant at the which unit?

A   Connelly unit.

Q   Connelly Unit?

A   Yes, sir.

Q   That's a prison unit?

A   Yes, sir.

Q   Okay.

A   He was -- he's always been very well respected.  I didn't know him at the time but I had heard of him.  You know, there's certain members that stick out, you know, that even though you don't know them you hear about them, and he knew a lot of people.  So when he got out, he automatically had the rank of lieutenant in the south side.

Q   Is that unusual?

A   No.

Q    Okay.  And was anything done for him when he got out?

A    Yes, sir.

Q    What was that?

A    We gave him a car.  A Rally Sport I believe it was, something like a Firebird.  And we gave him money and drugs.

Q    How much drugs?

A    A couple ounces of heroin.

Q    What was that for?

A    For him to sell.

Q    To get him started?

A    Yeah, get him started.

Q    Who else do you know?

A    I know Bam Bam.

Q    How do you know Bam Bam?  I'm sorry, who are you calling Bam Bam?

A    That person right there.

Q    You're identifying Jose Martinez, a defendant.  How do you know him?

A    Well, we had some drug dealings together as well.

Q    What kind of business did you do with him?

A    Not much, just a couple ounces.

Q    Who was buying and who was selling?

A    Huh?

Q    Who was selling and who was buying?

A    I was selling.  And when I fell out of -- also I know him

by the reason because when I fell out of favor with the Eme -- when I found out Loco had turned actually, I left, I left for Mexico, Laredo, Mexico and I stayed up there for a while, for about a week. And the guys thought I had left town. And I owed a substantial amount of money to the canton for cocaine. I owed it to Jimmy Panzon Zavala. But while I was away I had somebody else conducting my business, which was my common-law wife. And I was almost through selling the dope. You know, I had pretty much the lump sum of money that I owed. And one of the times that my ex-wife, I mean my common-law wife went to go drop off at a girl by the name of Pauline, Bam Bam was there. And when my common-law wife got there she got there with her two kids and he kidnaped her.

Q   Why?

A   Because they wanted the money that I owed them.

Q   Did you know a person by the name of Gilbert Enriquez, Solo?

A   Yes, sir. I didn't know him personally, I just -- the names -- the name, you know, I knew -- his name had been discussed.

Q   In what context? Why?

A   He had gotten killed.

Q   He what?

A   He had gotten killed.

Q   He got killed?

A    Yes, sir.

Q    Why?

A    I'm not sure.  I know that a lot of times, you know --

          MR. STENBERG:  Objection, Your Honor, it's speculation.

          THE COURT:  I'll sustain that.

Q    Don't guess.  Just you know he got killed?

A    He fell out of favor with the Eme.

Q    Why?

          MR. STENBERG:  Your Honor, it's asked and answered. He already said he didn't know.

          THE COURT:  No, I'm going to overrule that, that's a different question.  You're not guessing now, right?

          THE WITNESS:  No, sir.

          THE COURT:  Okay, go ahead.

          THE WITNESS:  I'm not guessing.

          THE COURT:  Go ahead.

A    A lot of times --

          THE WITNESS:  May I say something, Your Honor?

          THE COURT:  I'm sorry?

          THE WITNESS:  May I say something?

          THE COURT:  Let the prosecutor ask you a question.

          MR. CONTRERAS:  I'm sorry.

          THE COURT:  Ask your question.

Q    Why did he fall out of -- don't guess.  Why did he fall

out of favor?  What got him in trouble?

A   I'm not sure.  I can't specify exactly what it was.  It was on a need-to-know basis.

Q   Then don't answer that.  You know he got killed?

A   Yes, sir.

Q   And did you have any involvement after the fact relating to that murder?

A   Yes, sir.

Q   What was that?

A   There was a vehicle that needed to be re-upholstered.

Q   Why?

A   Because there was blood all over it.

Q   Whose blood?

A   Solo's.

Q   Whose vehicle?

A   Cache's.

Q   Do you know who carried out that hit?

A   I was told that it was Cache.

        MR. CONTRERAS:  Pass the witness.

        THE COURT:  Mr. Price?

                        **CROSS-EXAMINATION**

**BY MR. PRICE:**

Q   Sir, I'm the attorney for Mr. Navajar.  What kind of vehicle was it?

A   I'm not sure.

Q    Well, you did the work on it, right?

A    No, I did not do the work on it.

Q    Well, tell me again what involvement you had with the vehicle?

A    Cache told me that there was blood all over the vehicle and that he needed to get it re-upholstered.

Q    Did you see it?

A    No, sir.

Q    So this was based on a conversation you had?

A    Yes, sir.

Q    Okay.  How much time are you going to get?

A    I'm facing life.

Q    Uh-huh.  Are you hoping that's going to get cut down some?

A    I would hope it would.

Q    Do you expect to ever be on the street again?

A    To be quite frank with you, no, sir.

Q    How many murders did you take part in?

A    I conspired in four murders.

Q    Four?  And how many did you actually perpetrate yourself?

A    Where I actually killed the person?

Q    Uh-huh.

A    None of them.

Q    None?  You just arranged for the murders?

A    Yes, sir.

Q    Are those four that you admit to or four that you got

caught?

A    No, those are the ones that I actually was involved in.

Q    Are there others that you haven't disclosed yet?

A    No, sir.

Q    Okay.  Did someone else tell you about Cache being involved in that incident?

A    Besides Wero Rodriguez?

Q    Besides Cache?

A    Carlos.  Carlos and Loco Machine.

Q    Okay.  How long did you know Carlos?

A    From the time I got out, October of '99.

Q    And what was Carlos's rank?

A    He went all the way up to vice president.

Q    Okay.  And who made you assistant general?

A    Carlos did.

Q    Okay.  And who promoted you each time you were promoted?

A    I spoke to Carlos and Loco Machine.

Q    Okay, so they were your sponsors?

A    They weren't my sponsors, they were my bosses.

Q    Your padrinos?

A    No, no, my padrinos.  A padrino is somebody that indoctrinates somebody into the Mexican Mafia.  For instance, like Panzon Zavala, I was his padrino.  I brought him into the Mexican Mafia.

Q    Who was your padrino?

A    Luis Flores from the Valley.

Q    Where is he at now?

A    I don't know.

Q    Is he still a member of the Mexican Mafia?

A    I don't know.

Q    Okay.  Wouldn't it be safe to say that you'd do just about anything to get your sentence reduced?

A    No, sir.

Q    Okay.  You wouldn't lie?

A    No, I wouldn't lie.

Q    Okay.  And everything you've testified here today is the truth?

A    It's the whole truth.

Q    Okay.  You never told lies before?

A    Everybody's lied.

Q    Uh-huh.  Wouldn't you say pretty much your profession was being a liar for a long time?

A    No, sir.

Q    It wasn't?  Was deceit, lying, dishonestly, extortion, murder, racketeering wasn't your occupation?

A    Yeah, but I wouldn't lie about what Cache told me.

Q    Okay.  Do you have any vendettas or any debts that you owe Cache?

A    No, sir.

Q    Okay.  Has he ever wronged you or done anything to you?

A    No, sir.

Q    Has he ever insulted your family or said anything bad about your family?

A    I ran into an inmate in the county jail that Cache knows from the world, and I was told by that person that he had put a $10,000 price tag on my head; me and two other members of the Mexican Mafia.

Q    But you'd probably heard that many times, had you not?

A    No, sir.

Q    And why would someone put a $10,000 price on your head?

A    Because I'm at the opposite side of the barrel.  Now I got the barrel pointing at me because I'm informing on them.

Q    Well, how would he have known you were informing?

A    He's a general of the Mexican Mafia.  He runs San Antonio. He knows what goes on in San Antonio.  He's not, he's not stupid.  You know, he has his sources.

Q    Now he still runs San Antonio?

A    No, not right now.

Q    Okay.

A    But he does have, he does have some say.

Q    Who promoted Cache to general?

A    I'm not sure.

Q    How do you know someone's a general or a lieutenant or a captain?

A    You just know.  When you're active, you know, you know

who's running what.  You know, you run into other carnales, you know, and they let you know, you know?  If you're reporting to a certain corner, you know, they'll tell you who's in charge and who ain't.

Q   Who makes those decisions?

A   A general, usually comes from the inside from the vice president, which is Benito Alonzo.

Q   When's the last time you talked to Benny?

A   Excuse me?

Q   When's the last time you talked to him?

A   To who?

Q   The vice president.

A   When I held rank, but I didn't speak to him directly.  I spoke through his son.  His son goes and visits him.  I used to give his son drugs and messages and so forth.

Q   Have you ever talked to him directly?

A   No, sir.

Q   Have you talked to the president directly?

A   Yes, sir.

Q   Okay.  And you took care of his money, is that correct?

A   That's correct.

Q   How long did you do that?

A   I'd say a good two years.

Q   Did you ever see any blood in Mr. Navajar's car?

A   No, sir.

Q    Do you know what kind of car he drives?

A    Right now?

Q    The kind of car we're talking about, the one that was involved in a murder?

A    No, I didn't see that one.  I just saw the car that we gave him, the Firebird.

Q    You didn't know if it was a red one, a blue one, a green one, purple?

A    The car with the blood in it?

Q    Uh-huh.

A    No, sir.

Q    You don't know Ford, Cadillac, Chevrolet?

A    I can't tell you that.

Q    Do you know when it allegedly occurred?

A    The time, the very short time that he was out.

Q    Uh-huh.

A    He didn't last very long due to the fact that he went to go visit another Mexican Mafia member at the Connelly Unit and I believe a guard recognized him and they violated his parole.

Q    And how do you know that?

A    Excuse me?

Q    How do you know what you just said?

A    Because he told us.

Q    Who told you that?

A    Cache.

Q    Cache told you that?

A    Yes, sir.

Q    Okay.

MR. PRICE:  Pass the witness, Your Honor.

THE COURT:  Mr. Collins, any questions?

MR. COLLINS:  Yes, Your Honor.

**CROSS-EXAMINATION**

**BY MR. COLLINS:**

Q    So, Mr. Flores, this plea agreement that Mr. Price alluded to, you do expect to have your sentence cut, don't you?

A    I don't know what to expect.

Q    Well, you have an attorney, he probably discussed it with the Government, right?  You had some meetings?

A    Nothing was promised to me.

Q    Okay, I didn't ask if it was promised, I asked if you expect something?

A    Do I expect something?

Q    Yeah.

A    I hope not to get a life sentence, but do I expect something in return?  No, sir.

Q    But it required you to give substantial cooperation, right?

A    Yes, sir.

Q    And so by that that means something that's interesting to the Government.  You have to come up with something pretty

sensational not just something small, right, if you expect to get some help?  Would you agree with that?

A    Yes, sir.

Q    Okay.  And your whole life has been one based on deceit and dishonesty.  Wouldn't you agree with me?

A    As far as what?

Q    As far as your lifestyle and how you've conducted yourself?

A    As far as like doing drugs and stuff like that?

Q    Yeah, and the extortion and the home invasions and all those things?

A    I didn't lie it when I did the extortions or the home invasions, I told them what was going to happen.

Q    Okay.  I think you said earlier on direct examination that you knew in your heart you had done nothing wrong.  All these extortions and murders and things you've done, you know in your heart you've done nothing wrong?

A    I had done nothing wrong to betray the Mexican Mafia.

Q    And that's what was important to you, right?

A    I was loyal to the Mexican Mafia, you know.  I believed in the Mexican Mafia wholeheartedly, you know.  I was -- I'm not going to sugarcoat anything, you know.  I did my best to be a member of Mexican Mafia, you know, and I enforced every rule that was asked of me, you know.

Q    How long have you done heroin?

A    Since the age of 18.

Q    How old are you now?

A    I take that back, 17.

Q    How old are you now?

A    I'm 44, sir.

Q    All right, so for -- my math's not great, for 27 years you've used heroin?

A    Yeah.

Q    Are you under the influence right now?

A    No, sir.

Q    When's the last time you used it?

A    May 4th.

Q    Of this year?

A    2005.

Q    Okay.  Are you still involved in trafficking it in prison like you talked about earlier?

A    No, sir.

Q    When's the last time you did that?

A    When's the last time in prison?

Q    Yeah.

A    Trafficked in prison?

Q    Yeah.

A    In 1999.

Q    Okay.  And this latest case that's landed you in jail, not prison yet, what's that for?

A    Excuse me, can I backtrack for a minute?

Q    No, I wanted to ask you this question.  Where have you been -- what did you plead guilty to in 2008?

A    What did I plead guilty to?

Q    Yeah.

A    The RICO case.

Q    Okay, and that involves drugs, right?

A    Uh-huh.

Q    Okay.  And you just recently -- I'm not sure exactly when you pled, but you pled to that pretty recently, correct?

A    Yes, sir.

Q    All right.

          MR. COLLINS:  Pass the witness.

          THE COURT:  Mr. Stenberg, any questions?

          MR. STENBERG:  No, sir.

          THE COURT:  No?

          MR. CONTRERAS:  Just to clarify something.

                    **REDIRECT EXAMINATION**

**BY MR. CONTRERAS:**

Q    You're familiar with your plea agreement?

A    Yes, sir.

Q    Do you recognize what I'm showing here?

A    Yes, sir, I have one.

Q    Well, whose is that right there?

A    That's mine.

Q    That's yours?

A    That's correct.

Q    Well, we can go over a couple of pages and clarify something.

A    Okay.

Q    I'm on Page 4.  Do you see what the consequences of your telling a single lie up here are?

A    Yes, sir.

Q    "Should the defendant be less than truthful in
           any respect, whether through testimony as
           a witness or through statements to federal
           agents, this agreement is void and the
           defendant will be subject to a sentence of
           life imprisonment without the possibility
           of parole."

A    Yes, sir.

Q    You understand one lie and that's it?

A    I understand completely.

        MR. CONTRERAS:  Nothing further.

        THE COURT:  Nothing?  Yes, Mr. Stenberg.

                    **RECROSS-EXAMINATION**

**BY MR. STENBERG:**

Q    Joe Stenberg representing Mike Garcia.  How many hours have you spent with Mike Carlisle in the last, say, month?

A    Excuse me?  I can't hear you.

Q   How many hours have you spent with Mike Carlisle, Joey Contreras, Mary Green or somebody else with the Government in the last month?

A   This past month?  Month of what, May, right?  Speaking May?  None.

THE COURT:  In the last 30 days?

THE WITNESS:  Last 30 days, none.

Q   Okay, before that?

A   I was debriefed.

Q   And how many hours?

A   I can't specifically recall.

Q   Days?

A   Just hours.

Q   Over days?

A   No, sir.

Q   On one day?

A   Yes, sir.

Q   And have you seen notes of your debriefing?

A   Notes?  No.

Q   A summary?  Have you seen a summary of your debriefing?

A   No, sir.

Q   Have you gone over your debriefing?

A   No, sir.

Q   So you went -- you were debriefed when?

A   I can't exactly say when exactly.  I'm not quite sure.

Q   I'm not asking for the day but how about an approximate time?

A   I couldn't tell you.

Q   Do you know when your plea agreement was?

A   My plea agreement was -- I have to look at the date on it.

Q   Well, I'm sure they'll show you the date.

        MR. STENBERG:  Could we see that plea agreement?

        THE COURT:  Was it within the last 30 days, 60 days?

        THE WITNESS:  What, sir?

        THE COURT:  The plea agreement, when you signed the plea agreement?

        THE WITNESS:  No, sir.

        THE COURT:  Well, when do you think you signed it, how many weeks or months --

        MR. CONTRERAS:  We have the actual date right here, Judge.

Q   It was dated by you on January the 24th, 2008, dated by your attorney on October the 8th of 2007.

A   Yeah.  In fact, that was brought to me at the Connelly jail by Ernie Glenn.  He was my attorney at the time, which he's not no more.

Q   Okay.  So was your debriefing prior to or after your plea agreement?

A   Before.

Q   Okay.  So that was 2008?

A    Yes, sir.

Q    And since then you have not spoken to the Government people?

A    I spoke to them one more time after that.

Q    When was that?  Approximately?

A    A few months ago.

Q    And they went over your debriefing with you?

A    No, they just asked me some questions.  They didn't go over, you know, they asked me some questions that needed to be asked, some things that they hadn't asked me.

Q    And you provided them answers?

A    That's correct, sir.

Q    And you agreed to testify in this case?

A    That's correct.

Q    And what is it that you hope to get?

A    Maybe lesser time, but, you know, they can't promise me anything and they never have.

Q    I'm not saying they promised you.  You're the one that uses -- it's your words --

A    Well, the other attorneys --

Q    -- at least that's what I have written down.

A    Well, the other attorneys have asked me so, you know, I'm just, you know.

Q    It's your words that you said, you hoped.  What do you hope for?

A    I mean I would hope I would get a lesser sentence.

Q    Like what?  What are you going to tell this jury you want out of this?

A    I can't honestly say what I want, you know?  I mean, I would like another chance to get out, but, you know, as far as that happening, I don't know if it will.

Q    Well, so make sure the jury understands.  Right now the way it stands --

A    I'm facing life in prison.

Q    Life.  And you're wanting to say -- because you know it's -- the only person, the only entity, not your lawyer, the only people that can help you right now is the U.S. Government.  Is that right?

A    Well, a judge.  The judge sentences me.

Q    Yeah, the judge sentences you.  The only one that can file anything to help you right now is solely at the discretion of the U.S. Government, isn't that right?

A    I would imagine so.

Q    You imagine?  You don't know?  Your attorney didn't explain that to you?  Quote, "honestly," unquote?

A    I mean I would think that they would help me.

Q    Forget about thinking, I'm talking about honestly knowing. Didn't your attorney explain to you in the plea agreement before you signed it that the only people that can help you is the U.S. Government and it was solely at the U.S. Government's

discretion whether or not to file something to reduce your sentence?

A    Yes, sir.

Q    So you've got to testify to please them otherwise they will not please you.  Isn't that correct?

A    I'm not trying to please anybody.

Q    You're trying to.

A    I'm just saying what happened, the truth.

Q    The truth.  Thank you.

        MR. STENBERG:  Pass the witness.

        THE COURT:  Mr. Collins?

        MR. COLLINS:  Nothing further.

        MR. CONTRERAS:  Nothing further, Your Honor.

        THE COURT:  Okay, we'll take a recess till we get our next witness.

     **(Recess; resuming - Jury in.)**

        THE COURT:  Okay, let's go.

        MR. CONTRERAS:  May I proceed, Your Honor?

        THE COURT:  Yes.

        MR. CONTRERAS:  We call Mike Hernandez to the stand -- he's already on the stand.

          **MICHAEL HERNANDEZ, GOVERNMENT'S WITNESS, SWORN**

                     **DIRECT EXAMINATION**

**BY MR. CONTRERAS:**

Q    Tell us your name, sir.

A    Michael Hernandez.

Q    Michael Hernandez, you're in jail right now?

A    Yes, sir.

Q    Why?

A    For racketeering, RICO Act.

Q    I'm sorry?

A    For racketeering, RICO Act.

Q    Can you slide that a little bit closer to you?

A    I'm incarcerated for burglary, evading arrest and RICO Act.

Q    How old are you?

A    I'm 32 years old tomorrow.

Q    And how much of your adult life have you spent locked up?

A    Since I was 17 I've only spent about, say, three years of my life in the free world.

Q    I'm sorry?

A    Since I was 17 years old, I'd say about three years of my life I've been out in the free world.

Q    At some point as an adult did you become a member of the Texas Mexican Mafia?

A    Yes, sir.

Q    When was that?

A    That was in -- a full-fledged member I became in 2002.

Q    2002.  Where were you in 2002?

A    I was in the Winn Unit at TDC.

MR. CONTRERAS:  May I approach the witness, Your Honor?

THE COURT:  Yes, you may.

Q   TDC is the state prison?

A   Yes, sir.

Q   Do you know -- I'm going to show you Government's Exhibit RA2491.03.  Do you recognize that?

A   Yes, sir.

Q   What is it?

A   It's a picture of me, carnal Frank Velasquez, they call him Frost, and Ray Carrasco, and Robert Sanchez.  They call him Vala [phonetic].

Q   Vala?

A   Yes.

MR. CONTRERAS:  Offer Government's Exhibit RA2491.03.

MR. PRICE:  No objection, Your Honor.

THE COURT:  All right, let's go.  It's admitted.  I'm sorry, I didn't know all three were going to look at it.

MR. STENBERG:  No objection by Mike Garcia.

THE COURT:  Okay.

MR. COLLINS:  No objection.

THE COURT:  Okay, it's in.

MR. CONTRERAS:  Ms. McCowsky, can you publish 2491.03.

Q   Are you in this picture?

A    I'm wearing the -- that one right there in the white shirt.

Q    Top right?

A    Top right.

Q    And where's Frosty or Frost?

A    In the black.

Q    Okay, and who's the guy below him?

A    That's Ray Carrasco.

Q    Okay.  And the person to the right?

A    That's Robert Sanchez.

Q    And Robert Sanchez, who is that person?  What was he to you?

A    He was my prospect.

Q    And besides being your prospect, was he anything else to you?

A    Yeah, he was a close friend, you know, since the age of, I'd say ten or 11 years of age.

Q    Grew up with you?

A    I grew up with him.

Q    Where is he?

A    He was killed, I murdered him.

Q    You murdered him?

A    Yes, sir.

Q    Why did you do that?

A    It was an order from Chuy Low Ozuna.  Because of we were

collecting the ten percent, we did a home invasion in a residence on the south side on the street called Huron and Brighton, and we went inside the house. Vala had turned in the dope connection, so when we entered the residence, we held everybody hostage, we held everybody hostage --

Q   Let me slow you down a little bit. What was your purpose in going to the house? What year are we talking about, roughly?

A   We're talking 2005, I'd say maybe about April.

Q   V24, is that Vala that you're talking about?

A   Yes, sir.

Q   Robert Sanchez, your buddy?

A   Yes.

Q   In April 2004?

A   No, 2005.

Q   2005. Why were you-all going to that house?

A   You know, he advised me that at that residence they were selling narcotics and they weren't paying the ten percent.

Q   And had they been warned?

A   No.

Q   So what did you-all go to that house to do?

A   We went to go talk to them if they were selling narcotics there, and what happened was I told -- they had a big door and it was made out of steel so we couldn't get them to open the door. So what we told Vala to do was to tell them that we

wanted to sell them jewelry and guns in exchange for dope.
So Vala approached the residence and the guy opened the front
door, but the outer door was still closed, it was locked.  So
he told him we wanted to buy some jewelry and trade, you
know, trade for drugs and he said he wanted to look at it.

So what I did, I took off all my jewelry and I put
it inside of a bag and we got off, and the dude opened the
door.  When he opened the door we went inside the house and I
put him at gunpoint, sat him down.  I represented myself as a
Mexican Mafia and I told him that we knew that they were
selling drugs at that residence and that they had to pay the
ten percent.  They said that they weren't selling narcotics
but we knew that they were already.

So we searched the residence and we found a little
bit of drugs and some money.  And I called Frosty, Frank
Velasquez, and he told me to go ahead and take everything from
them, to shut the dope house down.  So we took, you know, the
money, the dope.  We took video games, TVs, DVD players --

Q   You cleaned him out?

A   Yeah, we cleaned him out.

Q   And then after you did that -- which corner or which side
of San Antonio did this?

A   That was the north side.

Q   The north side?

A   Yeah.

Q   And after you hit that house did you receive word that maybe there was a problem?

A   No, not right after it, no.

Q   No, I'm not talking about right after, at some point?

A   Yes, sir.

Q   Okay, what was the problem?

A   The problem was that the people had contacted Chuy Ozuna and they wanted us to return the items back to the residence.

Q   And Chuy Ozuna, was he an important member of the Mafia?

A   Yeah, at that time he was a captain.

Q   And I'm showing Government's Exhibit 17.  Is this the person you're talking about?

A   Yes, sir.

Q   The homeowner contacted the captain Ozuna?

A   Yes, sir.

Q   And what happened as a result?

A   Well, Frosty said that we had to give the stuff back to them.  What I had done is I had given the stuff back -- I had told Piaso and Vala that they could keep some of the items from the house.

Q   Before you go to that.  Did the homeowner, did it later turn out had some sort of a relationship with Low that you-all didn't know about -- or Mr. Ozuna?

A   To my knowledge they did, but I don't know exactly the relationship.

Q    Okay.  But you-all were ordered to return everything?

A    Yes, we were ordered to return everything.

Q    Did you return your part of the stuff you took?

A    Yes, sir.

Q    And did everyone else return their part of the stuff taken?

A    Piaso gave me a stereo and I went back and I gave it to them and they said that that wasn't the same stereo that was taken, and I told them, "Well, what was taken from the residence?"  While we were searching the house, Vala had the people in the living room area, the female and the guy, I guess his name is Jesse Pena.  He was guarding them at gunpoint.  During this time the lady said that he had removed some jewelry from her, some earrings and I think a chain or something.

Q    Accused Vala?

A    Yes.

Q    Robert Sanchez?

A    Vala.

Q    And was he ordered to return that jewelry taken?

A    Yes, he was ordered to return that.

Q    Allegedly taken?

A    He said he didn't take it.

Q    And at some point did the leadership decide what the solution to this issue was?

A    Yes.  It was during Fiesta, me and Vala were downtown during the Market Square and I called Low to buy some black tar heroin and he told me to meet him at Division Park on the city's south side.  So when I met him he asked me who was I with and I notified him who I was with.  And then he then told me that I had to take him for a ride [speaks Spanish], you know, I had to kill him, I had to murder him.

Q    Slow you down.  Chuy or Jesse Ozuna, a/k/a Low, told you you had to take who for a ride?

A    Vala.

Q    And he used a Spanish phrase but in English it means you take him for a ride?

A    Take him for a ride.

Q    What does that mean?

A    To murder him.

Q    Why would you have to do that?

A    Because it was my responsibility, I was his padrino.

Q    And how did you feel about that?

A    Well, he was my friend, I knew him for a long time and, you know --

        THE COURT:  Wait a minute.  This is your friend and you killed him?

        THE WITNESS:  Yes.  Yes, sir.

        THE COURT:  What did you think about that after you killed him?

THE WITNESS:  Well, you know, I was remorseful, you know, and --

THE COURT:  But not -- you were remorseful but not enough not to kill him?

THE WITNESS:  Yes, sir.

THE COURT:  Go ahead.  Make it quick and short, we get the point.

MR. CONTRERAS:  May I approach, Your Honor?

THE COURT:  Yes.

Q    You recognize Government's Exhibit RA2402.2?

A    Yes, sir.

Q    What is that?

A    That's Robert Sanchez.

Q    This is what you did?

A    Yes.

MR. CONTRERAS:  We offer Government's Exhibit RA2402.2.

MR. PRICE:  No objection, Your Honor.

MR. STENBERG:  No objection.

MR. COLLINS:  No objection.

THE COURT:  All right, that's admitted.

MR. CONTRERAS:  Publish it.

Q    How did you kill him?

A    Well, I went and picked up Jade Garza, we called him Lucky, and I picked up a prospect name of Robby Ybarra, and we

went to my house and I gave Robby and Vala cocaine and heroin and we all did cocaine and heroin.  And me and Lucky had planned that we were going to take him close by that residence so they could know that the job was done, that it was taken care of.

Q   You got him to let his guard down and you killed him in a car?

A   Yes, sir.

Q   Since then have you tried to make it right?

A   Yes, sir.

Q   You've sat in jail since we arrested you, right?

A   Yes, sir.

Q   And how have you tried to make it right, Mr. Hernandez?

A   By admitting my guilt and coming forward.

Q   And you know Agent Carlisle?

A   Excuse me?

Q   Do you know Agent Carlisle?

A   Yes, sir.

Q   Have you given him every bit of information you have to try to solve any crime that you know about?

A   Yes, sir.

Q   As a matter of fact, do you remember passing along some information regarding a terrible capital murder?

A   Yes, sir.

Q   An armed robbery?

A    Yes, sir.

Q    It was not related to the Mafia?

A    Yes, sir.

Q    But an innocent man was murdered during a robbery?

A    Yes, sir.

Q    Case was unsolved?

A    Yes, sir.

Q    And you told him who did it?

A    Yes, sir.

Q    And it was solved?

A    Yes, sir.

Q    You didn't expect anything for that, did you?

A    No, sir.

Q    Okay.  And you know what you're facing now, don't you?

A    Yes, sir.

Q    What are you facing, the maximum?

A    Life in prison.

Q    And you know this judge right here is going to decide what happens to you?

A    Yes, sir.

Q    And you're going to have to face up to what you did?

A    Yes, sir.

        MR. CONTRERAS:  Pass this witness.

        MR. PRICE:  No questions, Your Honor.

        MR. STENBERG:  No questions by Mike Garcia.

MR. COLLINS:  No questions, Your Honor.

THE COURT:  Okay, you're excused.  How many more minutes do we need, about ten?  Who's your next witness, Counselor?

MR. CONTRERAS:  It's Johnny Santana, Your Honor. He's right outside.

THE COURT:  Okay.

**JOHNNY SANTANA, GOVERNMENT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

**BY MS. GREEN:**

Q   Please introduce yourself to the jury.

A   Yes, my name's Johnny Santana, J-o-h-n-n-y, last name Santana, S-a-n-t-a-n-a.

Q   How are you employed, sir?

A   I'm currently employed as an investigator for the Bexar County District Attorney's Office.

Q   And prior to your employment with the Bexar County DA's Office, where were you working?

A   I was working for the Texas Department of Criminal Justice Office of the Inspector General.

Q   And what did that job entail, Mr. Santana?

A   Basically we conducted most of the criminal investigations within the prison system to include anything from staff to homicides.  We also worked the gangs as well.

Q   And how long were you employed for TDCJ?

A    I was employed approximately 15 years.

Q    And during that time when you were working for the Office of Inspector General for TDCJ, did you become very well acquainted with a prison gang known as the Texas Mexican Mafia?

A    Correct.

Q    And is there a unit within TDCJ that focuses on identifying and isolating and classifying gang members?

A    There is.

Q    And what is that unit called, sir?

A    It's called the Security Threat Group Management Office. It's located up in Huntsville.

Q    And what is the purpose of that group, the Security Threat Group?

A    One of the many functions is they confirm members that are on the prison units.  There's a whole process for doing that because they seem to be pretty disruptive.  And, again, it's mainly for classification purposes.

Q    So when an individual gets sent to the state prisons, are they immediately identified or is there a process that happens to identify who belongs to a gang and who doesn't?

A    Yeah, there is a process.  Usually at intake, if he's been a former inmate and he's been confirmed previously, he'll go directly to Administrative Seg.  However, if he's suspected -- there's any indications that he might be suspected, then they

do an internal investigation to determine whether he is a prison gang member or not.

Q   And do state inmates typically want to be confirmed?

A   No, they'll avoid it.  They'll -- ultimately they'll deny any affiliation simply because once they're confirmed they're locked away in a -- pretty much in a lock-down status 23 hours a day with only one hour for rec.

Q   Okay.

        MS. GREEN:  May I approach the witness?

        THE COURT:  Yes, you may.

Q   Mr. Santana, I'm going to show you what's been marked for identification purposes as TDCJ-1 and TDCJ-2.  Do you recognize those documents, sir?

A   Yes, ma'am.

Q   And what are those?

A   They're called Attachment A's, but they're a confirmation packet.  This is the documentation that they have on the inmates that get confirmed in TDCJ.

Q   All right, and TDCJ-1, who does that documentation packet refer to?

A   Jacinto Navajar.

Q   And TDCJ-2, who does that refer to?

A   Jose Alberto Martinez.

Q   And do you know Jacinto Navajar?

A   Yes, ma'am.

Q    And do you know Jose Martinez?

A    Yes, ma'am.

Q    Do you see both of those men in the courtroom today?

A    Yes, ma'am.

Q    Okay.  And if this is No. 1, which one is Mr. Navajar?

A    Sitting down in the defendants' table, second chair.

Q    Okay, so No. 1, No. 2?

A    Correct.

Q    All right, and Mr. Martinez?

A    Mr. Martinez at the end of the table.

Q    Okay.  Can you point to him, sir?

A    (Witness complies.)

Q    All right.  And are both Jacinto Navajar and Jose Martinez confirmed within the Texas Department of Criminal Justice Institutional Division as members of the Texas Mexican Mafia?

        MR. COLLINS:  I'm going to object to the hearsay and speculation this calls for.

        THE COURT:  Well, he may know.

A    Yes, ma'am, they are confirmed.

        MS. GREEN:  And the Government would offer into evidence TDCJ-1 and TDCJ-2.

        THE COURT:  All right.

        MR. PRICE:  No objection, Your Honor.

        THE COURT:  All right.

        MR. COLLINS:  Your Honor, my objection would go to

TDCJ-2 because it purports to be a business record but it's full of all kinds of conclusions and hearsay, letters written in Spanish and not translated.

THE COURT: Well, but does it confirm that your client is a member of the Mafia? The other portions can be redacted if necessary. Why don't we take that up during a recess. So it'll be held in abeyance. Okay, go ahead.

Q   Mr. Santana, are you fluent in Spanish?

A   Yes, ma'am.

Q   And during your tenure as both a officer with TDCJ and extending into the Bexar County District Attorney's Office, have you been called upon on many occasions to translate from Spanish to English items that have been recovered from members of the Texas Mexican Mafia?

A   I have.

Q   And can you even give us an estimate of how many phone calls you have listened to and translated?

A   It's been in the thousands.

Q   And how about an estimate of how many letters and documents you have reviewed and translated from Spanish to English?

A   About equally the same.

Q   And, in fact, you were part of the FBI Violent Gang Task Force for several years, were you not?

A   Yes, ma'am.

Q    And what period of time were you involved with the FBI task force?

A    Officially I became a member of the FBI task force in I believe March of '01, but I had been with them prior to that since '98.

Q    Okay.

            MS. GREEN:  May I approach, Judge?

            THE COURT:  Yes.

Q    Mr. Santana, I'm going to hand you what's been marked as Government's Exhibit RA1792.  Are you familiar with that two-page document, sir?

A    Yes, ma'am.

Q    Okay, and you have reviewed it prior to today?

A    I have.

Q    And the return address on the envelope to 1792 is from whom, sir?

A    This is the mailing address of a prison unit, it's called Ellis Unit and it's located near Huntsville.

Q    And who's the person that is writing the letter, sir?

A    A Benito Alonzo.  Right next to it is his TDCJ number.

Q    And who is the letter addressed to, sir?

A    To an H. Lomas.

Q    And do you know who H. Lomas is?

A    Yes, ma'am.

Q    And is that Hector Lomas?

A    Correct.

Q    And is he a Mexican Mafia member?

A    Yes, ma'am.

Q    Okay.  And was this letter, sir, then sent from the Ellis Unit of the Texas Department of Criminal Justice to a Hector Lomas here in San Antonio, Texas?

A    Correct.

MS. GREEN:  The Government would offer RA1792.

MR. PRICE:  No objection, Your Honor.

MR. STENBERG:  No objection by Mike Garcia.

MR. COLLINS:  No objection on behalf of Jose Martinez.

THE COURT:  Okay, thank you.  It's in.

Q    Mr. Santana, who do you know Benito Alonzo to be?

A    He's the vice president of the Mexican Mafia.

Q    And has he been in that position for almost as long as you've been affiliated with the Texas Department of Criminal Justice?

A    A little bit longer than that.

Q    Longer than that.  Okay.  And he has that position for life?

A    Correct.

Q    Now looking at Government's 1792, it's in English.  So it did not need to be translated, is that right, sir?

A    Correct.

Q   All right, I want you to focus, if you would on the P.S. of that letter.

          MS. GREEN:  And could we pull that up, please?  And could you focus in on the handwritten part at the bottom if you can?

Q   What does that P.S. say, Mr. Santana?

A   "What, you ain't done La Mercy the favor?"

Q   And it's signed Benito?

A   Correct.

Q   And what is the postmark date on Government's 1792?

A   September the 12th of '04.

Q   And do you know an individual by the name of Mercy Brooks?

A   I do.

Q   And do you know if Mr. Brooks is deceased?

A   He is.

Q   And do you know when he was killed, sir?

A   September the 18th.

Q   What year?

A   2004.

Q   Now this letter, RA1792, is that a typical way in which incarcerated members of the Texas Mexican Mafia send letters out, or is this an obvious example?

A   Yeah, it's an obvious example.

Q   And that's unusual, isn't it?

A   Correct.

Q    Usually they're a little more careful?

A    More careful.  They're more coded, as well.

Q    In fact, sometimes they will use very elaborate coding systems, is that right, sir?

A    Correct.

Q    Okay.  Now is part of your duties with the FBI task force when large numbers of documents are seized, for example, when a search warrant is run, will you be asked to then go through, summarize and translate them?

A    Yes, ma'am.

Q    Okay, and do you recall doing that to a large amount of correspondence that was seized at 5602 Bienville back in August of 2004?

A    I do.

Q    Okay.  And those correspondence, and it was voluminous, was it not?

A    It was.

Q    That was taken from the search of an individual's home and his name was Joe Saldivar?

A    Correct.

Q    Are you familiar with him?

A    Yes, ma'am.

Q    And what was the significance of all the documents that were located at that Bienville residence back in August of '04?

A    Okay, there was a significant find during that search simply because Mexican Mafia, they develop a tracking system of tracking their members, whether they're inside of prison and outside, and just because they leave the gates doesn't mean that they are -- they're still obligated to the organization and they would like to keep tabs on them.  So there's quite a bit of exchange of what members are inside and outside, what their status are, whether they're clear or not, whatever the information that they're doing.  It's a very complex system which they have, and it was one of the first occasions that we were able to see that documented.

Q    Okay, and was in fact Joe Saldivar the cable man during that period of time?

A    Yes, ma'am.

Q    Okay.  And did you review those documents and make translations?

A    I did.

Q    Let me just ask you for a little historical perspective, sir.  Since you've been dealing with the Texas Mexican Mafia, have there been distinct regimes, if you will, different generals that stayed in power for significant periods of time during let's say the last ten years?

A    Yeah, they have quite a bit of -- call them administrations or dynasties, whatever.

Q    Okay.  And starting with approximately the regime of

Carlos Wero Rodriguez, do you know who followed him?

A    After Carlos Rodriguez, Daniel Leza, also known as Gumby, he took over.

Q    Is that Daniel Leza?

A    Yes, ma'am.

Q    And I'm referring you to Government's 38.  Okay, so Daniel Leza followed Carlos Wero Rodriguez?

A    Yes, ma'am.

Q    And do you know who followed Gumby?

A    After Gumby there was some reorganizations of the gang itself and they had some temporary people that were there, but after him came Pancho Pena.

Q    Is that Joe Pena?

A    Joe Pena, correct.

Q    Is that Joe Pena, sir?

A    Yes, ma'am.

Q    And I'm showing you Government's 23.  Following Joe Pena, was his a brief or a lengthy reign?

A    It was a brief period.  He didn't say in power very long.

Q    And following Joe Pancho Pena who became general of San Antonio?

A    Gosh, I'm drawing a blank here.

Q    This would be in early 2005.  If you remember that's fine, if you don't, that's fine.

A    No.

MS. GREEN:  May I approach, Judge?

A   Oh, I'm sorry, I'm sorry.  No, no, okay.  I'm sorry. After him, Jacinto Navajar, Cache.

Q   Okay.  And that was in early 2005?

A   Yes, ma'am.

MS. GREEN:  May I approach, Judge.

THE COURT:  Yes.

Q   Mr. Santana, I'm going to show you what's been marked for identification purposes as DEA2511, which is an envelop, and then inside that envelop are several documents, 2511A, 2511ATR, which is a translation, 2511B, 2511C1, 2511C2, 2511C3, 2511D, 2511E, 2511F and 2511G.  Do you recognize all of those documents, sir?

A   Yes, ma'am.

Q   And are these the documents that came from the cable man's house on Bienville?

A   Correct.

Q   And did you do the translations of the -- or did you check the translations of these documents?

A   Yes, ma'am, I reviewed it.

Q   Okay, and are those translations accurate?

A   They are.

Q   Now I want to -- let me offer them first.

MS. GREEN:  At this time the Government would offer into evidence the 2511 series, which is 2511A, 2511ATR, 2511B,

2511C1, 2511C2, 2511C3, 2511D and 2511E, and 2511F and G.

THE COURT: Okay, we're going to take a recess, I need to talk to the lawyers.

**(Jury out.)**

THE COURT: Okay, Ms. Green, what is the substance of these documents?

MS. GREEN: Your Honor, these documents contain rosters of members. They contain just lists and lists of members, their locations, correspondence.

THE COURT: Okay.

MS. GREEN: And you know what, Judge? I think in an abundance of caution I'm going to just have him verify the translations and not offer them at this time.

THE COURT: Okay, why don't you do that during the recess.

MS. GREEN: Okay.

THE COURT: And then you can ask him is this -- you can tell him what this is and he can say yes it is or isn't.

MS. GREEN: Okay.

THE COURT: Okay. And from this day forward, I thought this was clear, that the Government shall share its exhibits prior to entry each morning so that we don't waste time. That way they don't have to look at them. They would have already looked at them, and if you have any objections, you can raise them during the course of the trial, but, you

know, see them before they're actually given to you so that you're not consuming time, a necessary time that you need to do but do it before we begin the day.  Or why don't you show it to them.  And these are lists -- let me see that.  These are lists of members, Mafia members?

MS. GREEN:  Yes.  And letters.

THE COURT:  And who would have written all these names and numbers?

MS. GREEN:  Joe Saldivar, who was the individual whose house was searched, compiled all this information.

THE COURT:  What was the purpose of all the membership?  A scrapbook?

MS. GREEN:  No, Judge, the cable man was in charge of keeping all the members.

THE COURT:  All right, give it to the *Express-News* and let them frame it on the front page.  Okay, we'll be in recess.

**(Recess; resuming - Jury in.)**

THE COURT:  Okay, go ahead.

Q   Mr. Santana, did you also look at -- listen to phone calls that were in Spanish and look at the translations of several of those phone calls and verify that the translations were accurate?

A   I did.

Q   All right.  And those were calls from both the Bexar

County Jail as well as calls from the Geo federal lockup facility?

A    Yes, ma'am.

Q    Okay.  And did you also review translations from calls made to a Bureau of Prisons facility in Three Rivers?

A    Yes, ma'am.

Q    And did you also review translations made of a consensual recording at a house on Baffin Street here in San Antonio, Texas?

A    Yes, ma'am.

Q    And of all the calls that you reviewed were the translations from Spanish to English accurate and correct?

A    Yes, ma'am, they were.

O         MS. GREEN:  At this time, Your Honor, the Government is going to withdraw previous exhibits TDCJ-1 and TDCJ-2.

         THE COURT:  All right, so that doesn't require a ruling then.  Okay.

         MS. GREEN:  And I'll pass the witness.

         THE COURT:  Anything?

         MR. PRICE:  No questions for this witness.

         THE COURT:  Anything?

         MR. COLLINS:  No questions.

         THE COURT:  Mr. Stenberg?

         MR. STENBERG:  No questions.

         THE COURT:  All right, call your next witness.  Thank

you, sir, you may step down.

MS. GREEN:  The Government calls Mark Gibson.

**MARK GIBSON, GOVERNMENT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

**BY MS. GREEN:**

Q   Mr. Gibson, where are you employed, sir?

A   I'm a criminal investigator with the Bexar County District Attorney's Office.

Q   And prior to that employment where did you work?

A   The Bexar County Sheriff's Office.

Q   And for how long did you hold that job?

A   Almost 20 years.

Q   All right.  And what was your position at the Bexar County Sheriff's Department?

A   I was a sergeant assigned as the Classification Supervisor.

Q   Okay, and was that at the jail?

A   Yes, ma'am.

Q   And what does the -- as Classification Supervisor what were your general job duties?

A   Classification housing of inmates and segregating inmates by classification and gang affiliation.

Q   Okay.  And did you become over your 20 years at the Bexar County Jail and continuing to the present, did you become very familiar with the Texas Mexican Mafia?

A    Yes, ma'am, I did.

Q    Okay.  And did you actually become a part of the FBI task force that was investigating the Texas Mexican Mafia?

A    Yes, ma'am, from 2001 until 2008.

Q    And as part of the task force and as part of your duties as Classification officer, did you listen to phone calls that came from the Bexar County Jail?

A    Yes, ma'am, I did.

Q    Okay, and could you tell us approximately how many phone calls you've listened to over the years?

A    Hundreds and hundreds, maybe thousands.

Q    Okay.  Are all the calls made by inmates at the Bexar County Jail, are they monitored and recorded?

A    Yes, ma'am, from the Bexar County Jail and from the Geo facility.

Q    Okay.  Prior to today did you have an opportunity to review several calls that were recorded both at the Geo facility and at the Bexar County Jail?

A    Yes, ma'am, I did.

Q    Okay.  And --

        MS. GREEN:  May I approach, Judge?

        THE COURT:  Yes.

Q    I'm going to show you what's been marked as BCJ10.D1.  Did you review that call, sir?

A    Yes, ma'am, I did.

Q   And did you indicate that you had done so?

A   I did.

Q   All right.  And that call is from who to who?

A   That call is from Chuy Ramirez, a Mexican Mafia member, to Sonya and on a three-way to Mexican Mafia member Jacob Garcia.

Q    BCJ18, did you review that call, sir?

A   Yes, ma'am, I did.

Q   And who is that call to and from?

A   That call is from an inmate in the Bexar County facility that they call Rude Dog, who was in charge at the time, to one of the defendants, Jacinto Navajar, a/k/a Cache.

Q   BCJ19.1, who is that to and from?

A   That call is from Rude Dog again, who was a lieutenant in charge of the jail, to another inmate a/k/a Caballo -- or from him and Caballo, I'm sorry, to Jacinto Navajar a/k/a Cache.

Q   Okay.  And I neglected to ask you before, for example, BCJ19.1, what was the date of that call, sir?

A   The date of that call was 7 February 2006.

Q   BCJ19.2, did you review that call, sir?

A   Yes, ma'am, I did.

Q   And who is that to and from?

A   That call is from Caballo, who was in charge of the Bexar County facility at the time, to Jacinto Navajar a/k/a Cache.

Q   And the date of that call?

A   The date of that call is 7 February 2006.

Q    BCJ26, did you review that call?

A    Yes, ma'am, I did.

Q    And who is that to and from?

A    That call is from a Mexican Mafia member a/k/a Corky to Jacinto Navajar a/k/a Cache.

Q    And BCJ31, did you review that call?

A    Yes, ma'am, I did.

Q    And to and from?

A    That call is from Jacinto Navajar a/k/a Cache to his son Paul.

Q    And the date of that call, sir?

A    18 January 2008.

Q    And BCJ32, sir, did you review that call?

A    Yes, ma'am, I did.

Q    And who is that call to?

A    That call is to a Mexican Mafia member named Jesse Ramirez a/k/a Chuy.

Q    Okay, and is that from the Geo facility?

A    Yes, ma'am, it is.

Q    And for each of these calls that I've just mentioned, sir, do the calls discuss Mexican Mafia business?

A    Yes, ma'am, they do.

        MS. GREEN:  The Government would offer into evidence BCJ10.D1, BCJ18.D1, BCJ19.D1, BCJ26.D1, BCJ31 and BCJ32.

        MR. PRICE:  No objection, Your Honor.

THE COURT:  All right.

MR. STENBERG:  No objection by Mike Garcia.

MR. COLLINS:  No objection.

THE COURT:  All right, it's in.

Q   Okay, let's begin, then, with BCJ19.2, which is the call -- that's not it.  I'm sorry, excuse me.

I'm sorry, let's start with BCJ10, 10.D1.  And before we start this, sir, this call was from August the 26th of 2004?

A   That's correct.

Q   Had something happened earlier in August of 2004 that caused a disruption within the Texas Mexican Mafia?

A   Yes, ma'am, there was a roundup by the Drug Enforcement Agency of several ranking members of the Mexican Mafia on a drug conspiracy case.

Q   Okay.  And did that happen in August of 2004?

A   Yes, ma'am, I believe it did.

Q   And was Jesse Ramirez, a/k/a Chuy, one of those persons arrested in that roundup?

A   Yes, he was.

Q   Okay.

MS. GREEN:  May I publish?

THE COURT:  Yes, ma'am.

**(BCJ10.D1 CD telephone played.)**

Q   Okay, that is a fairly obvious phone call, but, for

example, when he mentions giving orders and talking about roosters, what's he referring to?

A   He's talking about giving money out to the people that are going to be in charge out on the street.

Q   And that was right after a large number of the mesa were arrested and incarcerated?

A   Yes, ma'am, several of the ranking members were arrested and it left a, it left a power vacuum out there.

Q   Okay.  Okay, I'd like to now publish BCJ32, which involves the same person that we just listened to, Jesse Ramirez, a/k/a Chuy, from July 3rd of 2004.

**(BCJ32 CD telephone call played.)**

Q   Okay, that conversation was a phone call to Chuy Ramirez, correct?

A   That's correct.

Q   And they are -- this is an example, BCJ32 is an example of them -- of the Mexican Mafia members attempting to be careful on the phone?

A   Yes, ma'am, they're trying to conceal the person that they're talking about.

Q   Okay, and basically they're trying so hard to conceal it that Chuy Ramirez doesn't know who he's talking about, does he?

A   That's correct.  They had to eventually identify him by name.

Q   And the name that they used?

A   Brooks, Mercy Brooks.

Q   Okay.  And do you know Mercy Brooks?

A   Yes, ma'am, I do.

Q   And is he deceased?

A   Yes, ma'am, he is.

Q   And the Matilda that they're talking about, do you know who they're referring to?

A   Yes, ma'am, she was a drug dealer that had been arrested earlier and was in the facility at the time of this incident. She had informed them that Mercy Brooks had set her up wearing a wire.

Q   Okay.  And that's what all that reference to a Walkman and so forth?

A   Yes, ma'am, that's correct.

Q   So the unidentified person is telling Chuy that Mercy Brooks set Matilda up?

A   That's correct.

Q   Okay.  And then at the very end the unidentified male is talking about getting a deal on paper.  What does that mean?

A   Regarding the informant on paper, attempting to get something to show on paper that they were actually an informant.  The Mafia likes to see it on paper.  A lot of times rumors fly about who's an informant, but if they can get an actual piece of paper to show then they can put a hit out

on someone.

Q    Okay.  And could that piece of paper be, for example, a court document?

A    Yes, ma'am, it could.

Q    Okay, let's listen to BCJ18, which is Rude Dog to Cache, Jacinto Navajar, from January the 21st of 2006.

**(BCJ18 CD telephone call played.)**

THE COURT:  Mr. Gibson, give the jury and I just a substance or summary of that conversation since it was half and some -- it was in both English and Spanish.  So just give us the substance and then the attorneys for the other side can cross-examine your interpretation or your explanation of the substance.

THE WITNESS:  All right.

THE COURT:  What's the bottom line?

THE WITNESS:  The bottom line here, Rude Dog, Rudy Castillo was calling from the jail to Jacinto Navajar reporting on business at the jail.  He was asking about monies that Mr. Navajar was sending in to them.  They were telling him about different members they were having problems with, one of them being the brother of an informant that we had at that time who was a high-ranking member.  Mr. Navajar was telling them to deal with him as they had to and to take care of him if they had to, basically.

They were talking about other members that they were

having problems with, and he was also telling them to deal with them as they saw fit.  Which, in our understanding, that could either be an assault or an attempt on their life.  And Mr. Navajar was called regularly by the lieutenant in the jail to make these reports and to request monies.

Q   Okay, let's move to BCJ91.1.  Again, this would be the same individuals that we just listened to.

THE COURT:  These the same two individuals?

MS. GREEN:  I believe it is.

Q   Correct me if I'm wrong.

A   What number?

Q   19.1.  I believe this is Rude Dog, Jacinto Navajar and Caballo?

A   That's correct.

THE COURT:  Well, just tell us the substance of the call and, you know, we can go back and listen to it.  What's the substance of the call?

THE WITNESS:  The substance of the call is Rude Dog, Rudy Castillo, and Caballo, Eddie Villa, call Jacinto Navajar, Cache.  They're talking about who's going to be in charge of the jail because there's some conflict between the members. Jacinto Navajar puts Caballo, Eddie Villa, in charge of the jail and basically tells him that if he has problems to deal with it as he sees fit.  Then he puts Rude Dog back on the phone and Rude Dog -- he tells Rude Dog to keep an eye on

Caballo because Caballo has a tendency to let power go to his head and start falsely accusing other Mafia members of incidents. And that's basically --

THE COURT: Do either defense attorneys want the tape actually played or is the substance as revealed sufficient?

MR. STENBERG: I have no dog in this fight.

THE COURT: Okay.

MR. STENBERG: No pun intended.

MR. COLLINS: No do I, Your Honor.

THE COURT: Okay, Mr. Price?

MR. PRICE: I have no need --

THE COURT: Is the substance as relayed sufficient as versus playing the actual tape?

MR. PRICE: Sufficient, Your Honor.

THE COURT: Okay, great, thanks.

Q   All right, then let's do the same thing with 19.2, D2. What is the -- first of all who is that conversation between and what is the substance of it?

A   19.2?

Q   Yes.

A   That's a call from Caballo, Eddie Villa, who is the lieutenant at the time, to Jacinto Navajar, Cache. He's explaining to Cache that other members in there who had rank at one time were complaining about his leadership and causing problems. And Jacinto Navajar tells Caballo that he needs to

deal with it as he sees fit, that he needs to take care of it inside the jail and that he can't be bothered with this type of arguments between members and that he's getting tired of it.

THE COURT: And, Mr. Gibson, in your years of experience and training, what do the terms in this context, deal with him as you see fit, or saw fit, what does that ordinarily mean or convey to you?

THE WITNESS: That normally means that they'll either put them in the dark, which they'll cut them off from information. They can ex them out and make them and ex-member. They may have them assaulted. They may put a green light on them and when they get out, they may be subject to being killed or severely assaulted. Any range of punishment as he sees fit if he has that position.

THE COURT: Okay. And as I wrote these comments here, does saw fit, is that the equivalent of take care of him?

THE WITNESS: Yes, sir, as he sees fit. In other words, he wants him to make the decision because he doesn't want to be conducting their business from the outside over the phone.

THE COURT: All right.

Q   And let me call your attention to BCJ26, and that is between Jacinto Navajar and Vidal Longoria. And what is the

essence of that conversation, sir?

A    That call is from Corky, a/k/a Vidal Longoria, who was a lieutenant on the north side at one time, and he is calling Jacinto Navajar to tell him that other Mafia members in the jail are saying that Bumper, Steve Barrera, is, is -- may be an informant, that he's been talking to Classification and they think he might be an informant.  Corky, the lieutenant, tells Jacinto Navajar that he doesn't believe this, that this is just more of gossip and that they're trying to move Bumper out of the way because he was in running for lieutenant's position, and it was just discussion of mainly the credibility of Bumper.

Q    And then BCJ31 from January the 18th of 2008.  That is between Jacinto Navajar and his son, is that correct?

A    Yes, ma'am, that's correct.

        MS. GREEN:  And, Judge, the Government would request permission to play just a very small portion --

        THE COURT:  Sure, of course.

        MS. GREEN:  -- of BCJ31.

        THE COURT:  Okay.

        MR. STENBERG:  Excuse me, Your Honor, I don't think we have that.

        THE COURT:  I'm sorry?

        MR. STENBERG:  I don't think we have that.  We haven't seen that.

THE COURT:  Are you saying you don't have the tape?

MR. STENBERG:  We have not seen this.

MR. CARLISLE:  It's in English, Your Honor, there's no translation.

MS. GREEN:  There's no translation, it's in English.

MR. STENBERG:  Oh.

THE COURT:  Go ahead.

**(Telephone call played.)**

"Is this Lucky?"

"Yeah, yeah."

"Tell them to give you Pete's number, I need to call to see -- Pete is on the south side, to call it."

"Okay."

"Or if he comes then I can call him from here."

"Okay, you call him right now, Dad."

"Okay, I need to know here when he's on his phone, call him and tell him what to do because -- is he on, is he on the last deal?"

"Yeah.

"All right.  Tell him I need, I need ten for Chapato before, before the month is over majo."

**(Telephone call ended.)**

Q   Okay, what did Mr. Navajar just say to his son?

A   He said that he needs ten for Chapato.

Q   Before the month is over?

A   Before the month is over.

Q   And who is Chapato?

A   Chapato is one of the a/k/a's that Herb Huerta uses, who's the president of the Mexican Mafia.

Q   All right, and January of 2008 when that call was made was around the time that Mr. Navajar was arrested on this offense, is that right?

A   That's correct.

Q   And just in closing, when Jacinto Navajar and Jose Martinez were incarcerated at the Bexar County Jail, were they confirmed Texas Mexican Mafia members?

        MR. COLLINS:  Your Honor, I'm objecting to hearsay.

        THE COURT:  Well, he may know.  He may establish the reason or basis upon his knowledge, so I'll permit the question.

A   They were classified and housed as active Mexican Mafia gang members.  They were housed with active members and had no problems housing with active members.

Q   Okay.

        MS. GREEN:  I'll pass the witness.

        MR. PRICE:  No questions, Your Honor.

THE COURT:  Mr. Stenberg?

MR. STENBERG:  No questions.

MR. COLLINS:  No questions, Your Honor.

THE COURT:  All right, thank you.  Mr. Gibson, you're excused.  If the Government will call its next witness.  We need a recess?

THE BAILIFF:  Yes, sir.

THE COURT:  That'll be okay.  And who's your next witness, Mr. Contreras or Ms. Green?

MR. CONTRERAS:  Alex Guerrero.

THE COURT:  Is he in custody?

MR. CONTRERAS:  Yes, he's going to be a lengthy witness but we can start before lunch.

THE COURT:  Well, we'll go ahead and start and then we'll continue in the morning.  His name is Mr. Guerrero?

MR. CONTRERAS:  Alex Guerrero, Your Honor.

**ALEX GUERRERO, GOVERNMENT'S WITNESS, SWORN**

**DIRECT EXAMINATION**

**BY MS. GREEN:**

Q   You're Alex Guerrero?

A   Yes, ma'am.

Q   And how old are you, Mr. Guerrero?

A   I'm 37.

Q   Okay, and are you from San Antonio?

A   Yes, ma'am.

Q    And were you a member of the Texas Mexican Mafia?

A    Yes, ma'am.

Q    From when to when?

A    From August '94 to June of 2003.

Q    And what was your street name with the Texas Mexican Mafia?

A    Loco Machine.

Q    Okay.  Can you tell us how you became a member of the Texas Mexican Mafia?

A    Yes, ma'am.  I was approached by other members.  I used to live in the west side so I knew a lot of members already when I was younger.  And once I got incarcerated in the Bexar County Jail, I was approached by another member, Mercy Brooks, and he wanted to recruit me.  And at that time I had told him that I didn't, you know, I wasn't ready and stuff.  And I was still waiting -- I had gotten time already to prison and once I got to prison I ran into Mercy Brooks again on my unit and he told me that the doors were open to get picked up as a member and that's when I decided to get into the Mexican Mafia.

Q    Okay.  And did you have to do a cameo to get into the Mexican Mafia back then?

A    At that time there was a war going on with another organization, the Barrio Azteca, and the Mexican Mafia was recruiting a lot of people at that time.  So pretty much I

didn't have to do a cameo at that time, but the thing is that there was a war going on so, you know, it was bound to happen. And pretty as soon as I became a member, I ran into somebody Azteca and I had to attack them and stuff.

Q   Okay.  And that was required as part of your membership with the Texas Mexican Mafia?

A   Yes, ma'am.

Q   Okay.  When were you released from TDC the last time?

A   January of 1999.

Q   Okay.  And upon your release in January 1999 what was the rank structure in San Antonio?

A   The highest rank that was out at that time was a general and on down, which was assistant general, captain, a lieutenant of lieutenants, four lieutenants and four sergeants.

Q   Okay.  And I probably didn't phrase that well.  Who was the general in San Antonio upon your release in 1999?

A   His name was Carlos Wero Rodriguez.

Q   Okay.  And what were you when you were released in January of '99?

A   I was just a soldier, ma'am.

Q   Okay.  Explain how you went about getting cleared upon your release?

A   Once a member releases from a unit he's obligated, he has to report back to the unit and they send a letter from within

there, either the lieutenant or the sergeant major, which they call gallo major, and they'll send a letter back out saying that you're cleared and stuff, that everything's okay with you. And you have to present that letter to the sergeant of whatever section you're from on San Antonio.

Q   Now Carlos Rodriguez was the general?

A   Yes, ma'am.

Q   Okay, and did it just so happen that you lived close to Carlos Wero Rodriguez?

A   Yes, ma'am. When I paroled, I paroled to my cousin's house and they lived next door to Carlos Rodriguez.

Q   Did you become acquainted with Carlos Rodriguez?

A   Yes, ma'am.

Q   Okay, closely acquainted with?

A   Very close.

Q   Okay. About what time did you begin performing duties for the Mexican Mafia?

A   Probably by the second, third day that I was out.

Q   Okay. And this would be back in 1999?

A   Yes, ma'am.

Q   Okay. And what were some of the duties that you performed?

A   At that time the sergeant was a member by the name of Ray San Miguel. They called him Java [phonetic]. And he's a real good friend of mine before we were members and he's the one

that I made contact with and we started, you know, real quick looking for connections to charge for the ten percent and stuff like that, ma'am.

Q    Okay, and what did that entail?  How did you locate connections to hit for the dime?

A    We get them through drug users, people that we know, you know, from the neighborhood and stuff and they'll tell us where there's connections or where they're scoring, you know, whatever type of drug, you know, the majority heroin or cocaine, and things like that.  Or people that we know, you know, personally, friends and stuff like that, you know?

Q    Okay.  In addition to collecting the dime for the organization, were you also involved in distributing narcotics?

A    Yes, ma'am.

Q    Okay, and what were you mainly selling?

A    Heroin and cocaine.

Q    Okay, both?

A    Yes, ma'am.

Q    All right.  Tell us a little bit about quantities and so forth.  Back at this time period around '99, 2000, what were you dealing in mostly?

A    I was dealing in cocaine at that time, mostly, when I first got out, '99 and 2000, and there wasn't too much open up.  Carlos still had an established -- there were still a lot

of things that were trying to get organized within the organization because they were still coming off of the -- we call them arrastres, round up from the time of Beaver, Robert Perez. So there was still a lot structure that needed to be organized. And I started selling cocaine and stuff with Java, you know, roughly about -- I would score about an ounce every two, three days. That's how we were doing it, ma'am.

Q    Okay. And how much would an ounce cost back then?

A    They were selling it to me at $600.

Q    Okay. Did you have much dealings with heroin back then?

A    Again, at that time since there was a lot of structure, you know, trying to get back together, organized and stuff, I wasn't involved too much in the heroin at that time yet.

Q    Okay. Did there come a time that you became more heavily involved in the distribution of heroin?

A    Yes, ma'am, close towards the end of -- like mid-2000, late, late 2000 and 2001, from on there I started distributing a lot of heroin.

Q    Okay. And where was that heroin coming from, Mr. Guerrero?

A    We had two sources. We had another member from Eagle Pass that was supplying us with heroin, and we had another connect out of Mexico, but we were getting it from a lady that was selling a lot of heroin at the time also. And her connection was out of Acapulco, Mexico.

Q   Okay, and how was that heroin coming over from Mexico, if you know?

A   It was coming through the soles of shoes.  Whenever I received the soles -- a pair of shoes, it was roughly about ten ounces per shoe.  And pretty much it looked just like a regular shoe, just coming out of the, you know, out of the plant and stuff, you know, and it was hidden inside the sole of the shoe.

Q   Okay.  And what would you do with that heroin when you got it from Mexico?

A   We would open up the soles of shoes and there was roughly about nine to ten ounces of pure heroin in each shoe, and we would break it down into ounces and because the ounces, you can step on them.  In other words, you can cut them with, cut lactose, and roughly -- the heroin we were getting at that time was very good heroin.  And we can cut it up to three ounces, four ounces, and out of that one heroin we will make five ounces.

Q   Okay, and what were you selling ounces for?

A   $800.

Q   And what were you paying?

A   Now we were selling -- once it's cut, we were selling it for $800, but I was selling also pure heroin, the chicle.  We were selling it for 1350, 1400.

Q   Okay, and were you doing this narcotics activity on behalf

of the Mexican Mafia?

A   Yes, ma'am.

Q   Now back in 2000, you've already said that Wero, Carlos Wero Rodriguez was the general.  And who was directly under him as assistant general back at that time period?

A    Florencio Lencho Vasquez.

Q   Okay.  Did there become a time back in 2000 when there was a power struggle between Carlos Rodriguez and Florencio Vasquez?

A   Yes, ma'am.

Q   And can you tell us a little bit about that?

A    Florencio Vasquez, he was assistant general but he was up in the south side, and, to my understanding, he wanted more power.  He wanted the seat of the general.  And he was in contact with Benito Alonzo, which was the vice president at the time, and he got permission from Benito Alonzo to have Carlos Rodriguez killed.

Q   Okay.  So Florencio Vasquez went up the chain to Benito Alonzo asking for permission to kill Carlos?

A   Yes, ma'am.

Q   And Carlos found out about that?

A   Yes, ma'am.  Benito Alonzo was writing another member by the name of Bobby, Wino, I'm not sure what his name is, and Benito sent the letter that was supposed to be forwarded to Lencho, and within that letter he was giving permission to

Lencho to go ahead and kill Carlos Rodriguez.

Q    Okay.  And how did Carlos Rodriguez react to that?

A    We went and we got contact with Benito Alonzo's son. That's the way we would hold communication with Benito, because we -- you know, Carlos was also in communication with Benito.  And we sent the -- we gave some money to the son and everything to visit Benito Alonzo and Carlos was asking Benito Alonzo also for permission to kill Florencio Vasquez.

Q    Okay.  Did Carlos Rodriguez get permission from Benito?

A    Benito's answer was that he couldn't give him a yes or a no and pretty much -- I'm not too sure why Carlos asked, you know, because, like I said, Benito's the one that gave permission to Florencio in the first place to kill him, but I'm guessing that he was doing it just to see what the reaction was to Benito.  But he said that that's enough what he needed, to go ahead and do the hit.

Q    Okay.  And at this period of time when Florencio Vasquez's life is getting close to an end, what position were you in in the Mafia?

A    I held the rank of lieutenant.

Q    Okay.  And, again, you were neighbors with Carlos Rodriguez?

A    Yes, ma'am.

Q    And how often did you see him?

A    Every day.

Q   Okay.  Now as a result of this intrigue between Carlos Rodriguez and Florencio Vasquez were you given an assignment?

A   Yes, ma'am.  Carlos put the -- he put me in charge of getting the hit done on Florencio Vasquez.  He specifically told me to have another member by the name of Ray Carrasco and Henry Mundo Rodriguez to do the hit.  He wasn't telling me for me to do the hit personally, he was telling me to have these two gentlemen do the hit and make sure that they got it done.

Q   Okay.  And up on the screen, is that the Ray Carrasco you're talking about?

A   Yes, ma'am.

Q   And that is Government's Exhibit 5.  So initially what was your position going to be on this hit on Florencio Vasquez?  What were you going to do initially?

A   Just to make sure that they got the job done.

Q   Okay, do you-all have a term for a person that -- make sure a job gets done?  Do you-all have a word?

A   It's in Spanish, ma'am, just nomas que lo mandan al canton [phonetic].

Q   Can you translate it?

A   That means to send them to the house but send them to the house upstairs.

Q   Now what did you do as a result of this order from Carlos Rodriguez?

A   Well, I informed Ray Carrasco and Mundo that they had to

do the hit and I showed them where Lencho lived, his personal house, and I just told them to get the job done.  And time passed on, time passed on, you know, two months -- about two, three months, roughly, and every day pretty much Carlos would always be on top of me telling me that, you know, why hasn't the hit been done, you know, time is passing, you know, too much time is passing and stuff like that.

Q    And so how did you -- did you try to fix that?

A    Well, the thing was that one day Carlos called me up to the house and he told me he needed to speak to me personally. And he was again, you know, getting after me because the job hadn't got done yet.  And it was September 16th, and he told me that if the job didn't get done it wasn't Carrasco's or Mundo's fault, it's my fault, I'm the one that's in charge of the hit.  So the whole, you know, thing falls on my shoulders. And he pretty much put it to me that if I didn't get the job done, you know, he asked me himself, you know, where would that leave me?  And the only thing I could think of was in the same shoes that Lencho was.  Lencho was already, you know -- the hit for him was already, you know, talked about.  So he was going to, he was going to get killed regardless.  And he just told me, you know, that if I didn't get the job done where would that leave me?  Pretty much in Lencho's shoes, the same, you know, that -- you know, something would happen to me, I would get killed.  So I told him that that's, you know,

I understood everything.

And I took it upon myself to get ahold of Carrasco and Mundo, and I told them to get a car and everything and that same night we started looking for Carrasco. Personally, I went with them looking for -- Lencho, I mean -- and until we located him at a bar. And I told Carrasco to get two firearms, and I told Mundo that he's going to drive the car and stuff and Carrasco was going to assist me. I was going to do the job personally just to make sure that it was going to get done.

Q    Okay, let me stop you right there. Where did you find Florencio Vasquez the night of September 16th, 2001?

A    There's a bar called Guzman's off of Flores Street in the south side and we located his truck parked behind the bar.

MS. GREEN: May I approach?

THE COURT: Yes.

Q    Mr. Guerrero, I'm going to show you what's been marked as Government's Exhibit RA111.74, 111.75, 111.76 and 111.77. Do you recognize the building depicted in those exhibits?

A    Yes, ma'am, that's Guzman's Bar.

MS. GREEN: The Government offers 111.74 through 111.77.

MR. PRICE: No objection.

MR. STENBERG: Mike Garcia has no objection.

MR. COLLINS: No objection.

THE COURT:  All right, it's in.

MS. GREEN:  Could you please publish 111.77?

Q   What are we looking at there, Mr. Guerrero?

A   Guzman's Bar.

Q   Okay, and is that the front door?

A   Yes, ma'am.

Q   Okay.  And then moving to 111.76.  What are we looking at there?

A   That's the rear of the bar.

Q   Okay, and do you remember the name of the street that runs right there?

A   No, ma'am, I just know that it's Flores in the front of the bar.

Q   And 111.74.  Do you recognize that area, sir?

A   Yes, ma'am.  That's the rear of the bar.

Q   And 111.75?

A   That's the side of the bar.

Q   Okay.  All right, now you've gone through the -- you've gone through what has happened up to this point rather rapidly, so let's back up just a little bit.

A   Yes, ma'am.

Q   Who did you call that night?

A   I called Carrasco and Mundo.

Q   Ray Carrasco and Mundo, which is Henry Rodriguez?

A   Yes, ma'am.

Q    Okay.  And what did you tell them to do?

A    I told Carrasco that we needed a vehicle in order to do the hit and that we were going to go together to go look for Lencho.

Q    Okay.  And what about weapons?  How did you go about getting weapons?

A    I told Carrasco to obtain two weapons.  Well, I asked both of them and Carrasco is the one that volunteered that he had weapons at our disposal.  So I told him to get two weapons and have them ready for whenever we needed them.

Q    Okay.  And were you picked up or did you drive somewhere, or what happened?

A    I can't really recall, but I believe I was picked up, ma'am.  I can't really recall that.

Q    And do you recall what kind of vehicle you were picked up in?

A    Yes, we were in a little minivan.  It was like a kind of beige minivan.  It belonged to Carrasco's father.

Q    Okay.  And what were you -- when you were looking for Lencho, I understand that you found him at Guzman's.

A    Yes, ma'am.

Q    But did you go looking for him at other places?

A    Yes, we went to his house.

Q    And were you looking for his vehicles?

A    Yes, we were looking for his vehicles.  He had a truck and

he had a Cadillac.

Q   What color was the truck, do you remember?

A   It was like a dark color.  I want to say almost like a black or a purple, dark purple.

Q   Okay.  Now did you see his vehicle at Guzman's?

A   Yes, it was his truck.

Q   Okay.  And describe what you all did, and I'm going to go ahead and have 111.74 left up as you describe what happened on the evening of September 16th of 2001.

A   If you see where there's a, there's a truck to the far right on the corner?  That's where pretty much Lencho's truck was parked.  And once we saw that his truck there, I told Carrasco to go ahead and park the minivan on the other side of the street that's running right on the side of the bar, and we waited there while we're visually looking at it, like catty-corner, and just watching the back door and stuff.  I knew his truck was in the back so anytime he's going to exit the bar, you know, he's going to have to come out through that exit right there.

Q   Okay.  And did he come out?

A   Yes, ma'am.  Him and two other individuals.

Q   Okay, did you know the other people with him?

A   Yes, ma'am.

Q   And when Florencio Vasquez walked out of the back door of Guzman's, what did you-all do?

A    Well, we already had prepared.  We had -- since it's a minivan, the sliding door, we already had it open, you know, not completely open, just ready to open, you know, unlocked. And as soon as we seen him walk out, he was with two other individuals, Rudy Zamora, he was the captain at the time, and another just regular soldier by the name of Camilo, he's from the south side.  And we put our masks down, because we had some masks on, and Carrasco and myself, we ran up towards Lencho, Rudy and Camilo and pretty much almost point-blank range, we got up to 'em and we shot 'em.

Q    And what type of guns were you using?

A    I had a .38 special and Carrasco had .357.

Q    Okay, and was Florencio Vasquez hit?

A    Yes, ma'am, numerous times.

Q    Okay.  And did something happen to you --

A    Yes.

Q    -- during this shooting?

A    Yes, I was shot by Carrasco.

Q    And where were you shot?

A    In my hand.

Q    Okay.  And did you lose a finger as a result of that?

A    Yes, ma'am, after they amputated it.  It stayed on me because we were using gloves.

Q    Okay.  And as a consequence of that did you -- when you fled that scene, did you bleed?

A   Yes, ma'am.

Q   Okay.

A   I was bleeding very heavily.

Q   Okay.  And when you fled where did you go?

A   We ran in the same direction that we ran in the first place and back across the street Mundo already had the minivan, it was turned on and everything, ready to go in the middle of the street.  We jumped in and we took off.

Q   Okay.  And what happened with the weapons?

A   That I know of?  They drove me -- I was trying to contact -- once we got into the van and we took off, I was going to take off my gloves and that's when I realized that I was shot.  And I told Mundo or Carrasco, one of them, to give a call to Carlos because, you know, I really didn't know at that moment what to do, you know?  And we couldn't get ahold of him on the phone so we kept driving and stuff, and I told them to drive me to my cousin's house where I was living at.  And once I got there I told them to leave, and after that I'm not too sure what happened with the firearms, ma'am.

Q   Okay.  You didn't destroy them?

A   No, ma'am, not me.

Q   Now you were eventually arrested for the murder of Florencio Vasquez, is that right?

A   Yes, ma'am.

Q   And when was that?

A    In 2003, June.

Q    In June of 2003?

A    Yes, ma'am.

Q    Okay, and that case was originally filed as a state murder, was it not?

A    Yes, ma'am.

Q    And one of the ways that case was solved was because you left a DNA trail across that street as you bled and fled, right?

A    Yes, ma'am.

Q    Okay.  So that case, the murder of Florencio Vasquez, was that eventually incorporated into a federal case?

A    Yes, ma'am.

Q    And have you pled guilty to a RICO conspiracy?

A    Yes, ma'am.

Q    Okay.  And what type of punishment are you facing?

A    Life, ma'am.

Q    Now when you were arrested in June of 2003, you didn't immediately begin providing information to the Government, did you?

A    No, ma'am.

Q    Did something occur in July of 2003 that disrupted everything involving you and the Mexican Mafia?

A    Yes, ma'am.  My then wife at the time, she was still living at our house and stuff, and there was another member,

he was a lieutenant.  His name is Rojalio Flaco Rodriguez, and he's the one that was at that -- you know, at 2003 he's the one I stored all my heroin, cocaine, stuff like that, and pretty much all my money and also dope money, you know, drug money there at his house.  And he was the lieutenant of the west side.  And my wife was returning home, probably visiting her mom or something, and we were speaking on the phone and Flaco waved her down and stopped her.  And he started telling her that they wanted for him -- for her to give me a message that the Mexican Mafia wanted the ten percent.  They wanted the safe that contained the ten percent.

Q   Did you have the safe that contained the ten percent?

A   I didn't have it personally any more.  I already knew by other members that were where I was housed in Bexar County, they already, you know, were telling me that they -- you know, the people that got back into in charge, which was Gumby and everybody else, they already had picked up the safe, ma'am.

Q   Okay.  But this Flaco Rodriguez was asking your wife where the money was?

A   Yes, he was pretty much telling her that the people up above, they wanted her to tell me and where was the safe with the ten percent and for me to relay that message to her so she can tell them where the safe was.

Q   Okay.  Do you have any idea how much money the Texas Mexican Mafia had in the summer of 2003?

A    In that safe they had only $37,000, ma'am.

Q    Okay.  Now did something else occur in the summer of 2003?
Besides you being arrested in June, did Carlos Rodriguez get
killed in July of 2003?

A    He got killed in June the 9th of 2003, ma'am.

Q    I stand corrected.  So he got killed, in fact almost
simultaneously with you being picked up?

A    Yes, ma'am.

Q    Okay.  Now when this incident happened with your wife, did
you take that as a threat?

A    Yes, ma'am.

Q    Okay, and did you bond out eventually on the murder case
that was filed in state court?

A    Yes, ma'am, in 2004.

Q    Okay.  And was it around that time that you started
providing information to the Government or was it prior to
that?

A    It was prior to that.

Q    Okay.  Let me back up a little bit and ask you did your
rank change after you killed Florencio Vasquez?

A    Yes, ma'am.  Carlos appointed me general.

Q    All right, and so that would have been in 2001?

A    Yes, ma'am.  Lencho's murder happened in September of
2000, and right around January of 2001 Benito Alonzo was
coming up for parole.  He was the vice president at the time.

And he gave up the position, I'm guessing to look better for parole, you know. And so that position, the vice presidency was vacant and Herb Huerta appointed Carlos Rodriguez. So since the general rank was vacant, he appointed me general at the time.

Q   Was Alfonso Flores part of the rank structure back in 2001 with you?

A   Yes, ma'am.

Q   And what was his rank?

A   He was my assistant general.

Q   Back at this time period, I think you mentioned it earlier, but was Carlos Rodriguez attempting to establish better narcotics connections for the Mexican Mafia?

A   Yes, ma'am.

Q   Okay, and what was being done at that point in time as far as narcotics?

A   Well, we were pretty much selling to any and all members, you know, in the rank system and also non-ranking members. But we were also -- he was organizing all of the Mexican Mafia within Texas. We were having large juntos, which are just meetings, you know, within the organization itself, and he was appointing, you know, ranks within the cities in all of Texas and stuff, and just opening up more communication throughout all of Texas, and doing that, you know, we'll be able to distribute more narcotics or get better, you know,

connections.

Q   And was this different than how the Mafia had been run previously?

A   Yes, ma'am.

Q   Okay.  I want to talk a little bit about your cocaine connection.

A   Yes, ma'am.

Q   Who were you getting a majority of your cocaine from?

A   I was getting my cocaine from a drug dealer by the name of Joey Villarreal.

Q   Okay.  And what quantities are we talking about and what time period?

A   The time period was in 2002, pretty much late -- summer of 2002, late 2002 all the way until I got arrested in 2003.

Q   Okay, and what kind of quantities are we talking about at that time period?

A   From Joey I was receiving one to two kilos roughly every two weeks.

Q   And what would you do with that cocaine, those kilograms of cocaine?

A   I would sell it to members.

Q   Okay.  And did you have to recon it yourself or did you buy it pure?  Just explain it for us.

A   Well, we were getting escama, which is pure cocaine, and Joey Villarreal had -- he had teached me how to recon.  So we

started reconning the cocaine. And out of a pure kilo of cocaine, the way he was doing it, he was reconning it and making two kilos. But the purity, you know, you pretty much downgrade it a lot. And since I was dealing with members and stuff, I wanted to make sure that the purity that they were getting was still high. So what we did was I'll get two kilos of escama, which is the pure cocaine, and put the cut into it and make three kilos, which would keep the cocaine at about 75 percent purity.

Q   Okay. And then the three kilos that you ended up with, how was it distributed, or was it distributed to Mafia members?

A   Yes, ma'am. Some members -- I had some members from other cities that were purchasing kilos from me. From like from New Braunfels, I had the lieutenant and a sergeant from there, they were purchasing kilos from me. I had another member here in San Antonio that was purchasing kilos from me. And probably one of the kilos, we'll break it down into ounces or quarter keys or half keys.

Q   And was the heroin distribution still ongoing at this time?

A   Yes, ma'am.

Q   Okay, and is this when you were dealing with the shoe heroin --

A   Yes, ma'am.

Q    -- for lack of a better word?

A    Yes, ma'am.

Q    The heroin coming from Mexico?

A    Yes, ma'am.

Q    Okay.  Now what about dime collection, Mr. Guerrero?  Did you do any dime collection?

A    Yes, ma'am, I did a lot of it.  When I first got out of prison, you know, I was out in the streets, you know, personally looking for connections and stuff, talking to people, making them, you know, pay the ten percent.  And within time that, you know, I grew in rank and stuff like that, I got less and less involved in the, you know, in the street level of looking for connects and stuff like that.  Once I became general, pretty much the only times I would deal with the ten percent is when somebody was dealing big or something like that, ma'am.

Q    Okay.  And can you tell us about any situation where someone was dealing really big and you were involved in much more than a dime collection?  I'm referring to a bar owner.  Do you recall that?

A    To a bar owner?  I don't recall that, ma'am.

Q    Do you remember a man named Pete Pastrano?

A    Oh, yes, ma'am.  Pete Pastrano.  He owned the bar Black Jack's off of Highway 90.

Q    Okay.  And tell us about the money that you got as part of

the Mexican Mafia from Pete Pastrano at Black Jack's?

A    We had heard that Pete -- see, we knew Pete because he was a half-brother of another Mexican Mafia member that had gotten killed back in the '90s by the name of Chipo.  And so Pete was pretty much well known within the Mexican Mafia.  And at the time that I was out there we had heard rumors that Pete Pastrano was moving a lot of cocaine.  But the thing is that he was moving large quantities of cocaine that, you know, we couldn't really get the information, the solid information to really say that we, you know, we really do know.  But we did approach Pete Pastrano and we asked him if he was dealing in cocaine and stuff and he denied it at the time.

          Some time passed and Pete Pastrano got -- he got caught by -- I'm not sure if it was DEA or FBI, but he got caught with a lot of cocaine.  So once we found out he had gotten caught, we knew he, you know, he was dealing very, very large and stuff, and we went back to him and we charged him the -- a back pay of $50,000, ma'am.

Q    $50,000?

A    Yes, ma'am.

Q    From one person at one time?

A    Yes, ma'am.

Q    Did he pay it?

A    Yes, he paid that same day.

Q    Okay.

479

THE COURT: Ms. Green, we're going to recess for the day. Members of the jury, we will reconvene at nine in the morning. Remember your instructions, do not speak to anyone nor permit anyone to speak to you about this case. And I need to visit with the lawyers before you-all leave. Thank you, members of the jury.

**(Proceedings adjourned to 5/12/10.)**