UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

UNITED STATES OF AMERICA,      )      **Case No. SA-08-CR-47-OLG**
                               )
            Plaintiff,         )
                               )
VERSUS                         )      San Antonio, Texas
                               )      May 19, 2010
**JACINTO NAVAJAR(1),**        )      May 20, 2010
**JOSE MARTINEZ(9),**          )      August 4, 2010
**MIKE GARCIA(20),**           )
                               )
            Defendants.        )
_____)

**Trial on the Merits**
**BEFORE THE HONORABLE ORLANDO L. GARCIA**
**UNITED STATES DISTRICT JUDGE**
And Jury
**August 4, 2010 - Sentencing Hearing**
VOLUME 8 OF 8


APPEARANCES:

For the United States      HONORABLE JOEY CONTRERAS
                           HONORABLE M. GREEN
                           Assistant U.S. Attorney
                           U. S. Attorney's Office
                           601 N.W. Loop 410, Suite 600
                           San Antonio, Texas  78216


For Defendant Navajar      HONORABLE STEVEN P. PRICE
                           Price & Price
                           The Lincoln Center
                           7800 IH-10 West, Suite 521
                           San Antonio, Texas  78230


For Defendant Martinez     HONORABLE KEVIN L. COLLINS
                           Law Offices of Kevin L. Collins
                           600 Navarro Street, Suite 250
                           San Antonio, Texas  78205


          **Captured and transcribed by computer - Xscribe**

APPEARANCES CONT'D

For Defendant Garcia          HONORABLE JOE STENBERG
                              722 Euclid Avenue
                              San Antonio, Texas   78212


Court Reporter                MAURICE D. WEST
                              Official Court Reporter
                              655 E. Durango Blvd., Suite 316
                              San Antonio, Texas   78206

                                * * * * *
                                - - - - -

**(May 19, 2010, 9:00 a.m. - Jury in.)**

THE COURT: Okay, good morning, members of the jury, we're at the stage now that I'm going to read the charge to you, if you'll follow along with me, please.

Members of the jury, in any jury trial there are, in effect, two judges. I am one of the judges, the other is the jury. It is my duty to preside over the trial and to decide what evidence is proper for your consideration. It's also my duty at the end of the trial to explain to you the rules of law that you must follow and apply in arriving at your verdict.

First, I will give you some general instructions which apply in every case, for example, instructions about burden of proof and how to judge the believability of witnesses. Then I will give you some specific rules of law about this particular case, and finally I will explain to you the procedures you should follow in your deliberations.

You, as jurors, are the judges of the facts. But in determining what actually happened; that is, in reaching your decision as to the facts, it's your sworn duty to follow all of the rules of law as I explain them to you.

You have no right to disregard or give special attention to any one instruction, or question the wisdom or correctness of any rule I may state to you. You must not substitute or follow your own notion or opinion as to what the

law is or ought to be. It is your duty to apply the law as I explain it to you, regardless of the consequences.

It is also your duty to base your verdict solely upon the evidence, without prejudice or sympathy. That was the promise you made and the oath you took before being accepted by the parties as jurors, and they have the right to expect nothing less.

The indictment or formal charge against a defendant is not evidence of guilt. Indeed, the defendant is presumed by law to be innocent. The law does not require a defendant to prove his innocence or produce any evidence at all, and no inference whatever may be drawn from the election of a defendant not to testify. The Government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so you must acquit the defendant.

While the Government's burden is a strict or heavy burden, it is not necessary the defendant's guilt be proved beyond all possible doubt. It's only required Government's proof exclude any reasonable doubt concerning the defendant's guilt.

A "reasonable doubt" is a doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case. Proof beyond a reasonable doubt, therefore, is proof of such a convincing character that you would be willing to rely and act upon it without hesitation in

the most important of your own affairs.

As I told you earlier, it is your duty to determine the facts. In doing so, you must consider only the evidence presented during trial, including sworn testimony of witnesses and the exhibits. Remember that any statements, objections or arguments made by the lawyers are not evidence. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case and, in doing so, to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that control in the case. What the lawyers say is not binding upon you.

During the trial I sustained objections to certain questions and exhibits. You must disregard those questions and exhibits entirely. Do not speculate as to what the witness would have said if permitted to answer the question or as to the contents of an exhibit. Also, certain testimony or other evidence has been ordered stricken from the record and you've been instructed to disregard this evidence. Do not consider any testimony or other evidence which has been stricken in reaching your decision. Your verdict must be solely based on the legally admissible evidence and testimony.

Also, do not assume from anything that I may have done or said during the trial that I have any opinion

concerning any of the issues in this case. Except for the instructions to you on the law, you should disregard anything I may have said during the trial in arriving at your own findings as to the facts.

While you should consider only the evidence, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts which have been established by the evidence.

Do not be concerned about whether the evidence is "direct evidence" or "circumstantial evidence." You should consider and weigh all of the evidence that was presented to you.

Stipulation of Evidence. The parties have agreed and stipulated to the introduction of certain evidence at trial in this cause. The admission of this evidence is not contested by any party and will be deemed admitted. The evidence whose admission is stipulated consists of 22 autopsy reports of the persons whose deaths are alleged in the indictment.

Now, members of the jury, then you'll note there are 22 exhibits of 22 individual autopsies. If you'll then proceed to the bottom.

These autopsy reports are admitted and may be

considered by you as you deem appropriate.

In addition, the parties have agreed and stipulated to the introduction of a firearms report that was marked Government's Exhibit No. 2751.  The admission of this report is not contested by any party and is deemed admitted.  This firearms report may be considered by you as you deem appropriate.

I remind you that it is your job to decide whether the Government has proved the guilt of the defendants beyond a reasonable doubt.  In doing so, you must consider all of the evidence.  This does not mean, however, that you must accept all of the evidence as true or accurate.

You are the sole judges of the credibility or believability of each witness and the weight to be given the witness's testimony.  An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.  You should decide whether you believe all or any part of what each person had to say, and how important that testimony was.  In making that decision I suggest that you ask yourself a few questions.  Did the person impress you as honest?  Did the witness have a particular reason not to tell the truth?  Did the witness have a personal interest in the outcome of the case?  Did the witness have any relationship with the Government or defense?  Did the witness seem to have a good memory?  Did the witness clearly see or

hear the things about which he testified? Did the witness have the opportunity and ability to understand the questions clearly and answer them directly? Did the witness's testimony differ from the testimony of other witnesses? These are a few of the considerations that will help you to determine the accuracy of what each witness said.

Your job is to think about the testimony of each witness you have heard and decide how much you believe of what each witness had to say. In making up your mind and reaching a verdict, do not make any decisions simply because there were more witnesses on one side than the other. Do not reach a conclusion on a particular point just because there were more witnesses testifying for one side on that point.

The testimony of a witness may be discredited by showing that the witness testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something, or failed to say or do something, which is inconsistent with the testimony the witness gave at this trial.

Earlier statements of a witness were not admitted in evidence to prove the contents of those statements are true. You may consider the earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and therefore whether they affect the credibility of that witness.

If you believe that a witness has been discredited in this manner, it is your exclusive right to give testimony of that witness whatever weight you think it deserves.

You've been told that certain witnesses were convicted of various criminal offenses. A conviction is a factor you may consider in deciding whether to believe that witness, but it does not necessarily destroy the witness's credibility. It has been brought to your attention only because you may wish to consider it when you decide whether you believe the witness's testimony. It is not evidence of anything else.

The testimony of an alleged accomplice, and the testimony of one who provides evidence against a defendant as an informer for pay or for immunity from punishment or for personal advantage or vindication must also be examined and weighed by the jury with greater care and caution than the testimony of ordinary witnesses. You, the jury, must decide whether the witness's testimony has been affected by any of those circumstances, or by the witness's interest in the outcome of the case, or by prejudice against the defendant, or by benefits that the witness has received either financially or a result of being immunized from prosecution. You should keep in mind that such testimony is also to be received with caution and weighed with great care.

You should never convict any defendant upon the

unsupported testimony of such a witness unless you believe the testimony beyond a reasonable doubt.

In this case the Government called as one of its witnesses an alleged accomplice, named as a co-defendant in the indictment, with whom the Government has entered into a plea agreement providing for the dismissal of some charges and a lesser sentence than the co-defendant would otherwise be exposed to for the offense to which the co-defendant pled guilty. Such plea bargaining, as it is called, has been approved as lawful and proper, and is expressly provided for in the rules of this court.

An alleged accomplice, including one who has entered into a plea agreement with the Government, is not prohibited from testifying. On the contrary, the testimony of such a witness may alone be of sufficient weight to sustain a verdict of guilty. You should keep in mind that such testimony is always to be received with caution and weighed with great care. You should never convict a defendant upon the unsupported testimony of an alleged accomplice unless you believe that testimony beyond a reasonable doubt. The fact that an accomplice has entered a plea of guilty to the offense charged is not evidence, in and of itself, of the guilt of any other person.

The testimony of someone who is shown to have used addictive drugs during the period of time about which the

witness testified must always be examined by the jury with greater care and caution than the testimony of ordinary witnesses.

You should never convict any defendant upon the unsupported testimony of such a witness unless you believe that testimony beyond a reasonable doubt.

During the trial you heard the testimony of expert witnesses. If scientific, technical or other specialized knowledge might assist the jury in understanding the evidence or in determining a fact, a witness qualified by knowledge, skill, experience, training or education may testify and state an opinion concerning such matters.

Merely because such a witness has expressed an opinion does not mean, however, that you must accept this opinion. You should judge such testimony like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the soundness of the reasons given for the opinion, and all other evidence in the case.

You will note that the indictment charges the offense was committed on or about a specified date. The Government does not need to prove that the crime was committed on that exact date, so long as the Government proves beyond a reasonable doubt that the defendant committed the crime on a

date reasonably near the date stated in the indictment.

You are here to decide whether the Government has proved beyond a reasonable doubt the defendant is guilty of the crime charged. The defendant is not on trial for any act, conduct or offense not alleged in the indictment. Neither are you concerned with the guilt of any other person or persons not on trial as a defendant in this case.

During the trial you heard evidence that the defendant, Mike Garcia, may have committed wrongful acts not charged in the indictment. For instance, and without limitation, you have heard evidence concerning the death of Eduardo Guajardo on or about November 12, 2006, in or near Frio County, Texas. The Government offered such evidence to attempt to show the defendant was, by such act, then and there intending to further the objectives of a herein-charged conspiracy. You are not to consider the evidence at all unless you find beyond a reasonable doubt that the defendant did, in fact, commit the wrongful act, as well as said wrongful act was intended by Defendant Mike Garcia to advance, facilitate or promote a herein-charged ultimate conspiratorial objective. Those of you who believe the defendant did the wrongful act for such purpose may consider it.

Even if you do find the defendant committed a wrongful act for such purpose, you may consider this evidence only for the limited purpose I have described. You may not

consider this evidence to prove the defendant is a bad person and for this reason was likely to commit a charged offense. In other words, you should consider this evidence only for the specific limited purpose I have described. To consider this evidence for any other purpose would be improper.

If a defendant is found guilty, it will be my duty to decide what the punishment will be. You should not be concerned with punishment in any way. It should not enter your consideration or discussion.

The case of each defendant and the evidence pertaining to that defendant should be considered separately and individually. The fact that you may find one of the defendants guilty or not guilty should not control your verdict as to any other defendant.

Various exhibits have been identified as a typewritten transcript and partial translation from Spanish into English of the oral conversation which can be heard on the tape recording as received in evidence. The transcript also purports to identify the speakers engaged in such conversation.

I have admitted the transcript for the limited and secondary purpose of aiding you in following the content of the conversation as you listen to the tape recording, particularly those portions spoken in Spanish and also to aid you in identifying the speakers.

You are specifically instructed that whether the transcript correctly or incorrectly reflects the content of the conversation or identity of the speakers is entirely for you to determine based upon your own evaluation of the testimony you have heard concerning the preparation of the transcript, and from your own examination of the transcript in relation to your hearing of the tape recording as the primary evidence of its own contents; and, if you should determine that the transcript is in any respect incorrect or unreliable, you should disregard it to that extent.

Certain portions of the indictment have been removed so that you will not have the complete indictment before your consideration. This process of removing portions of the indictment is referred to as redaction. You may not speculate either as to why portions of the indictment were redacted or as to the content of the redacted portions.

You will have a copy of the indictment with you in the jury room.

The next part, members of the jury, are elements of the crime.

18 U.S. Code Section 1962(d), Racketeer Influenced and Corrupt Organization Act (RICO) Conspiracy. Title 18 U.S. Code Section 1962(c) makes unlawful the crime of racketeering in what is known as the Racketeer Influenced and Corrupt Organizations statute, or the RICO statute. This statute

makes it a crime for any persons employed by or associated with an enterprise engaged in, or the activities of which affect interstate or foreign commerce, to conduct or participate in the conduct of affairs of that enterprise through a pattern of racketeering activity.

Title 18 U.S. Code Section 1962(d) makes it unlawful the crime of conspiracy to violate the RICO statue. The defendants are charged in Count One with conspiracy to violate the RICO statute, in violation of Title 18 U.S. Code Section 1962(d). This means the defendants have been charged with conspiracy to conduct or participate in the conduct of the affairs of an enterprise through a pattern of racketeering activity. The defendants are charged in Count One of the indictment with having committed the crime from the early 1980's until the date of the indictment, in that the defendants were employed by and associated with the enterprise known as the Texas Mexican Mafia, whose purposes were:

1. To enrich its members through, among other things, drug trafficking, extortion, robbery and murder;

2. To preserve and protect the power and profits of the Texas Mexican Mafia through the use of intimidation, violence, threats, assault and murder;

3. To promote and enhance the Texas Mexican Mafia and its members' activities;

4. To keep its victims in fear of the Texas Mexican

Mafia and in fear of its members through violence and threats of violence.

For you to find a defendant guilty of a RICO conspiracy offense, you must be convinced that the Government has proved each of the following beyond a reasonable doubt:

First: The existence of an enterprise or that an enterprise would exist;

Second: That the enterprise was or would be engaged in, or its activities affected or would affect, interstate or foreign commerce; and

Third: Defendant knowingly agreed that a conspirator, which conspirator may include the defendant himself, would commit a substantive RICO offense; that is, in violation of 18 U.S. Code Section 1962(c).

Now I will instruct you on the law applicable to each of the three essential elements of the RICO conspiracy. As I mentioned, the third element of a RICO conspiracy violation, 18 U.S. Code Section 1962, is the defendant agreed that a conspirator, which conspirator may include the defendant himself, would commit a violation of the substantive RICO statute, 18 U.S. Code Section 1962(c). The elements of a substantive RICO violation are as follows:

One: An enterprise, as described in the indictment, existed on or about the time alleged in the indictment;

Two: The enterprise engaged in, or its activities

affected, interstate or foreign commerce;

Three: The defendant was employed by or was associated with the enterprise;

Four: The defendant knowingly conducted or participated, either directly or indirectly, in the conduct of the affairs of the enterprise; and

Five: The defendant knowingly participated in the conduct of the affairs of the enterprise through a pattern of racketeering activity, as described in the indictment; that is, through the commission of at least two of the charged racketeering acts within ten years of each other, or through causing or aiding and abetting the commission of two such racketeering acts.

As you have heard and will hear from the instructions that I give you, there is some overlap between the elements of a RICO conspiracy violation and a substantive RICO violation. For instance, the existence of an enterprise is an element that each violation requires. For a substantive RICO violation, the Government must prove that the enterprise existed on or about the time charged in the indictment. By contrast, for a RICO conspiracy violation, which is the violation with which the defendants in this case are charged in Count One of the indictment, the Government must prove either that the enterprise actually existed or the enterprise would exist during the time period charged in the indictment.

As used in these instructions the term "enterprise" includes any individual, partnership, corporation, association, or other legal entity, or any union or group of individuals associated in fact although not a legal entity.

The term "enterprise" as used in these instructions may include a group of individuals associated in fact, even though this association is not recognized as a legal entity. Thus, the enterprise need not be a formal business entity such as a corporation but merely an informal association of individuals. A group or association of people can be an "enterprise" if these individuals have associated together for a common purpose of engaging in a course of conduct.

The existence of an association-in-fact of enterprise is proven by the evidence of an ongoing organization, formal or informal, and by evidence that various associates functioned as a continuing unit. The enterprise must have three following structural features:

1. A purpose;

2. Relationships among those associated with the enterprise; and

3. Longevity sufficient to permit the associates to pursue the enterprise purpose.

It is not necessary the the enterprise have any particular or formal structure, but it must have sufficient organization that its members functioned and operated in a

coordinated manner in order to carry out the alleged common purpose or purposes of the enterprise. Such a group need not have a hierarchical structure or a "chain of command"; decisions may be made on an ad hoc basis and by any number of methods: by majority vote, consensus, a show of strength, et cetera. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group may function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity and punctuated by periods of inactivity.

Thus, an enterprise need not have role differentiation, a unique modus operandi, a chain of command, professionalism or sophistication of organization, diversity and complexity of crimes, uncharged or additional crimes aside from predicate acts, an internal discipline mechanism, or an enterprise name. Moreover, an enterprise is not required to be businesslike in its form or function and it may, but need not, have an economic or profit-seeking motive. Indeed, RICO is not limited to groups whose crimes are sophisticated, diverse, complex or unique.

Such an association of individuals may retain its

status as an "enterprise" even though the membership of the association changes over time by adding or losing individuals during the course of its existence. The existence of the enterprise continues even if there is a gap or interruption of the enterprise racketeering activities.

Although the existence of an enterprise is a distinct element that must be proved by the Government, it is not necessary to find the enterprise had some function wholly unrelated to racketeering activity. Common sense dictates that the existence of an association-in-fact enterprise is oftentimes more readily proven by what it does rather than by an abstract analysis of its structure. Thus, the evidence used to prove the pattern of racketeering and the enterprise may in a particular case coalesce. Therefore, you may consider proof of the racketeering acts to determine whether the evidence establishes the existence of the charged enterprise and, further, you may infer the existence of an enterprise from evidence used to prove the pattern of racketeering activity.

The term enterprise includes legitimate and illegitimate enterprises. An enterprise can be a vehicle used by a defendant to commit crimes, and the enterprise itself may be a victim.

The Government is not required to prove each and every allegation about the enterprise or the manner in which

the enterprise operated.

The "interstate or foreign commerce" element is another element that the Government must prove for either a substantive RICO violation or a RICO conspiracy violation. For a substantive RICO violation, the Government must prove that the charged enterprise engaged in, or its activities affected, interstate or foreign commerce. By contrast, for a RICO conspiracy violation, which is the violation with which the defendants in this case are charged in Count One of the indictment, the Government must prove the enterprise was or would be engaged in, or its activities affected or would affect, interstate or foreign commerce.

Interstate commerce means trade or conducting business or travel between one state and another state or the District of Columbia; and foreign commerce means such trade, business or travel between the United States and another country. Therefore, interstate and foreign commerce may include the movement of money, goods, services or persons from one state to another state or the District of Columbia or between the U.S. and another country. This may include, among other matters, the purchase or sales of goods or supplies from outside the United States or the state in which the enterprise was located, the use of interstate or international mail or wire facilities, or causing any of those things.

An enterprise is generally "engaged in commerce" when

it is itself directly engaged in the production, distribution or acquisition of goods or services in interstate commerce. If you find that the evidence is sufficient to prove the enterprise was "engaged in" interstate commerce or foreign commerce, the required nexus to interstate or foreign commerce is established, and therefore the Government is not required to prove the alternative that the activities of the enterprise affected interstate or foreign commerce.

Regarding that alternative method of satisfying this element, to establish the requisite effect on interstate or foreign commerce, the Government is not required to prove a significant or substantial effect on interstate or foreign commerce. Rather, a minimal effect on interstate or foreign commerce is sufficient.

It is not necessary for the Government to prove the individual racketeering acts themselves affected interstate or foreign commerce; rather, it is the enterprise and its activities considered in their entirety that must be shown to have that effect. On the other hand, this effect on interstate or foreign commerce may be established through the effect caused by the individual racketeering acts.

Moreover, it's not necessary for the Government to prove the defendant knew the enterprise would affect interstate or foreign commerce, that the defendant intended to affect interstate or foreign commerce, or that each defendant

engaged in, or his activities affected, interstate or foreign commerce.

The Government contends the enterprise in this case was engaged in, or would be engaged in, or affected or would affect, interstate or foreign commerce in the following ways, among others: through the distribution of cocaine and heroin that moved from a foreign country to the United States.

The Government is not required to prove all the circumstances outlined above. To satisfy this element, the Government need only prove beyond a reasonable doubt either that the activities of the enterprise considered in their entirety had some minimal effect on or would affect interstate or foreign commerce, or that the enterprise was "engaged in" or would be engaged in interstate or foreign commerce.

The third element of a RICO substantive offense is the defendant was "employed by" or "associated with" the enterprise. Either one is sufficient to establish this element.

For a substantive RICO violation, the Government must prove the defendant was employed by or was associated with the enterprise. By contrast, for a RICO conspiracy violation, which is the violation with which the defendants in this case are charged in Count One of the indictment, the Government need only prove the defendant or one of his conspirators would have been employed by or associated with the enterprise.

The term "employed by" should be given its common, plain meaning. Thus, a person is "employed by" an enterprise when, for example, he is on the payroll of the enterprise and performs services for the enterprise, holds a position in the enterprise or has an ownership interest in the enterprise.

"Associated with" also should be given its plain meaning. As stated in *Webster's Third New International Dictionary*, 1971 Edition, "associate" means "to join, often in a loose relationship as a partner, fellow worker, colleague, friend, companion or ally...to join or connect with one another." Therefore, a person is "associated with" an enterprise when, for example, he joins with other members of the enterprise and he knowingly aids or furthers the activities of the enterprise, or he conducts business with or through the enterprise.

It is not required the defendant have been "employed by" or "associated with" the enterprise for the entire time the enterprise existed. The Government also is not required to prove the defendant had a formal position in the enterprise, or participated in all activities of the enterprise, or had full knowledge of all of the activities of the enterprise, or knew about the participation of all the other members of the enterprise. Rather, it is sufficient that the Government prove beyond a reasonable doubt that at some time during the existence of the enterprise as alleged in

the indictment the defendant was "employed by" or "associated with" the enterprise within the meaning of those terms I've just explained and that he knew of the general nature of the enterprise, and that the enterprise extended beyond his own role in the enterprise.

The fourth element of a RICO substantive offense is that the defendant conducted or participated, directly or indirectly, in the conduct of the affairs of the enterprise. Such proof may include evidence the defendant intentionally performed acts, functions or duties which are necessary to, or helpful in, the operation of the enterprise. Thus, for a substantive RICO violation, the Government must prove that the defendant participated in the operation or management of the enterprise or that he had some part in directing the enterprise affairs. However, the Government need not prove the defendant exercised significant control over or within the enterprise, or that he had a formal position in the enterprise, or that he had primary responsibility for the enterprise's affairs. Rather, an enterprise is operated not just by upper management but also by lower-rung participants in the enterprise who are under the direction of upper management or carry out upper management orders. Therefore, you may find guilty all who participate in the conduct of the enterprise, whether they are generals or foot soldiers. An enterprise also might be operated or managed by one who exerts

control over the enterprise.

For a RICO conspiracy violation, the Government need not prove the defendant personally participated in the operation or management of the enterprise. Rather, a defendant may be convicted of a RICO conspiracy even if he did not personally participate in the operation or management of the enterprise when the evidence establishes the defendant knowingly agreed to facilitate a scheme which, if completed, would constitute a RICO substantive violation including at least one conspirator who would participate in the operation of management of the enterprise.

The fifth element the Government must prove for a substantive RICO violation is the defendant engaged in a pattern of racketeering activity. For a RICO conspiracy violation, which is the violation with which the defendants in this case are charged, the Government must prove the defendant agreed that a conspirator, which conspirator could be the defendant himself, would commit a pattern of racketeering activity.

As I have stated, the indictment alleges the defendant and his alleged co-conspirators agreed to commit racketeering acts including murder, conspiracy to commit murder, attempted murder, conspiracy to interfere or affect commerce through extortion, and conspiracy to distribute heroin and cocaine. To establish a "pattern of racketeering

activity," the Government must prove three elements beyond a reasonable doubt:

One: The defendant intentionally committed, or caused, or aided and abetted the commission of, two or more of the racketeering acts alleged in the indictment. These two or more acts must have been committed within ten years of each other. Your verdict must be unanimous as to which specific racketeering acts you find the defendant committed, caused or aided and abetted. Shortly, I will instruct you on the elements regarding each of the charged racketeering acts.

Two: The racketeering acts have a "nexus" to the enterprise and the racketeering acts are "related." A racketeering act has a "nexus" to the enterprise if it has a meaningful connection to the enterprise. To be "related," the acts must have the same or similar purpose, results, participants, victim, or methods of commission, or be otherwise interrelated by distinguishing characteristics and not merely isolated events. Two racketeering acts may be "related" even though they are dissimilar or not directly related to each other, provided that the racketeering acts are related to the same enterprise. For example, for both "nexus" and "relatedness" purposes, the requisite relationship between the RICO enterprise and a predicate racketeering act may be established by the evidence that defendant was enabled to commit the racketeering act solely by virtue of his position

in the enterprise or involvement in or control over its affairs, or by evidence that the defendant's position in the enterprise facilitated his commission of the racketeering act, or by evidence that the racketeering act benefitted the enterprise, or by evidence that the racketeering act was authorized by the enterprise, or by evidence the racketeering act promoted or furthered the purposes of the enterprise.

Three:  The racketeering acts themselves either extended over a substantial period of time or they pose a threat of continued criminal activity.  The Government need not prove such a threat of continuity by any mathematical formula or by particular method of proof, but rather may prove it in a variety of ways.  For example, the threat of continued unlawful activity may be established when the evidence shows the racketeering acts are part of a long-term association that exists for criminal purposes or when the acts are shown to be the regular way of conducting the affairs of the enterprise.

Moreover, in determining whether the Government has proven the threat of continued unlawful activity, you are not limited to consideration of the specific acts charged against the defendant; rather, in addition to considering such acts, you also may consider the nature of the enterprise, other unlawful activities of the enterprise and its members, viewed in their entirety, including both charged and uncharged activities.

To convict a defendant on the RICO conspiracy offense in Count One, the Government is not required to prove that any defendant or conspirator actually committed any racketeering act. Moreover, it is not necessary, in order to convict a defendant of a charge of conspiracy, that the objectives or purposes of the conspiracy, whatever they may be, have been achieved or accomplished. The ultimate success or failure of the conspiracy is irrelevant. Rather, the conspiratorial agreement to commit a RICO offense is the essential aspect of a RICO conspiracy offense.

Moreover, the Government is not required to prove that the alleged enterprise was actually established, that the defendant was actually employed by or associated with the enterprise, or that the enterprise was actually engaged in, or its activities actually affected, interstate or foreign commerce. Rather, because the agreement to commit a RICO offense is the essence of a RICO conspiracy offense, the Government need only prove that if the conspiracy offense were completed as contemplated, the enterprise would be established, the defendant would be employed by or associated with the enterprise, and that the enterprise would be engaged in, or its activities would affect, interstate or foreign commerce.

Finally, the Government need not prove the defendant personally participated in the operation or management of the

enterprise. A defendant may be convicted of a RICO conspiracy offense even if he did not personally participate in the operation or management of the enterprise when the evidence establishes the defendant knowingly agreed to facilitate a scheme which, if completed, would constitute a RICO substantive violation involving at least one conspirator who would participate in the operation or management of the enterprise.

As I previously stated, the agreement to commit a substantive RICO offense is the essential aspect of a RICO conspiracy offense.

The jury may find that a defendant has entered into the requisite agreement to violate RICO when the Government has proved beyond a reasonable doubt that the defendant agreed with at least one other co-conspirator that at least two racketeering acts would be committed by a member of the conspiracy in the conduct of the affairs of the enterprise. The Government is not required to prove the defendant personally committed two acts, or that he agreed to personally commit two acts. Rather, the Government must prove beyond a reasonable doubt the defendant agreed to participate in the enterprise with the knowledge and intent that at least one member of the RICO conspiracy, which could be the defendant himself, would commit at least two predicate racketeering acts in the conduct of the affairs of the enterprise.

Moreover, in order to convict the defendant of the RICO conspiracy offense, the jury's verdict must be unanimous as to which acts you believe beyond a reasonable doubt the defendant conspired to commit. Unless you are unanimous in finding beyond a reasonable doubt the defendant conspired to commit a charged racketeering act, you must disregard that act in deciding whether the defendant is guilty or not guilty of conspiring to engage in racketeering. It is not sufficient that some of the jurors find the defendant conspired to commit two of the acts while others of you find that he conspired to commit different acts. However, it is sufficient to convict the defendant if you are unanimous in finding that he conspired to commit at least two of the acts and you are all in agreement as to which two acts he conspired to commit.

Furthermore, to establish the requisite conspiratorial agreement, the Government is not required to prove that each co-conspirator explicitly agreed with every other co-conspirator to commit the substantive RICO offense, or knew all his fellow conspirators or was aware of the details of the conspiracy. Rather, to establish sufficient knowledge, it is only required the defendant know the general nature and common purpose of the conspiracy and that the conspiracy extends beyond his individual role. Moreover, the elements of a RICO conspiracy, such as the conspiratorial agreement, the defendant's knowledge of it, and the

defendant's participation in the conspiracy, may be inferred from circumstantial evidence. For example, when the evidence establishes the defendant and at least one other conspirator committed several racketeering acts in furtherance of the charged enterprise affairs, the jury may infer the existence of the requisite agreement to commit a RICO offense. However, it is for the jury to determine whether, based on the entirety of the evidence, the Government has proven the defendant entered into the required conspiratorial agreement.

Furthermore, it is not necessary that the Government prove that a particular defendant was a member of the conspiracy from its beginning. Different persons may become members of the conspiracy at different times.

If you find there is a conspiracy, you may consider the acts and statements of any members of the conspiracy during and in the furtherance of the conspiracy as evidence against a defendant whom you have found to be a member of it. When persons enter into a conspiracy, they become agents for each other, so that the act or statement of one conspirator during the existence of, and in furtherance of, the conspiracy is considered the act or statement of all other conspirators and is evidence against them all.

Moreover, a defendant may be convicted as a conspirator even though he or she plays a minor role in the conspiracy, provided you find beyond a reasonable doubt that

the conspiracy existed and the defendant knowingly participated in the conspiracy with the intent to assist other conspirators in accomplishing its objective or objectives.

Count One of the indictment alleges the defendants agreed that two or more racketeering acts would be committed in conducting the affairs of the enterprise. However, the indictment does not allege each defendant agreed to all of the racketeering acts alleged and you should consider each defendant independently bearing in mind the racketeering acts in which the respective defendants are named. All of the racketeering acts alleged are as follows:

Racketeering Act Twelve (Murder of Raymond "Mon" "Nochipa" Rodriguez).

Racketeering Act Seventeen (Murder of Mercy Brooks).

Racketeering Act Eighteen (Murder of Tony Rodriguez).

Racketeering Act Nineteen (Murder of Juan "Green" Perez).

Racketeering Act Twenty (Murder of Roy Vera).

Racketeering Act Twenty-one (Murder of Rudy "Scooby" Contreras).

Racketeering Act Twenty-two (Murder of Joe Santos).

Racketeering Act Twenty-five (Attempted Murder of Ernesto "Neto" Rodriguez).

Racketeering Act Twenty-six (Conspiracy to Interfere with Commerce by Extortion).

Racketeering Act Twenty-seven (Conspiracy to Distribute Narcotics).

To prove the defendant agreed that a racketeering act alleged in Count One of the indictment would be committed in conducting or participating in the conduct of the affairs of the enterprise, the Government must prove beyond a reasonable doubt the following:

Racketeering Acts 12, 17, 18, 19, 20, 21 and 22 allege the offense of murder in violation of Texas law. Texas law, Sections 7.01, 7.02 and 19.02 makes it a crime to intentionally or knowingly cause the death of an individual.

To find that the defendant along with others committed the offense of murder as charged in Racketeering Acts 12, 17, 18, 19, 20, 21 and 22, the Government must prove beyond a reasonable doubt the following:

1. The defendant and others individually or otherwise did intentionally and knowingly;

2. Cause the death of the individual named in the act in the manner alleged in the act you are considering.

Under Texas law, a person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result. A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

Under 7.01 of the Texas Penal Code, a person is criminally responsible as a party to an offense if the offense is committed by their own conduct, by the conduct of another for which he is criminally responsible, or by both.

Under 7.02(a)(2) of the Texas Penal Code, a person is criminally responsible for an offense committed by the conduct of another if acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs or aids or attempts to aid the other person to commit the offense.

Racketeering Acts 12, 17, 18, 19, 20, 21, 22 and 25 also allege the offense of conspiracy to commit murder in violation of Texas law. Texas law makes it a crime to conspire to intentionally or knowingly cause the death of an individual.

A person commits a criminal conspiracy if, with the intent that a felony be committed (1) he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense; and (2) that he or one or more of them performs an overt act in the pursuance of the agreement.

An agreement constituting a conspiracy may be inferred from the acts of the parties.

To find the defendant along with others committed the offense of conspiracy to commit murder as charged in

Racketeering Acts 12, 17, 18, 19, 20, 21, 22 and 25 the Government must prove beyond a reasonable doubt the following:

The defendant, with the intent that murder be committed: (1) agreed with one or more persons that they or one or more of them would engage in conduct that would constitute the offense of murder; and (2) the defendant, or one or more of those with whom he has agreed, performed an overt act in pursuance of the agreement in the manner alleged in the racketeering act that you are considering.

My instructions above regarding the state offenses of murder are applicable.

Racketeering Act 25 of the indictment alleges the attempted murder in violation of Texas law. Texas Law Sections 7.01, 7,02, 15.01 and 19.02 makes it a crime to attempt to commit an offense by doing an act with the specific intent to commit that offense, which act amounts to more than mere preparation that tends but fails to effect the commission of the offense intended. To find the defendant committed the offense of attempted murder, as alleged in Racketeering Act 25, the Government must prove beyond a reasonable doubt each of the following:

Defendant and others individually or otherwise with the specific intent to cause the death of another did an act in more than preparation but failed to effect the death of an individual named in the racketeering act you are considering.

For the purposes of considering whether the defendant and others individually or otherwise committed the offense of attempted murder, a person acts intentionally, or with intent, with respect to the nature of his conduct or a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result.  Sections 7.01 and 7.02(a)(2) of the Texas Penal Code that I discussed above regarding Racketeering Acts 12, 17, 18, 19, 20, 21 and 22, are also applicable.

Racketeering Act 26 alleges the defendant and others committed the offense of conspiracy to interfere with or affect commerce by extortion in violation of Title 18 U.S. Code Section 1951.  Title 18 U.S. Code Section 1951(a) makes it a crime for anyone to obstruct or affect commerce by extortion.  Extortion means the obtaining of or attempting to obtain property from another, with that person's consent, induced by wrongful use of actual or threatened force, violence or fear.

To find the defendant along with others committed the offense of conspiracy to interfere with or affect commerce by extortion in violation of Title 18 U.S. Code Section 1951 as charged in Racketeering Act 26, the Government must prove beyond a reasonable doubt the following:

1.  The defendant and other persons, directly or indirectly, reached an agreement to interfere with or affect

commerce by extortion;

2. The defendant knew of the unlawful purpose of the agreement;

3. The defendant joined in the agreement willfully; that is, with the intent to further its unlawful purpose; and

4. The conspiracy interfered with or affected interstate commerce.

As discussed with you in my earlier explanation of conspiracy law, a person may become a member of a conspiracy without knowing all of the details of the unlawful scheme or the identities of all the alleged conspirators. If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him for conspiracy even though the defendant had not participated before and even though the defendant played only a minor role. The Government in this regard is not required to prove the defendant was personally involved in obtaining or attempting to obtain property from another.

The Government need not prove that the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme. Nor must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their

unlawful objectives.

Mere presence at the scene of an event, even with the knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy. Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of a conspiracy, does not thereby become a conspirator.

The Government is not required to prove that any conspirator knew that his conduct would interfere with or affect interstate commerce. It is not necessary for the Government to show that a conspirator actually intended or anticipated an effect on interstate commerce by his actions or that commerce was actually affected. All that is necessary is that the natural and probable consequence of the acts agreed upon by the conspirators would be to affect interstate commerce. If you decide there would be any effect at all on interstate commerce, then that is enough to satisfy this element. The effect can be minimal.

The term "property" includes money and other tangible and intangible things of value.

The term "fear" includes fear of economic loss or damage, as well as fear of physical harm. It is not necessary

the Government prove that the fear was a consequence of a direct threat; it is sufficient for the Government to show the victim's fear was reasonable under the circumstances.

The use of actual or threatened force, violence, or fear is "wrongful" if its purpose is to cause the victim to give property to someone who has no legitimate claim to the property.

As I discussed in my earlier explanation of conspiracy law when instructing you on Count One, a person may become a member of a conspiracy without knowledge of all the details of the unlawful scheme or the identities of all the alleged co-conspirators. If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him for conspiracy even though the defendant had not participated before and even though the defendant played only a minor part.

Racketeering Act 27 alleges the defendants and others committed the offense of conspiracy to distribute at least one kilogram of heroin and at leave five kilograms of cocaine, which is a violation of Title 21 U.S. Code Sections 846, 841(a)(1) and 841(b)(1)(A).

To find the defendant along with others committed the offense of conspiracy to distribute at least one kilogram of heroin and at least five kilograms of cocaine as charged in

Racketeering Act 27, the Government must prove beyond a reasonable doubt the following:

1. The defendant and other persons, directly or indirectly, reached an agreement to distribute a controlled substance, namely heroin or cocaine;

2. The defendant knew of the unlawful purpose of the agreement;

3. The defendant joined in the agreement willfully; that is, with the intent to further its unlawful purpose; and

4. The unlawful scope of the conspiracy involved at least one kilogram of heroin or at least five kilograms of cocaine.

As I have discussed in my earlier explanation of conspiracy law when instructing you on Count One, a person may become a member of a conspiracy without knowing all of the details of the unlawful scheme or identities of all alleged conspirators. If a defendant understands the unlawful nature of a plan or scheme and knowingly and intentionally joins in that plan or scheme on one occasion, that is sufficient to convict him for a conspiracy even though the defendant had not participated before and even though the defendant played only a minor part. The Government in this regard is not required to prove the defendant was personally involved in a quantity of heroin in excess of one kilogram or cocaine in excess of five kilograms, only that the overall conspiracy to distribute

controlled substances involved at least one kilogram of heroin or at least five kilograms of cocaine.

The Government need not prove the alleged conspirators entered into any formal agreement, nor that they directly stated between themselves all the details of the scheme.  Nor must it prove that all of the persons alleged to have been members of the conspiracy were such, or that the alleged conspirators actually succeeded in accomplishing their unlawful objectives.

Mere presence at the scene of an event, even with knowledge that a crime is being committed, or the mere fact that certain persons may have associated with each other, and may have assembled together and discussed common aims and interests, does not necessarily establish proof of the existence of a conspiracy.  Also, a person who has no knowledge of a conspiracy, but who happens to act in a way which advances some purpose of a conspiracy, does not thereby become a conspirator.

To distribute simply means to deliver or transfer possession of a controlled substance to another person, with or without any financial interest in the transaction.

The word "knowingly," as that term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

Interstate commerce means commerce or travel between one state, territory or possession of the U.S. and another state, territory or possession of the U.S., including the District of Columbia.

Foreign commerce means commerce or travel between any part of the United States, including its territorial waters, and any other country, including its territorial waters.

Commerce includes travel, trade, transportation and communication.

Unanimity Theory. You have been instructed that your verdict, whether it is guilty or not guilty, must be unanimous. The following instruction applies to the unanimity requirement in this case.

Each count of the indictment charges the defendant with a violation of federal law. The indictment alleges a number of separate means, methods, or acts by which the defendant is accused of violating each of these laws.

The Government does not need to prove all of the means, methods, or acts alleged in the indictment for you to return a guilty verdict.

Each juror must agree with each of the other jurors, however, that the same means or method or act alleged in the indictment was, in fact, engaged in or employed by the defendant in committing the crimes charged in the indictment. The jury need not unanimously agree on each means, method, or

act, but in order to return a guilty verdict, all 12 of you must agree on the same ones as having been engaged in by the defendant.

Unless the Government has proven the same means, methods, or act to each of you beyond a reasonable doubt, you must acquit the defendant of the crime charged.

Now, to reach a verdict, members of the jury, whether guilty or not guilty, all of you must agree. Your verdict must be unanimous on each count of the indictment. Your deliberations will be secret. You will never have to explain your verdict to anyone.

It is your duty to consult with one another and to deliberate in an effort to reach agreement if you can do so. Each of you must decide the case for yourself, but only after an impartial consideration of the evidence with your fellow jurors. During your deliberations, do not hesitate to reexamine your own opinions and change your mind if convinced that you were wrong. But do not give up your honest beliefs as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Remember at all times, you are judges, judges of the facts. Your sole duty is to decide whether the Government has proved the defendant guilty beyond a reasonable doubt.

You were permitted to take notes during the trial.

Your notes should be used only as memory aids. You must make your decision based on what you recall of the evidence. You should not give your notes precedence over your independent recollection of the evidence. If you did not take notes, you should rely upon your own independent recollection of the proceedings, and you should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the memory or impression of each juror as to what the testimony may have been. Whether you took notes or not, each of you must form and express your own opinion as to the facts of the case.

We have had an official court reporter making a record of the trial; however, we will not have typewritten transcripts of this record available for your use in reaching a decision in this case.

When you go to the jury room, the first thing you should do is select one of your number as a foreperson who will help you guide your deliberations and will speak for you in the courtroom.

A form of verdict has been prepared for your convenience, and I'll explain that to you in a moment.

The foreperson will write the unanimous answer of the jury in the space provided for in each count of the indictment, either guilty or not guilty. At the conclusion of your deliberations, the foreperson should date and sign your

juror number. Because this is an anonymous jury, the foreperson will evidence his or her signature by writing his or her juror number in the signature blank as opposed to your name.

If you need to communicate with me during your deliberations, the foreperson should write the message and give it to the Marshal. I will either reply in writing or bring you back into the courtroom to answer your message.

Bear in mind that you are never to reveal to any person, including the Court, how the jury stands, numerically or otherwise, on any count of the indictment until you've reached a unanimous verdict.

Now, members of the jury, that is the charge and we will go now to the actual verdict form. And each of you have a copy of the verdict form; however, the foreperson will have the original copy that he or she will submit to the Court once reaching a verdict.

Now, the verdict form, there's one verdict form per defendant, and it reads:

"WE THE JURY FIND the defendant, JACINTO NAVAJAR," either "'Guilty' or 'Not Guilty' as charged in Count One of the indictment. "If you find the defendant 'guilty' of Count One, please answer the following Special Issues as to the defendant. You

will enter 'did' in the blank if you unanimously find the defendant did that particular act. You will enter 'did not' in the blank if you do not unanimously find the defendant did that particular act.

"If you find the defendant 'not guilty' of Count One, do not answer the Special Issues as to the defendant."

Then the Special Issues with regard Mr. Navajar are, with regard to this gentleman, the jury find the Defendant Jacinto Navajar "did" or "did not," and then it alleges the information there, "did" or "did not," "did" or "did not." And likewise. And then with respect to Mr. Jose Martinez:

"WE THE JURY FIND the defendant, JOSE MARTINEZ, 'Guilty' or 'Not Guilty' as charged in Count One of the indictment.

"If you find the defendant 'guilty' of Count One, please answer the following Special Issues as to the defendant. You will answer 'did' in the blank if you unanimously find the defendant did that particular act. You will enter 'did not' in the blank if you do not unanimously find the defendant did that particular

act.

"If you have found the defendant 'not guilty' of Count One, do not answer the Special Issues."

And then the following Special Issues apply to Mr. Martinez and you'll answer "did" or "did not."

With respect to Mr. Garcia, Mike Garcia, it reads:

"WE THE JURY FIND the defendant, MIKE GARCIA, 'Guilty' or 'Not Guilty' as charged in Count One of the indictment.

"If you find the defendant 'guilty' of Count One, please answer the following Special Issues as to the defendant. You will answer 'did' in the blank if you unanimously find the defendant did that particular act. You will enter 'did not' in the blank if you do not unanimously find the defendant did that particular act.

"If you have found the defendant 'not guilty' of Count One, do not answer the Special Issue as to that defendant."

And then you'll find the specific issues regarding Mr. Mike Garcia as "did" or "did not" each of the elements listed there.

Now, that took an hour and five minutes. And now, Mr. Contreras, on behalf of the United States, you may make your closing argument.

MS. GREEN: Me first.

THE COURT: Ms. Green.

MS. GREEN: May it please the Court, Counsel, ladies and gentlemen of the jury. You-all just got hit with an hour and five minutes of some very dense law. But it is not that complicated. And what I want to do, or attempt to do for you this morning is break that dense legal language down into just normal ways that we talk every day. All right?

These defendants, and I want you to understand this, these defendants are charged in a one-count indictment with conspiracy to violate the RICO statute. Let's look at the RICO statute so that you can see what we're talking about here, just briefly.

Now, what was just read to you by the Court was what the RICO statute criminalizes. And the legal version of it is that any person that associates with an enterprise that engages in activities that affect interstate or foreign commerce, it prohibits them from participating in the affairs of that enterprise through a pattern of racketeering activities. This is the RICO substantive count. What does that mean in plain English?

That means, ladies and gentlemen, in this case, the

enterprise is the Texas Mexican Mafia. The interstate and foreign commerce is the drug trade. The pattern of racketeering activity that is prohibited by the RICO statute in this case consists of the murders, attempted murders, dime collections and extortions and the drug dealings that further the goals and objectives of the Mexican Mafia. Okay? That's what we're looking at in this case.

We are charged here today, these defendants, with, as I've said before, a one-count indictment that charges a conspiracy to commit what we just looked at. What's a conspiracy?

Common sense, ladies and gentlemen. In plain English, a conspiracy is an agreement between two or more persons to commit a felony offense. As the charge told you, you need not know all the details of the plan, you need not know all the identities of everyone involved in the plan, you simply must understand the unlawful nature of the plan and you must intentionally and knowingly join in that activity.

And to use a silly hypothetical, just to show you how commonsensical it is, let's say that Mr. Contreras and I have had it up to here with Agent Carlisle; we are done. Okay? So Mr. Contreras and I, we have a meeting and we decide we are going to knock him off. We buy a gun, we buy ammunition, we get a map to his house, and we get a picture of him and we have now conspired to kill Agent Carlisle. Let's say we

decide, "Umm, maybe that wouldn't be too good for prosecutors to do that, let's bring somebody in here that's really sweet and nice. Let's bring Ms. McCowsky in, no one's going to suspect her, and provide her with our plan and our stuff and so she can go do it." We are all conspiring to commit that offense. Common sense: a conspiracy is an agreement.

In a RICO conspiracy case such as this one, it is only the agreement by a defendant to participate in the activity that is necessary to prove guilt. And I want you to understand that. It is only the agreement to participate.

The Government must prove that the defendants agreed to participate in the enterprise with the knowledge and intent that at least one member of the enterprise, of the conspiracy, and it could be the defendant himself, would commit at least two racketeering acts in the conduct of the affairs of the enterprise. There's the legalese. Here's the bottom line. What we must prove and what we have proven is an agreement to participate and conspire to do the business of the Texas Mexican Mafia. And we, the Government, have done that.

More legal language. A conspiratorial agreement to commit the acts is all that is required to be found guilty. The Government is not required to prove that the defendants personally committed two racketeering acts or that he agreed to personally commit two racketeering acts. There's your legal language, what does that mean?

What that means is that the Government does not have to prove that any of these defendants personally pulled a trigger, stabbed an inmate, sold drugs or collected the dime. Rather, what we have to prove and what we have proven over the past week is that the defendants are members, they agreed that at least two of these racketeering acts were going to be committed, and those acts were committed for the benefit of the Texas Mexican Mafia.

The RICO conspiracy statute is broad. It is overwhelmingly broad. It is a wide net enacted and designed for organizations just like the one you have learned about in this past week. That's why the RICO statute was enacted and that's why we have proceeded under this law in this case today. Big net, all the fish; get them all.

Is there any doubt in your mind, ladies and gentlemen, that the Mexican Mafia is a criminal organization? There shouldn't be. They tell us so themselves. I'm going to remind you of Government's Exhibit 0100. The Constitution of the Texas Mexican Mafia. You can look at it, you can read it, you can discuss it, but let's look at one section of the constitution. In their own words:

"It being a criminal organization, we function in" -- I'm sorry, my eyesight -- "in whatever aspect or criminal interests for the benefit of advancement of Mexican

Eme. We will traffic in drugs, contract murders, prostitution, major robberies, gambling, arms and anything else we can imagine."

The Mexican Mafia itself proves the RICO conspiracy. This is what these people live by. You will have a copy of it, look it over.

Is there any doubt in anyone's mind that this is an organization that conspired to participate in a pattern of a racketeering activity? There shouldn't be. Look at Government's Exhibits RA0100, 0200, 0300, 0400, 0500, 0600, 0700 and all the way up. Look at those 24 autopsy reports. Is there any doubt in your mind that these people conspired to engage in conduct for the benefit of the Texas Mexican Mafia? Were all of those dead souls random acts of violence? Of course not.

The interstate commerce connection that must be part of a RICO conviction, I want you to remember the testimony of Agent Sanford. She testified that heroin is not produced in the United States. It must be brought in from another country. That is your interstate commerce. That is proven.

Is there any doubt that all of the members of the Texas Mexican Mafia, including the three here in this courtroom, conspired to engage in drug dealing? I want to remind you of the testimony of Daniel Flores. That one

witness said that he dealt in ten to 15 kilos a month of cocaine, five kilos a month of heroin.

Alex Guerrero, talking about at the beginning of this decade, remember his testimony about the black tar heroin coming in from Mexico in the women's shoes.

Joe Pena testified that in 2003 alone he dealt in a couple of hundred kilos of cocaine and 70 kilos of heroin. No question. All three defendants are alleged to have conspired to engage in drug trafficking. That is the one you should go to immediately. Racketeering Act 25. All three of them conspired to engage in the drug trade -- 26, I'm sorry. Check it off: all three of them did it, the organization did it, they conspired to do it, they did it.

Did the organization and the members of that organization conspire to collect the dime, which is the extortion racketeering act? Of course they did. Every single witness brought by the Government testified that the members of this organization routinely collected the 10 percent. That was their job. And they collected that 10 percent through threats of force and violence. Remember the testimony about the home invasions. Remember the testimony about breaking into people's homes armed and taking everything they owned if they did not pay their 10 percent. Day in, day out.

I will remind you of Government's Exhibit DEA2612U, V and W. Those are those GPS maps of dime collection in one

afternoon. Look at it. Of course the Government has proven that racketeering act.

I want to refresh your memory about the testimony from Dolly Flores. Do you remember the woman that came in here that's been a major, major heroin distributor for years and years and years. She testified that she has paid the 10 percent for 15 years at a thousand dollars a week, plus some back pay. Well, I had to pull out my calculator. Pulling out my calculator, that breaks down to $52,000 a year for 15 years. Throw in the back pay, that's about $800,000 from one drug dealer. That, in turn, ladies and gentlemen, buys a lot of dope and keeps a lot of inmates happy, probably keeps Herb Huerta pretty happy too.

Now I have no doubt that when defense counsel gets up here to make their closing arguments that they are going to spend a great deal of time assailing the Government's witnesses, calling them everything in the book. All right. I'm going to ask you a rhetorical question. Who else, ladies and gentlemen, who else is going to know about these activities? Who else can tell you the details of the murders, the attempted murders? Who else, who has the knowledge? Government's not going to make any apologies for presenting people that know. And that's who we presented: people that are part of the organization, people that have participated in all the illegal activities of the organization.

When you evaluate their testimony, I want you to think long and hard about what they risk coming in here and telling you what this organization is all about. They risk a lot. I want you to think about that.

I want you to think about or ask yourself why were all the Mexican Mafia members that testified asked who their pardinos were. Remember that constitution, Government's Exhibit 100? In that constitution it says that whoever sponsors a person into the Mexican Mafia, that pardino is responsible for that member's activities. So not only are these witnesses risking a great deal to come in here and tell you about this organization, so are other people.

The Government anticipates that Mr. Price is going to argue that his client, Mr. Navajar, has been locked up for years and was just released in January of 2005, so how could he possibly be involved in all of the crimes and activities that have been brought forward to you this past week. Well, you have heard evidence that from that release in 2005 until his arrest in 2008, he was a very busy man. He became the general here in San Antonio. And the general in San Antonio is the general of the entire state.

You also heard testimony early on from Alfonso Flores and Alex Guerrero that Mr. Navajar has been a member of the Mexican Mafia for years; years. And he ran his prison units when he was incarcerated. That is all before you.

I want you to think back also to what was testified to by those two early witnesses, Mr. Flores, Mr. Guerrero, about the murder of a fellow known as Solo. Remember what they told you about Mr. Navajar back in 2000, 2001. Remember Solo? Remember the car that needed to be upholstered?

I want you to think about and look at, if you choose, what Mr. Navajar had on his person when he was arrested in 2008, and that is Government's -- there's a whole list of them. RAX42B through L, those envelopes of money. That was the dime, ladies and gentlemen.

I want you to, if you choose, review RAX13A, C and E, that videotape at Luby's showing him running a meeting between himself and the Texas Syndicate. I want you to look at RAX -- I'm sorry, those 13's are he and Hector Lomas in that house discussing Mexican Mafia business. RAX44 is the Luby's.

Look at the video of him meeting at Rocky's Taco House and remember the testimony about Mr. Navajar's activity. Listen to the phone calls between Mr. Navajar and Mr. Alfredo Martinez regarding the situation at the Three Rivers facility.

Look at RA2511.76, 2561.06, 2561.07. And then go ahead and look at RA2510, the video taken at the Three Rivers facility.

And then I want you to think about the testimony of Mr. Castorano, the last witness. Mr. Castorano told you that he was offered $10,000 to get rid of Alfonso Flores, Alex

Guerrero and Mikio Hernandez. Why? Mr. Navajar is guilty.

Mr. Martinez, Jose Martinez. You've heard about several racketeering acts. Nochipa Rodriguez at the A&M Mechanic Stop Shop? Remember the testimony that puts him and Joe Pena circling the block waiting for it to be done.

When you think about the murders of Mercy Brooks, Roy Vera, Tony Rodriguez, think about the details that you heard. He was leading juntos, meetings where these murders were discussed over and over again, when these murders were assigned to various members of the Mexican Mafia.

Remember what he told Rudy Garza about Tony Rodriguez. And remember the testimony about Jose Martinez himself shooting the nephew of Tony Rodriguez while he was masked and disguised. Jacob Garcia told you all about that.

All of those murders, ladies and gentlemen, are squarely on Mr. Martinez's shoulders because he agreed that these killings had to be done for the benefit and furtherance of the Mexican Mafia. And don't forget Joe Santos. Don't forget the killing in Austin that Trini Riojas told you about because he was there. Jose Martinez is guilty.

Mike Garcia. Remember the murder of Roy Vera. He was a prospect one day and a carnal the next, Mike Garcia was. Trini Riojas was there. He told you what happened. Rudy Garza told you all about it because he was told all about it by Mike Garcia. Jacob Garcia saw these folks right before

they left his house and right after the murder of Roy Vera and Jacob got that car painted for him.

Scooby Contreras, another snitch that had to go, just like Mercy Brooks. Rudy Garza was there and so was Mike Garcia. Mike Garcia is guilty.

Ladies and gentlemen, the Texas Mexican Mafia has directed savagery in our community for many, many years. They have terrorized their communities. They have indoctrinated thousands of young men to become criminals and murderers. They have reigned through violence and intimidation, they have poisoned thousands with their narcotics. So regime by regime, decade by decade, court case by court case, the Government goes after them. Your guilty verdict will tell them that they cannot continue with impunity. The evidence, ladies and gentlemen, is overwhelming. All three of these men are guilty and the Government urges you to find them so.

THE COURT: Thank you, Ms. Green. Mr. Price, on behalf of Mr. Navajar you may proceed.

MR. PRICE: Thank you, Your Honor. Please the Court, opposing counsel, ladies and gentlemen of the jury. On behalf of Jacinto Navajar I want to thank you for your attention today. This is the last time I get to talk to you or say anything and my client has asked me to express his gratitude for your attention and the time that you've devoted here today.

I want to remind you of a couple of things. One is that my client spent 29 out of the last 54 years in prison. Now the Government's told you that we're going to make a big deal out of that and we are because 99 percent of this occurred while my client was locked up in prison.

You may say, "Well, he had communication, he had opportunity," he had whatever, but the real truth of the matter is there is a constitution called Constitution of United States of America. That's the one that binds you and that binds me and that governs this trial. And that Constitution says my client is innocent until proven guilty.

Now, I came here and I told you that sometimes as a defense lawyer you represent saints and sometimes you represent sinners. And I'm not saying my client is a saint. But I'm saying that the Government has a burden of proof. The Government has to prove beyond a reasonable doubt that my client participated in this racketeering conspiracy. And I'm here today to say that they haven't met that.

And I gave you a framework to prove that with. I said, basically, if you take the time, you take the place, you take whatever, the premise or the facts that they presented to you that the Government can't tie those together and link those together to show beyond a reasonable doubt that my client committed any type of criminal act or activity.

In 2005, January 2005, my client was released. I

think you heard from three witnesses who said they committed criminal acts with him in 2004. One guy said four or five days off or whatever, but there were at least three witnesses in orange jumpsuits that said in 2004 that they committed criminal activities with my client, which would certainly cause one to think and reflect and try to determine what their motivation is, which I think I also told you at the beginning of this trial that you're going to see the largest parade of murderers, thieves and cutthroats that you can possibly imagine. I think the definition of a serial killer is someone that's killed a couple of people. These are multiple, multiple serial killers, and they've all walked away from the needle anyway. Now they're going to serve some time in jail but their life is not at risk anymore. The only thing at risk now is their freedom and they're trying to earn their freedom by testifying there against my client saying that my client did that.

Now we're talking about here, we're talking about constant scrutiny. And I think Agent Phillips from the Drug Enforcement said that. From the day my client got out of jail, he was under constant scrutiny by the FBI, by the Drug Enforcement Agency, by the San Antonio Police Department, by the Bexar County Sheriff's Department, by the Bexar County District Attorney's Office, by the United States Attorney, by the Texas Rangers, by the Joint Task Force. That's eight or

nine agencies constantly surveiling my client. Wiretaps, audio taps, video surveillance, personal surveillance. God knows what kind of Star Trek stuff they use. I saw some things today -- or in this trial I didn't even know were possible. Two years later they can find blood on the ground by putting a tent up and using some kind of chemical.

That bone doctor guy was pretty smart too. I mean the FBI and Drug Enforcement and the Government have tools available to it that are beyond compare. Did you see any evidence about my client, or blood in my client's car? You heard somebody in an orange jumpsuit say something about it, but you didn't see any blood evidence.

You saw evidence in the form of cocaine, but you didn't see evidence regarding my client and any type of drugs. You heard people in orange jumpsuits say, "Mr. Navajar committed this act, committed that act," but you didn't see any real evidence.

I'd say that, given the resources, the time, the efforts by the Government that my client had been under constant surveillance, had he been doing what they're saying he did, they would have proof for you.

Now they did play for you an audio tape with Alfred Martinez. Alfred Martinez was the guy that said my client ordered him to commit a murder in the TDC where you saw the stabbing on the videotape. My client said when he asked him

about doing whatever, and it didn't say "green light, stab him," or whatever, it said, "Give me a little more time. Let me check on something and then I'll let you know. All right, later on I'll tell you later. Wait. I'll let you know something. Give me about three days. I'm going to take a little longer on that one, okay? It's going to take longer to check that. Hold off until I get ready and give me another three or four days."

Now, where, where does he say go ahead and stab that guy? Where does he say, "You got the green light"? Where does he say, "Go ahead and do that"? They can tell you all day long in the code but common sense will tell you that my client didn't give anybody any orders. Plus this guy's not indicted; Mr. Martinez is not indicted.

Special Issues as to Jacinto Navajar. Number one:

"With regard to Defendant JACINTO
NAVAJAR,
we, the jury, find that Defendant JACINTO
NAVAJAR ('did' or 'did not') agree with
[sic] at least one member of the RICO
conspiracy would attempt to murder Ernesto
'Neto' Rodriguez."

That's this conversation, the one we just talked about. Who did he conspire with? Where is it at?

Number two, did or did he not agree with at least two members of the RICO conspiracy he would conspire to murder

Neto Rodriguez? Now let alone one, let alone two. Who, what, where? The Government has not proven. Where is the audio tape? Where is the picture? Where is the surveillance? Where is the DEA tape? Where is the paid informant? Where is the fingerprint? Where is the DNA evidence? Where is the gun, where is the bullet, where is the evidence? There is no evidence on this first thing. So you have to find my client not guilty on that.

Number three, did Jacinto Navajar agree with at least two members of a RICO conspiracy they would conspire to interfere with commerce by extortion? We heard a lot of evidence, a lot of testimony about extortion. This one and that one, Dolly Flores 15 years paying, paying the dime. But she didn't recognize my client. Not one person said that, "Jacinto Navajar came with a crew and helped kick my door down." Not one person said, "Jacinto Navajar made me turn money over to him."

You heard testimony from an officer, who heard from another officer, that Jacinto Navajar had $4,000 in his girlfriend's car when they stopped him; not his car but his girlfriend's car, who was nine months pregnant and the officer didn't remember until I reminded him that she was nine months pregnant. $4,000 when we're talking about $800,000 from one client is not a lot of money. That's not what a general who is collecting the dime actively would have in his pocket.

And these were envelopes marked with acronyms. They say it had geographical locations. I think a reasonable person could surmise that it could have been for anything else. It could have been to pay bills. A lot of people put money in bills and then pay it out as they come due. But it wasn't an exorbitant amount of money. As a matter of fact, I had a hard time getting the agent to tell you exactly how much it was until I refreshed his memory it was $4,000. It wasn't $400,000, it was $4,000.

The fourth question they answer, Jacinto Navajar did or did not agree with at least two members of the RICO conspiracy who had conspired to distribute at least one kilogram of heroin and at least five kilograms of cocaine. Well, they talked a lot about drugs. They proved some drugs but they didn't prove my client had drugs. The only people that said anything about my client and drugs were people in orange jumpsuits right there. Now let's talk about those a little bit.

You've got a guy that committed 16 murders. You've got another guy who shot -- his friend was ten years old, he grew up with him, 20, 30 years old, and he would put a gun to his head and shot him and killed him because he was ordered to. My question is what wouldn't those people do? And how convincing a person do they have to be to get your best friend in the car to go with you to commit murder. Time after time

after time these people have proven that they're good liars. They've proven that they'll do anything, they'll say anything. What wouldn't they do?

Why wouldn't they lie about -- they got three people's lives here on the line. If they shoot their friend from ten years old, what would they do to these guys? I don't think anything you heard from that witness stand is credible because you're looking -- every one of those guys is looking at least 30 years. They got nothing to lose and everything to gain. They've already gained their lives, which, you know, you can say what you want and the Government's not going to apologize, I've already told you that, but you got multiple mass murderers that are still going to be breathing the air out there and they're going to be running around someplace doing whatever they're going to be doing.

And should my client be punished based on the Mexican constitution, the Mexican Mafia constitution, or should you uphold the United States Constitution which says you're innocent until proven guilty beyond a reasonable doubt. There is a reasonable doubt on every corner of this case regarding my client.

My client's not a saint, my client's made a lot of mistakes. My client spent 29 out of the last 54 years in prison, but my client is not guilty of these offenses as charged by the Government and the Government has not met its

burden. And the Government, despite all of its paid informants, all of its wiretaps, its constant surveillance by eight or nine agencies over a period of months and months and months, it's not like they didn't know where my client was, like he disappeared, they knew where he was at every day, every minute of every day. They can't bring one conversation to you. They can't bring a pound of cocaine, kilos of cocaine, marijuana, whatever, whatever they're trying to allege my client did, they haven't proven.

If you apply those four things we talked about and you look at those four questions, my client's not guilty. He's presumed not guilty, the Constitution demands that he be found not guilty. Thank you.

THE COURT: Thank you, Mr. Price. We'll take a recess not to exceed five minutes.

**(Recess; resuming - Jury in.)**

THE COURT: Mr. Stenberg, on behalf of your client, Mr. Garcia, you may proceed.

MR. STENBERG: Thank you. My name is Joe Stenberg and I represent Mike Garcia.

First of all, let's go over some general things that are important in this case and in every criminal case. First of all would be the burden of proof. Burden of proof for the Government is beyond a reasonable doubt. And I'm sure you've heard in civil cases it's preponderance of the evidence;

whoever has the greater weight of evidence wins. And you're talking about multimillion-dollar verdicts in many cases. All you gotta do is a little bit more credible evidence and you win. And then, to take a child away from somebody it takes clear and convincing evidence, clear and convincing evidence. Higher burden of proof; obviously it should be a higher burden of proof. Everybody here that has a child or knows somebody with a child would want the Government to have that burden of proof before they take a child away. Clear and convincing evidence.

Well, criminal case is even higher, it's beyond a reasonable doubt; beyond a reasonable doubt. Now, that creates other issues, other issues with -- for instance in here we only have "did" or "did not." Well, did means proven beyond a reasonable doubt guilty and "did not" means did not prove beyond a reasonable doubt, which would be in effect not guilty.

Now, in those two questions there is something else: not proven, not proven. In other words, when you say not -- when you say guilty, you're saying it's been proven beyond a reasonable doubt. And what does not guilty mean? It doesn't mean a person's been proven innocent, does it? It just means the Government has not proven this case beyond a reasonable doubt and, therefore, in some other countries they have three verdicts that go to the jury: guilty, not guilty, not proven.

Well, we have that not proven, it's just balled up in "did not" or "not guilty." So it's just not proven. That's all you've got to come to a conclusion, just not proven.

Now, when we talk about the burden of proof, let's look at why. I mean look -- use your eyes -- why. The Federal Government basically throughout this trial has sitting on their side three federal agents in the courtroom to help, two attorneys in the courtroom to help, two staff people in here to help. Mike Garcia's only help is right here. That's it, that's all he's got. I mean give me a break. The burden of proof should be high on the Government. They've got the resources out the -- I mean unreal; Mike's only got me.

This verdict form in Mike should be "did not," "did not," "did not," "did not," that's it. Did not conspire to kill Roy Vera; did not conspire to kill Rudy "Scooby" Contreras; did not conspire on the other two issues concerning extortion and heroin trafficking. Did not.

Now, how can we get there? How can we get to that "did not"? Because you've heard a lot of evidence from a lot of people that says -- I mean we've got 22 bodies in this case, not counting the body from Frio County, Floppy, Eduardo Guajardo, that's 23. Twenty-two bodies, what do we have, 22 bodies. Twenty-two bodies that you heard that there were discussions about hits, cameos, "We want to cameo on this guy, we want a cameo on this guy, we want a hit on this guy, we

want a green light on this guy." There were discussions before a killing. You know that, that was the evidence.

Now when I say you know that and I say that's the evidence, keep in mind what I really mean by that. I don't know what happened on any of these cases any more than you-all. We only have testimony. So when I say this is what happened, this is what was testified to. That's all I can usually say: this is what was testified to.

Twenty-two hits and Floppy; no hit ordered on Floppy. And you say, "Well, Joe, why are you talking about Floppy? We're not even asked about that." Mike wants you to consider Floppy's case against Mike big time because it shows how some other issue comes up and that's false confessions. And I tried to show you how false confessions come about. We have heard in -- I mean I think the evidence shows that we've heard a bunch of lies from a bunch of people who allegedly say they were Mexican Mafia members at a given time. Some of them even admitted they were lies. Some of them admitted that I'm such a good liar I could convince my friends that I've known for a long time that we were going for whatever excursion. They're good liars, people. And yet they come in here and want you to believe them on certain matters. Obviously I'm only concerned about the matters that people testified to against Mike Garcia, but that's important, why these people said they admittedly lied. And one said, "I don't even care whether you

believe me, I'm just saying what I'm here to say." You know, "I know I'm lying and I know I've lied, but I'm just saying I can say anything."

Others have come in and told you, "Yeah, I've killed X number of people," and then you find out it's X number of people times two or plus. "Well, you know, the Government didn't ask me about that." False confessions; show you how they come about.

Guadalupe Ramos is picked up in California. She's brought to San Antonio. And when she's picked up she's told she's charged with murder. Anybody with any common sense knows, "Bad stuff, I'm in deep doo-doo." And she's put in the Frio County Jail for at least two days. She's charged, she's charged with murder. She sits in that jail for two days. You're charged -- not you, but if a person's charged with murder for two days, they're worrying big time. They're worrying about themselves. "How am I going to extricate myself from this situation?"

And then she's picked up from the Frio County Jail by the Texas Ranger and driven to San Antonio where for the purpose of a meeting with an FBI agent and Assistant U.S. Attorney she's appointed an attorney. And, sure enough, they -- I mean think about it. They tell her, "This is what we've got. You were the last person seen with Jimmy Mendoza and an unidentified male before he was killed and you've been

charged with murder. This is who we think -- this is what we think happened. Now, we're willing to give you immunity" -- that means her lawyer, court-appointed lawyer for that one specific meeting, advised her what immunity meant. They can't use anything against you ever that you say.

"Okay. By golly. All right." And she starts with a false confession. Now, I'm not saying everything she said is a lie. I wasn't there, I wouldn't know. Maybe she was there when Floppy was killed. But Mike wasn't.

But she testifies about that. And keep in mind before this meeting she had that two meetings with the Texas Ranger, first one a couple days after Floppy's death, I think it was November 14th, and two days later, she has an interview with the Texas Ranger and she said that she drove by herself to Devine and went to Jimmy Mendoza's mom's house. That's where Jimmy Mendoza and his brothers live. And she met Jimmy there. And then along comes Mikio, who was dropped off. That's her words, "dropped off at the house."

And then, about -- I could be a little wrong on my times. "About 1 o'clock we decided to go to the bars. So Jimmy, Mikio and I went to the bar and we went to another bar. And then the bar closed and we went to Irma Ramirez's house. Then I went home."

The way she said she went home is -- I think that was the second time. So on November the 19th, after a shooting at

the Mendoza house, a man was shot, Ranger goes to the house and says, "You know, I'd like to talk to Jimmy and Guadalupe Ramos." And he takes them one at a time to the Medina County Annex, court annex, and he has interviews. And we have his notes about what she said. At that time she said she drove -- when everything was over, she drove Mikio to his house, Mikio's -- no, that -- she didn't say. She said she drove Mikio to a residence on the west side off Culebra. And you have a map, you can look at the map, Exhibit No. 7, Culebra is on the west side.

And then, on May the 8th of 2008, she's in this deep muck of trouble. She says, "Okay, I'm going to tell you the truth. I drove Mike Garcia after the killing to Mike Garcia's house on Southcross on the east side after everything was over." That's what she said. That was after she was granted immunity. But then what did she come and testify in court?

She comes in court and says, "Naw, Mike drove up, Mike Garcia drove up in his car and met us, Jimmy Mendoza and I, at Jimmy's mom's house. So then we drove to San Antonio and dropped Mike's car at my house. Then we drove from San Antonio back to Devine, Lytle and Natalia and went to those two bars and that lady's house which lady then lived in Devine. And then when it was over I took Mike Garcia back to my house, let him off at my house where Mike got into his car and drove wherever."

People, false confessions should not be relied on. When people are given immunity when they are under really, real big-time, serious charges against them, murder, and they're given immunity? Be careful. I don't think anybody would want to be convicted on that type of evidence. Mike Garcia does not want you to consider that.

Then there's other things. And keep in mind I am an attorney and I probably see things a little bit differently than you-all may see them. In other words, sometimes I'll grasp at straws. Well, to be any consideration in this trial, that killing of Floppy, Edward Guajardo, in November of 2008, had to be in furtherance of the Mexican Mafia, had to be an objective to further the interests of the Mexican Mafia. The evidence just isn't there, people. According -- and I don't know what's true, but according to Guadalupe, Floppy had stolen some of Jimmy Mendoza's personal stash when she, Guadalupe, and Jimmy Mendoza went out some night. Jimmy came back, checked his container and, "Hey, some of my stuff is gone. Floppy, you're the only one here."

Floppy said, "I know, I used it, but I'll pay you back."

"Okay, okay, okay, you pay me back." Jimmy Mendoza don't want to be paid back. He wasn't paid back.

And the Government can come in and say, "Well, that was disrespectful of Jimmy Mendoza," but I'm going to direct

your attention to what the Government argued -- well, they didn't really argue but they -- well, they did, in presenting their testimony they developed this scenario I'm getting ready to discuss when Mr. Green was killed in Graham Central Station. Somebody had been disrespected in front of another member of the Mexican Mafia. And the Assistant U.S. Attorney asked the question, "Well, when you're disrespected, an Eme is disrespected in the presence of another Eme, can you let that go?"

"Well, no. You've been disrespected in front of other members, you have to make it right."

None of that in this case. No disrespect in front of any particular member. Just doesn't follow. You say well -- and I say, therefore, I think the evidence is so weak but it wasn't part of furthering the interests of the Mexican Mafia enterprise for sure, in my opinion.

Now, other thing is we've got 22 other murders. And somebody testified that the choice that the Mexican Mafia uses, the choice of killing, this shooting in the head, you heard that, especially in the face, you heard that, well, not all of these were -- there's one guy was kneeling down injecting and he was shot in the back of the head, according to the testimony, but they're all shootings. And this case was -- I don't know what it was, a blunt instrument, sharp instrument, whatever, Floppy was whacked pretty well,

according to Guadalupe's statement here in court for the first time, not in her statements that she gave the Texas Ranger, neither of those two statements, not in her statement that she gave back on May the 8th after she was arrested, 2008. But here in court she says, "Oh, before Jimmy and Mikio left, Jimmy and Mikio got some tools out." Okay?

I mean the type of murder, the way it was, was not even consistent with a Eme; no shooting. It really does sound like somebody just got pretty ticked off and used whatever they wanted to use at the time, but I don't even know if it was preplanned. If it had been preplanned and had been an Eme hit they would have had a gun. I mean you know that. That's true, you've seen some non-Eme hits they were using shanks, but where were those, people? Those were in the pen. Not very easy to get a gun. But out in the free world they use guns.

So false confessions, got a false confession from Guadalupe Ramos on Floppy. That's the only evidence they have. And the other thing is the term Mikio, where do you hear Mike's name called Mikio? Look at the photos that they put up. They have nicknames, if people have nicknames they have nicknames the Government puts up. And they don't have Mikio by Mike. And we know there are at least two other Mikios in this case because they're mentioned. Two other people, Mikios.

So I'm going to submit to you that maybe she did drop off Mikio, but then we have other problems -- but not Mike. Then we have another problem. Texas Ranger did some investigation and he interviewed witnesses that night. He interviewed a witness that night, Leonard Pompa, Reynaldo "Rey" Ramirez. They were the two that went with Floppy to the bar. And Leonard Pompa said, "Hey, this unidentified male, I've never seen him before, but what happened was the three of us, myself, Leonard, Rey and Floppy, were at a bar. And in comes Jimmy Mendoza and Jimmy Mendoza's girlfriend" --

MR. CONTRERAS: Your Honor, I'm going to object. There's no evidence of any of this.

MR. STENBERG: It was asked of the agent, Your Honor.

THE COURT: I'm sorry?

MR. STENBERG: It was asked of the agent.

THE COURT: The jury will recall the evidence as it came in. And remember what the lawyers say is not evidence. Go ahead.

MR. STENBERG: And keep in mind Guadalupe Ramos said that she came into the bar with Jimmy Mendoza and this unidentified male.

But Leonard Pompa, according to the Ranger, said all this unidentified male had on the face was a goatee. And Rey Reynaldo Ramirez said, "No, I saw this person I never seen before and, by golly, he was clean-shaven." Went and talked

to Irma Ramirez, who's the lady's house they went to a party when the bars closed, she said he was clean-shaven, this unidentified male.

Well, then there was somebody else, Marcel Perez. He was a bartender at Rhonda's Bar. That was the last bar. And I asked the Ranger, "Isn't it true that Marcel told you that it was Jimmy Mendoza, Jimmy Mendoza's girlfriend, who we now know is Guadalupe Ramos, and Jimmy Mendoza's brother that came in?"

Well, yeah, we know why Guadalupe Ramos is going to say anybody but Jimmy Mendoza's brother. This is Jimmy Mendoza she's had a child by. And that's her boyfriend. She's not going to implicate the brother.

But then what happened? Well, shortly thereafter, there is a murder at the Mendoza house and the Ranger goes there and, hey, he sees two of the brothers, one of Jimmy Mendoza, and at that time one of the brothers has been on the lam since then and that's how the Ranger got to talk to Guadalupe Ramos the second time.

Now, in that respect, by golly, we've got a little bit of a problem because that brother is now charged with killing in a shooting just one week later. Was on the lam for a long time and I asked the Texas Ranger that, "When I was there on Friday and talked to Jimmy Mendoza's brother Rafael, would it surprise you that the other brother's now in the

caboose there, the county jail, charged with murder?"

"No, it wouldn't surprise me. I don't know but" -- and they haven't ever refuted that, they could have. Sounds like a violent person to me. So I think the evidence is so weak -- and, yeah, let's get something else out. The boot prints, Texas Ranger can't identify a shoe print versus a boot print, and there were just boot prints out there. And so four days after that interview on May the 8th of 2008, four days later Mike Carlisle is knocking on the door and Jessica Garcia, Mike's wife, opens the door. And, according to Carlisle, he had no warrant, he just said, "Hey, I'd like to go ahead and search," and Jessica said, "Sure."

And, of course, something else about mistakes. Carlisle, when I asked Carlisle approximately a week before trial, "Hey, I've been talking with the family and they said you were out there investigating and you took some things, took some pictures."

"No, no, no, no, I was there to make the arrest and that was it."

And then I told Mike when I cross-examined him, I said, "Well, and then the next day I came and told you that I talked to the family and they were really sure that you were there and you'd taken some boots and a hatchet."

"Yeah, I did. I forgot. I got the boots, I got the hatchet." That's four days after. "But I don't remember any

photos."

And you heard what Jessica said. Jessica said, "Hey, there were seven, eight people. There was Mike" -- talking about a week ago, I think it was brought up that Mike said he went there with a couple other people and then when he took the stand he said, "Yeah, it could have been six others, or maybe six altogether, I don't remember." Which goes pretty close with Jessica said there was -- she said she thought there were about seven people there. And Jessica said they took a bunch of photos, including a bunch of guns. But those guns were BB guns. And, people, you've seen these BB guns nowadays. I've represented people that have robbed banks with BB guns. They look real, some of them. By real, they look they could definitely blow a hole in you.

So they take a picture of the guns on the bed. And then you get somebody going a little bit later comes in and say, "Yeah, Mike stored the guns." Yeah, come on, people, why did he say that? That person's shown a picture. We've got pictures of guns in Mike Garcia -- "Yeah, yeah, he stored the guns there."

It's easy to see how shabby and flimsy the evidence is and how fabricated the evidence is against Mike Garcia. But put yourself in the shoes of an attorney trying to represent Mike Garcia. How do you prove what didn't happen? How do I prove Mike Garcia was not there?

I mean, people, they have to prove he was there. I can't prove he was not there. That's an impossible task. Well, sometimes it could happen. Sometimes you could have been attending a funeral of your mother out of state at that particular time and you have rental receipts. Well, I didn't have any of that. But it's the Government's burden, and consider the evidence that they used.

Now, I think Floppy's death, first of all, everybody that's been killed didn't deserve to die. They deserve to be maybe punished in the law some way for whatever they did wrong, whatever, but not die the way they died. That's why we have a judicial system. That's why we come in front of people like you to try and sort it out. You've got a heavy burden.

You've got a man, Mike Garcia, who says, "Joe, I don't know these people." Well, I wasn't there. I bring to you his family. I mean, big deal. How do they get some of these false confessions? Well, Bugsy, you remember Bugsy, Rudy Garza, all the way until less than seven days prior to trial the Government was telling me Bugsy's a star witness against Mike Garcia and, by golly, we got his statement that Bugsy was there, Bugsy saw a tarp over the car. My god, I'm in deep doo-doo here trying to defend.

But then less than a -- it was Tuesday, I believe, or Wednesday of the week before the Monday that we started the trial, Mike Carlisle comes in and said, "You want the *Reader's*

*Digest* version?"  Well, yeah --

MR. CONTRERAS:  Objection, there's no evidence of any of this.

MR. STENBERG:  There is evidence but not the *Reader's Digest* version.  So I'll restate it.

THE COURT:  Just stick to the evidence.

MR. STENBERG:  So Mike Carlisle comes in, "I'll tell you what I'm going to tell you.  I believe Rudy Garza was lying, Bugsy was never there on the shooting of Roy Vera."  Nice to know.

Six days prior to trial, the case has been pending for two years, and you're going to come tell me that?  Why?  Did you all of a sudden find out the truth?  That's what he tells you and I say poppycock.  Bull corn or whatever other expression you want to use.  Because he knows, Mike Carlisle knows that any attorney worth his salt, doesn't take a good attorney to look at what Trini says and Bugsy says, they don't jive.  Trini said Bugsy wasn't there.  "Well, gee, we don't want to go to trial with that problem, so I'm just going to say Bugsy is a liar."  Okay.  Easy way to clear up that little inconsistency.  Doesn't even completely unclear everything because Bugsy's a liar, known to be a liar, stated by Mike Carlisle to be a liar, and yet they still put him on the stand and want you to believe him.  He'll say whatever.

I don't know, I wasn't there, but Mike has pled not

guilty. He did not participate in the killing of Rudy Contreras, did not participate in the killing of Roy Vera. Did not. Government's burden of proof is proof beyond a reasonable doubt how? By the use of credible evidence. Credible evidence. And so many times in this trial, so many times I've heard, "Yeah, I was told Mike was there." Couple times people'd say, "Mike told me" and we'll go over those. Not credible evidence. And most of the time it's just hearsay.

Now, normally hearsay cannot be used. This is a conspiracy case and I don't know the legal stuff and maybe -- but it all came in. Stuff that they don't know but just what they were told. Now how credible is that? How many times have you been told something by a friend and the friend said, "I don't know this but I was told this" and you found out that "this" was not true? It happens in life. And especially if you're told that by somebody that's an admitted liar. And yet the evidence, burden of proof to prove that Mike Garcia did anything is by proven beyond a reasonable doubt by credible evidence. Well, by golly, think about it. This investigation went on and it was going on definitely 2004, 2005, 2006, 2007; 2008 I think the indictment comes down and people are picked up.

2008 goes through, 2009 goes through, and here we be. Long time. Long time. And what do they show you? They show

you a bunch of video, a couple videos. Mike Garcia's not even mentioned in any video. They have beaucoup audio tapes of telephone conversations. You had sheriff's officers, you had FBI people, DEA people all tell you, "Yeah, we were audio taping" -- not audio taping -- "listening in to all these conversations, then we screened out and these are the ones that we think we got these people on." But not Mike Garcia. They come up with one, one audio tape. Not Mike Garcia, it was somebody else, a conversation in April -- got my notes somewhere -- April of -- I do have my notes -- a long time ago between Sammy and somebody else and they say that Michael Garcia had some marijuana and he was a prospect in April. I think it was April 2005. And that person was not paying the dime.

But then there's evidence coming out of these mouths of these people that have been testifying, "Yeah, I know another Mike Garcia," and one of them says -- I said, "Is it that Mike Garcia?"

"No, no, no, no, no, Michael Garcia that I know is an Eme is not that guy."

And there is another Michael Garcia that was in Poteet who was collecting the dime in Poteet, his name was Michael Garcia. They were different Michael Garcias. In fact, there was a peace officer testified in this court by the name of Michael Garcia. I'm assuming they were not talking

about him. But there's no tying in that Mike Garcia to my client, Mike Garcia.

Then talking about that car and how false confessions can come up based upon whatever, I mean Floppy tells the FBI back when he's arrested or -- no, that's right, Floppy is one of the cooperating people that's separate from this case so basically -- not Floppy, I said Floppy -- Bugsy. Bugsy talks about Michelle's car and says, "Hey, it was her car." I don't know how Bugsy, you -- if Mike was using the car it was owned by his daughter, but whatever. And then it was put under a tarp after this murder and kept there for a few days and then a few days later it got painted. So I mean maybe he said a couple days, but a couple. Then I think I pointed out to him, "Yeah, like every DWI, 'I've had a couple beers,' what does that really mean?"

"I don't know, more than one." But then, boy, did that fall flat because Bugsy's just lying through his teeth.

But I think it was Jacob Garcia says, "Yeah, I was told that Mike was involved in a killing, even though" -- or maybe it was Joe Pena, I think it was Joe Pena who supposedly was a general at the time. "I was told that Mike was involved."

Okay, but let's talk about that car. She gets a traffic ticket in I think it was June the 26th of 2004, but she -- his daughter, for no liability insurance, but she was

hit, the other person was in the wrong, so no harm was done by her having no liability insurance except she got a ticket. But the other people paid for it and brought her the receipt and it was paid to have her car fixed up right, correctly. I mean A-1 certified, whatever you call the regular car shop that's in the business, and the insurance company paid almost $4,000 to fix it up right.

Then she says, "Well, the second time I had an accident was after that, and what happened then I got hit by somebody else again and it was their fault and they had insurance, they had an insurance card. So I went and I was going to get everything done right and I was" -- she went to a medical clinic and started therapy. And then she got the phone call saying, "No, you can't, we're not going to give you any more therapy because that was a fake ID or a fake" -- not ID, insurance card. So, "Omigosh, I'm not going to get my car fixed."

I mean you-all know. I mean it -- the law states you can only consider evidence in this trial. But the law also, I don't know if it states in the charge or not but it's in there, you can use your common sense, people. You have a car wreck nowadays it costs you a little bit of money. Doesn't have to be major for you get a $3,000 bill easily.

They kinda briefly describe the house that Mike's family live in and how many people are living there. Small

house. They don't have money. And yet the Government wants to just slam these people because they don't get a upstanding paint job. They could tell it wasn't a good paint job. Well, I submit to you you can drive anywhere in town and you can get a cheap paint job someplace. It won't be up to snuff for an insurance company, it won't be up to snuff for some of you-all, but how can she be faulted for not paying out the bucks when she doesn't have it? She couldn't get a good paint job. She said that she was going to school at Hallmark, started in 2004, graduated in 2006. She said her baby was in the hospital for many months. She needed that car. She used that car every day except for when it got damaged, fixed up and painted.

Now it wasn't just painted, the damage was fixed up and it was painted. It had been in a wreck. It was damaged, not just painted. And she said, "I chose the color blue." What is wrong with changing the color of your car when you have it painted if you wanted another color? And the only way the Government's case can survive is Bugsy and some other liars will tell you about this paint job and not damage fixed and she tells you she -- "I went to the therapist, I wanted to get proof, they couldn't give it to me. They don't keep the records that long. I went to the insurance company that I had" -- the second time she had insurance, though only liability so it wouldn't fix her car, and they didn't keep the

records that long. So we can't prove the dates. She's not going to make up a date and come and try, like some of these other witnesses, and maybe they're a little bit better liars. "A little bit better liars," listen to me. They are great liars. She's not. She's just a good gal, has some children, went to school, had a baby with medical problems, she's not here to lie to you. Neither was Jessica.

I point out these two ladies for a real good reason. We've heard a lot of evidence, a lot of people saying things, I don't think it's credible evidence but you heard it, "Oh, Mike Garcia always carried a gun. He always had the gun. He had the guns at his house."

Jessica said, "No way." She's a sweet little lady. And the Government wants you to believe that she's a liar? "There's no way I'm going to have a gun in my house, never has, and I've been married to this man many, many years, never had a gun."

Well, by golly, another little minor thing, think about it. And it was brought out by the Government. Mike did pick up a robbery case. It wasn't an armed robbery case, it was a robbery case. What'd he do? He went in and they talked about he grabbed the little cash register and was caught running down the street with the cash register. Did he go in with a gun and say, "Give me your money"? If he always had a gun don't you think it would be consistent with a robbery, an

armed robbery? No, what does he do? He wanted some money and he grabbed this little cash register that you've seen in some convenience stores and he's trucking down the street with it. Now is that consistent with a man that always had a gun? It's just not, people. Her story has so many holes in it it's unreal. Mike Garcia, in life, is not the Mike Garcia that they want you to believe through these bald-faced liars that they've put on the stand. False confessions, big time.

How much more time do I have?

THE COURT: Fourteen minutes.

MR. STENBERG: Oh, my gosh. Okay. Mike Hernandez, Mikio, hopes to see the free world. Another thing, another peace officer, they testify about all these lists they got and with different names on them. You don't see Mike Garcia on any of that physical evidence, nothing.

See Alex Guerrero, also known as Loco Machine? He's loco. He talks about ex-members and which doesn't make a lot of sense if you listen to the other testimony. I mean, obviously, when we talk about ex-members and you talk about the Government's witnesses there's, "Can't be an ex-member because you're going to be dead," I mean inconsistency. Big thing? Well, I don't know. Definitely inconsistency. But what it amounts to, a doggone -- killed a lot of people, didn't he? And he was given immunity. Immunity, not a plea bargain, immunity.

And then Fernando Espinoza, Sweet Pea, again given immunity. And he said, "Hey, I want a downward departure, you know, I want to be out." And he didn't mention anything about Mike but he -- well, he said, "Well, I'm not saying these people should believe me," whatever; why testify.

Daniel Flores, Shotgun, talks about Mikio, Michael Vargas. "Mikio, Mikio, Mikio." We've heard Mikio so many times, but only one person associated Mikio with Mike Garcia and we know what a liar she is. And Sweet Pea was hoping for a better deal; doesn't really mention Mike, but, now, Alfredo Martinez, Guero? He just, "Gosh, another man was present," parroting. What about Mike? Well, he could remember some murders but what about Mike? Nothing.

Then we talked to Hector Morales from the FBI. He gets Bugsy's phone, Bugsy's phone, phone records. See Mike's name being called? Nope.

James Phillips, FBI. They get some data. "Do you see Mike's name mentioned in there, Mike Garcia?"

"Nope."

Mike Hernandez, he identified Mike Garcia, identified Mike Garcia, but how did somebody else identify Mike Garcia, say, "Yeah, I know Mike Garcia, I know," he goes, "I saw his picture in the newspaper, said he was a member of the Mexican Mafia." I mean, just not there.

Michael Garcia with the SAPD? Nothing about my

client. Richard Saenz said, "Hey, I told Speedy thry killed Jaime Lopez, I told Speedy a fake story and, you know, he believed me; my friend, he believed me." People, these people can have their dearest friends believe them and you're going to believe them? That's credible?

Nancy Sanford, she gets a bunch of stuff again, physical evidence, documents, whatever; not Mike Garcia's name.

Michael Rios says, "Hey, I don't know Mike Garcia, don't know him." Says, "I do know a Michael Garcia that's an Eme, he's in charge of Poteet and he used to call me and I used to call him. I never saw him but he was in Poteet and I used to call him and we talked," but he said, "I don't know this Mike Garcia."

Dahlia Flores? Talked about other people. She was a big-time drug dealer.

Victor Huerta said, "Yeah, I heard about Rudy Contreras' death and I know who was there," and he -- I don't know how he knows, he wasn't there, but he talked there was Juan Fanzy, Roy Garcia and Charlio and two other carnal and I said, "Well, do you see one of those other carnal that you say two others here?"

"Nope, don't see them."

So Mike Garcia, this gentleman knows about that death but not Rudy Contreras, or Scooby's death but Mike Garcia's

not involved.

Frank Velasquez, Frosty? He talked about, "I worked once with Mike." That's what he said on direct. "I worked once with Mike, once with Mike." But then listen on cross. He said, "I did home invasions two or three times with Mike Garcia. But, I mean, his story sure got better, didn't it? I mean he lied. "I worked once with Mike" versus, "I did home invasions two or three times." And then he also said when he was directed, direct exam by the Government, "Oh, I know Mike Garcia did home invasions but not with me, not with me." But then he changed that and said once and then he changed that and said two or three times a week. Credible? Give me a break. No, not credible.

Joe Pena? He's the one that issued the cameo about Roy Vera but he said, "I don't know who did the hit, I really don't." But then he comes back and said, "Well, now I remember; now I remember." Now he came back and, I mean, I have several pages of notes, and then he says, "Now I recognize Mike Garcia."

Okay. So I asked him, "Well, how do you now recognize Mike Garcia?"

"Well, I saw his photo in the newspaper when he was arrested and the FBI showed me his photo." This is the general that ordered the hit. He didn't know Mike? Give me a break, people, Mike wasn't part of Eme. But he'll sure come

out and say that he knows him because he saw his picture in the paper. And he said, "Everybody here wants to be in the free world."

Roberto "Ghost" Agosta? Said he reported Jacob Garcia and Sammy Garcia. "I was at good time bars" or whatever, but not Mike Garcia.

Barry Schrum -- I may have mispronounced your name -- gives some good evidence but nothing about Mike Garcia.

Joseph Huerta, Frosty? Nothing about Mike Garcia.

Then, of course, then we get to Guadalupe Ramos and I think I've beaten that horse to death. I mean, no, she's -- no. I mean, we've gone a long way through this trial, really, no credible evidence on Mike Garcia.

And then Eddie Suarez takes the stand. This was on Monday, today is Wednesday, and he identified Cache, you know Cache. And he said, "After the murder of Roy Vera, Mike told me that the gun that was used to kill Roy Vera belonged to Mike's brother-in-law." Yeah, right. You're going to believe him? No.

And then Trinidad Riojas. Now Trinidad Riojas, every other story we've heard about Roy Vera's death when people would testify is, "Trinidad had a gun, Trinidad gave the gun to Mike, Mike got out of the car and, bam, did the shooting." But Trinidad said, "No, I didn't have a gun, Mike had the gun. He always had the gun. Mike always had a gun, I didn't have

the gun."

It's all false statements. I don't know what's true. And you're going to try and convict Mike Garcia upon this type of incredibly uncredible evidence? You should come back "did not."

But we're not through, we've got two others. Bear with me, Your Honor. Jacob Garcia says, "I was informed with respect to Scooby; I was informed that Bugsy, Charlio, and I cannot remember who else." That's what he said. And he's the one that said Michael always had the gun. But he said -- I think he's the gentleman that said, "But if I had to guess who did the shooting, I'd guess it was Trini because that was Trini's style." Credible evidence? Give me a break.

And then I don't know why they put on Joe Castorano, I have really no idea. The ex-member that's been in jail for a while on a counterfeiting charge and he's got a counterfeiting charge coming up? Oh, he said something about Cache and whatever. "I've been an ex-member for 11 years and I've been locked up all this time, but I know Mike Garcia." Oh, I guess he knows Mike Garcia like the other people. I mean read about it in the newspaper. But he didn't have any firsthand knowledge, he didn't testify to anything, did he?

But that kind of brings up a closing. Credible evidence, people, it's -- hey, I've got to try and persuade you-all that bunch of hooey that you-all have been given in

this trial to try and convict Mike Garcia and this gentleman said, gentleman, Mr. Joe said, "We've got about -- I know about 200 to 300 active members, and I know unactive or inactive members a lot."

"How many?"

"Two hundred to 300."

And yet the Government sets up these people that have -- other people that have talked to you, "You cannot leave the Mexican Mafia or you're dead. You go out, you're dead." And they had you pretty well convinced until I think you heard that last statement.

What is the truth? I don't know. But I do believe that the evidence that you heard does not prove beyond a reasonable doubt that Mike Garcia was involved in a conspiracy to kill Roy Vera, was not involved in a conspiracy to kill Joey [sic] Contreras and that Floppy deal should, you should just totally toss that out and not consider it for any purpose other than the fact you now know how false confessions -- and that's why I went into that, you know how they come about and how bad they really are. You've got some bad evidence in this case against Mike Garcia.

Please do the right thing. Thank you.

THE COURT: Thank you, Mr. Stenberg. Members of the jury, we'll take our recess and we will reconvene in 35 minutes, which is 12:30. Thank you.

**(Recess; resuming - Jury in.)**

THE COURT: Mr. Collins, on behalf of Mr. Martinez, your client, you can proceed with your argument.

MR. COLLINS: Thank you, Your Honor. Ladies and gentlemen of the jury, we'd like to thank you for your attention too and it's always hard being a speaker after lunch. I hope you-all got something to eat but I want you-all to, you know, continue to pay attention as I know you have during this trial. And we thank you for that.

In this case I think we can look at what the Government's evidence is and we can see that it consists of people who are snitches, in some cases paid informants who are very, very highly motivated to provide testimony that will result in what we now know is called substantial assistance. So before I start here I want to kind of talk about that because everything has to be looked at through that, what is the motivation of these witnesses.

We heard from every one of these people in the orange suits about how they expected their sentences to be reduced or hoped they would be, and some were more honest than others about many things. Obviously, as we've pointed out in this case, it's very difficult to tell who, if anybody, is telling the truth. But at least a few of them were honest about this point and said, "We want to get out. We would like to be out as soon as possible." So one way that's going to happen for

them is if they're able to point to some scapegoats, somebody they can point to to help do that for them.

I represent Jose Martinez and the way that this evidence shaped up was you have these people, like Alex Guerrero, Loco Machine, I know we've all talked about him because it's still just stunning that this guy's probably the biggest mass murderer in Bexar County history, at least 16 to 20 that he can remember, it's stunning this is the guy who doesn't get prosecuted for any of those cases on the State's side, has pled to a couple over here in this RICO conspiracy, and as part of that hopes to be out soon.

And if you'll remember, he was given a bond at one point, I think for several years we talked about, was paid, was given $30,000. Do you know whose money that is? That's our money, that's taxpayer money. $30,000 of your money was given to Alex Guerrero to go find and relocate and make a new life for himself. And with his background, who knew in the neighborhood where he was living, whatever community that was, whatever place he was working at, they didn't know about this guy's background, and the Government put him out there and gave him that opportunity because he helped them. That guy's very highly motivated to get out.

And they talked about, "Well, we're not going to apologize, you gotta dance with who brung you," but, I mean, he's the guy that did it. I mean of course he can solve all

these murders, he did them. So it's sad to see the -- horrible, really. I know for me it's been terrible seeing all these bodies day in and day out, I know it has been for you-all too, but you have to think about who did it. The Government's witnesses are the ones that killed those people; the Government's witnesses.

So when you look at who they make deals with, we talked about deals with the devil and that type of thing, they made deals with people who ordered it, like Alex Guerrero, who's a general, and who also carried several out, he likes to do them both. People like Joe "Pancho" Pena? A general who is the one who ordered all these green lights we're going to talk about that they say Jose Martinez was somehow involved with.

So you have the people, you've got the perpetrators and you've got the people who issued the orders, they're the Government's witnesses. So who's left? I guess they're trying to say Mr. Martinez, he's like the middleman or something, I guess. And, you know, he doesn't have any rank or authority, he's got a green light on him but, boy, he was involved in all that stuff.

So they have the people who did all these things and now they're trying to get out of jail or prison as quickly as they can so that what, what will happen then? They'll be back in our community, or some other community, some unsuspecting

community.

And remember -- I jump around a lot, just how I am, and I apologize, but remember Joe Pena, Pancho, he talked about going to Mexico for several months and hiding out. And why was Joe "Pancho" Pena down there? He was down there to continue his work with -- he had started with the Zetas. I had him tell you-all about the Zetas and who they are. And he agreed with me. Joe Pena, he's killed whatever it was, six, eight, ten, who knows. At least that he admitted. He even said that, "I agree with you, Mr. Collins, the Zetas are a lot more dangerous than we are, they make us look like amateurs." That's the people he's hooked up with, Joe "Pancho" Pena, and that's the guy, another guy who made a deal with the Government. That's a guy who at least was honest that "I want to be out soon."

So the Government, the position they're in, is to make cases where there aren't evidence, they made these deals with the people who did them and who ordered them. And, ironically, if you follow through logically, your verdicts, if your verdicts agree with that evidence, or you feel that's evidence beyond a reasonable doubt, your verdicts are going to validate that. Your verdicts are going to validate their whole system where the guilty, the guilty get to have their sentence reduced because they made some sort of deal. Okay? That's what they're asking you to do.

Every single one of these people -- and it's a very lengthy, lengthy list of witnesses that came up here and, you know, it's hard for me even to remember all the names because some of them have street names, they have real names, there's multiple Mike Garcias, there's multiple Bam Bams, there's multiple people named Martinez. There's all kinds of different people that have these names allegedly at different points, so it's very difficult to keep them straight. But I do know that you, like me, will remember what you heard from that witness stand.

And the witnesses that the Government put on have a history of murdering, robbing, stealing, assaulting and lying. And even on the witness stand several of them said, "Well, I didn't -- you know, I don't think I'm getting any help from anybody, I don't -- I'm just up here, you know, out of the goodness of my heart." And then, upon some general questioning said, "Oh, yeah, we do realize we can get some help for this. If we're believed, if the evidence we give is believed by somebody, then we will be rewarded with substantial assistance. We don't know what the number's going to be, we all hope to get out soon." It's what you heard from every one of these people and some of them admitted lying to the Court that they had never even read their plea bargains. Others admitted that they'd lied to the Government at different times, they've given multiple statements.

I want to go through some of those people but the point is when you're a liar, when you're a thief, when you're a murderer, your stripes don't change. And what's the proof of that? When Alex Guerrero got out, more trouble. When Daniel Flores got out, Government gave him a bond and let him out, what happens? More trouble, he's involved with some counterfeit ring. Okay? Gets arrested again. These are people that are continuing to commit crimes, they've done them their whole life, so does anybody really think that when they get out they're not going to go right back in the same thing? And it's particularly dangerous when you deal with the types of people that these people are that the Government presented to you.

The Mexican Mafia? You saw them all up in that witness stand. That's the Mexican Mafia, it's the Government's witnesses. And I think -- I wanted to go back to Joe Castorano for a minute. That is a -- I agree with co-counsel, that's kind of a fluky little weird witness to bring in but one thing interesting about him was he said, "This blood in, blood out thing, I don't know what anybody's talking about because I've been an ex-member for years," and he didn't seem very afraid up there, I think you-all saw his demeanor. "I've been an ex-member for years, I know hundreds of ex-members."

So this whole idea, the Government wants you to

believe these guys that came up here are so terrified for their lives because by testifying they're going to be in mortal danger, it doesn't hold water. Just look at Mr. Castorano. He got up there and acted like this was no big deal. Yeah, having coffee with his mom on Sunday.

And so that blood in, blood out thing doesn't, it doesn't work that way. It's not how it goes. We know from his testimony there's hundreds of ex-members. Of course you can believe anything any of these people told you, that's what he's talking about.

So that is not the case. What they're really afraid of? What these people who got up there and talked about, what they're afraid of is spending the rest of their life in prison. And that's where they need to spend it. But that's what they're afraid of. They're not afraid of anything else.

So when you look at all of this evidence and it's -- what a massive -- this is a big case. It's like, you know, the Judge had to read that charge for an hour and there's a, you know, huge indictment, there's tons of instructions, it's very, very big. But -- and a broad net, as the Government, as Ms. Green pointed out. But that doesn't mean because it's a broad net the Government doesn't have to prove their case beyond a reasonable doubt. I think it means that you need to be even more careful with it because it is a broad net that can sweep people up like my client, Jose Martinez, who wasn't

guilty of the offenses alleged. That's the danger of it. So you have to look at this thing and go, "Okay, what really happened concerning Jose Martinez?"

Well, we had this history lesson for days with all these murders that occurred, and people like these old-timers like Loco Machine are the ones that did all those. We had to look at all that stuff. And I guess the point of that is, "Well, you know, it's just the machine, that's how they are, that's how they operate, this conspiracy goes on and on and on," but yet we know from Mr. Castorano, again if you believe what any of these people said, that you can get out, it's no big deal. You don't have to be -- the machine doesn't make you do these things.

Everybody got up there like Alex Guerrero and Pena and those guys and said, "Had no choice. I had to cap my ten-year-old -- my best friend since we were ten, I had no choice." Those people all had a choice. They had a choice. Just like Mr. Castorano, he didn't do anything like that. They don't have to do that. That's what they want to do. That's how their lifestyle is. And if they get back out, that's what they're going to do again.

The charge talks about beyond a reasonable doubt, and so you have to look at this big, massive thing, but you have to look at my client and say, "What have they proven beyond a reasonable doubt?" Remember, we talked about this in voir

dire and at different times but the Fifth Amendment protects each and every one of us in the United States of America. This is America, the Constitution of the United States applies to all of us, not some Mexican Mafia constitution or something else. The United States Constitution allows us all to have the benefit of the Fifth Amendment. We don't have to testify, we don't have to put on any witnesses or evidence, and you are not to draw any inference from that, because it ties in with the burden of proof and that is the Government. The Government always has that burden of proof.

We talked a little bit about how high the burden of proof that is. Nobody can tell you it's 75 percent or 80 percent or whatever, but it's very, very high. And I think what Mr. Stenberg was talking about, he said take a child away, we're talking about a child custody case, just so you-all know. There's a preponderance of the evidence, then there's clear and convincing, which is higher than that, that's a child custody case. To take a child out of a parent's house, they have to be able to show by clear and convincing evidence.

The burden of proof beyond a reasonable doubt is higher than that. And the language is in the charge but it talks about you have to be so convinced that you would act without hesitation in the most important of your own affairs. You have to be certain. You have to be certain that the acts

alleged are what happened. Not maybe, not, "Gee, Mr. Collins's client, you know, maybe he was there on some of these things, maybe he was an associate," that's not enough. They have to prove beyond a reasonable doubt that he was a member, and not only a member but that he was actively engaged in the conspiracy and the predicate acts of the conspiracy. And they haven't done that.

If you look at the Act 12, Raymond Rodriguez, whose name is Mon or Nochipa, he was killed by Jimmy Mendoza, by Capone. My client didn't do that. You heard that from all these witnesses.

And then you heard from other people like Mike Rios, this is another Government witness. Mike Rios said Jose Martinez had no knowledge of that case. He knew nothing about the Raymond Rodriguez case. He goes, "I'm the person who would know." He told you he knew nothing about it. So, in that case, we don't even have the supposed, you know, middleman situation. We have nothing to connect my client to Raymond Rodriguez, not even from their witnesses.

And also, that first murder was in September of 2003, the first one we were talking about my client. And after that, I couldn't get it established from the witnesses, the exact date, but sometime after that my client was green-lighted. He's got a hit on him.

And you heard from witness after witness -- again, I

don't think you can believe any of these people for anything, but witness after witness up there said, the Government's witnesses, that if you have a green light on you, you can't order hits. And what did Bugsy say? "Man, he disappeared, I don't know where he went, because we're all after him."

So he's not even in the position, even if you believed he was a member, he wouldn't be in the position to order these things. You know, the Government's like, "Hey, this is the way this thing's worked, it's a well-oiled machine, these guys have to do it this way, I'm going to get killed," blah, blah, blah, and in every case what did they say? The general issues these orders. The general is the one has to do that. Nobody, nobody said my client was a general, a captain, any of those things.

Daniel Flores said as far as he knew he was a low-level soldier. That's what they told you. That's what the evidence supports at best. There was absolutely no allegation he was in a leadership role of any sort. That's why the evidence isn't believable. That's why it's important because if you're not somebody that can issue these orders then you can't do it. That's just the way it is under the Mexican Mafia. And the Government spent this whole eight or nine days just drilling that into our heads that you're in the Mafia, you're an automaton, you've got to do what they say. You have to do it or else. And that's how it works. They all

told you, even Alex Guerrero and Joe "Pancho" Pena said, "I issued those orders. I have to do it." Okay?

Now let's look at -- let's talk about Act 20 for a minute, Roy Vera. Roy Vera -- and that was in December of '04. Roy Vera was waved off by my client. Again, if you believe what these people say -- I can't tell you you should believe anything they say, but even according to what they say, and they're trying to convict my client, but even according to their words he didn't -- he waved it off, he didn't do it. Would that be another reason he might have a green light because he's not a killer, he didn't kill any of these people? Yeah, that's exactly why. He can't issue the order and he won't take them. He's not somebody who's going to do that. So green light for him, he won't kill these people.

No question he waved off the Roy Vera, it did not get done; he did not do it. Later, Roy Vera was killed at the urging of Trinidad. You-all remember Trini? Trini's, "No, I can't wait to get back out." His whole life robbery, murders since he was a juvie. He shoots people in the face. Not in the head but in the face, that's the way he does it. He was described by other gang members as without a conscience, will do anything. And Trini, he's the one who was handpicked by Joe Pena, by Pancho, to go to Mexico, to hang out with the Zetas. You know why? Because that guy would do anything,

that's why. He would say anything, he would do anything, and Joe Pena knew that so he took him with him. He was his most trusted person. He was characterized by some of the other witnesses as part of his hit crew, if you remember that.

Jose Martinez was not part of the hit crew. It was Jacob Garcia, Bugsy, and this guy Trini. That was Joe Pena's hit crew. He used them because they are killers. They were and are killers. They can get the job done. They can get it done. You know, if Mr. Martinez was ever given those orders, he certainly couldn't carry them out and that's why he has a green light on him.

So Pena went to people that could do it. And we heard from those people. And what's in common with those people? They got the deal from the Government. Trinidad Riojas got the deal from the Government. Cold-blooded, stone cold-blooded killer, no question about it. And he's eager to get out.

Juan Perez, "Green," no link to my client. It's Frosty, it's Jacob Garcia, it's Johnny "Green Eye" Ybarra, it's Eddie Suarez, "Monster," another friend of Trini and those guys. All they can say -- these are the guys that got the deals and they're all friends, remember they still communicate sometimes? They're all friends, they're all still under Joe Pena. They say that my client was at a junto where he didn't stand up and object to it. Remember that? Mr.

Contreras made a big deal. Well, he didn't object to it, you-all know, but that's what they want to say is an agreement. He wasn't even there. It's not even true. But even if you believe them, even if you believe them, that's -- it's not an agreement to do anything. He didn't do it. It's just more sticking something on the wall and hoping that it's going to land somewhere. It takes more than that; it takes more than that.

Let's look at Tony Rodriguez, November of 2004, Act 18. Who did the hit? Rudy Garza, Bugsy. Bugsy, Bugsy, Bugsy. He can't tell the truth to save his soul. We all know that. Mr. Stenberg went over that, went over it on the witness stand with him. He lied to Agent Carlisle. "I wasn't there with Tony Rodriguez. Oh, you make a deal for me? You know what, I remember I was there, will you give me some credit?" That's Bugsy, remember him?

Can't believe a word that guy says. He, Bugsy, is a killer, he killed Tony Rodriguez, and he'll do anything to help his friend, Joe Pena. And these guys are all -- the Government talked about the power struggle and the shift that was going on. Well, that is what makes some sense in this story, if you can believe any of it. Joe Pena is trying to move the Zetas in here, trying to move the Zetas in here. He has got all these people working for him to consolidate his power. The old ones are gone. He's out there trying to get

this power thing going. Joe Pena.

Jose Martinez, according to everybody, was low level at best. He's never -- I asked one witness, "Well, my god, if he was ever I heard a lieutenant one time from somebody, how long would that have been for, like a month or two?"

And he goes, "I don't know, maybe." That is not somebody that is green-lighting people all through 2003 and 2004. And, remember, again, if you can believe anything they say, he had a green light on him as well.

Mercy Brooks: Joe Pena consolidating power. Trigger man, Ghost Man, Robert Agosto, you know, that's who did that one. Robert Agosto killed Mercy Brooks.

And, by the way, again, I don't know if it's true or not, but Bugsy or Frosty, one of them said that, "You know, these people weren't killed because they were informants. They were killed because they were hanging out with Tony Rodriguez," and that was the power struggle that was going on, if you remember? That's the power struggle thing that's going on. That's why they were killed. The new leadership under Pena tried to take those people out. It had nothing to do with informants. In fact, poor Mercy Brooks came back on his own. He wasn't sought and hunted down, he came back, was back in the action again. Heard the agent talk about it. And he was killed because he was hanging around with the wrong people, according to Bugsy. And, again, I don't -- who knows

if anything any of those guys said -- that's what he said.

Jacob Garcia. Stone-cold killer, Jacob Garcia. He, part of the hit crew with Joe Pena. And what did Jacob Garcia tell Agent Carlisle about who killed Joe Santos? He said, "If anybody did it, it was Trini," our friend Trini Riojas. That's what Jacob Garcia said about it. It's his buddy and he's even telling Carlisle that's who did it, Trini. Okay?

And then if you look at the facts of that case, the Government's had this case for years and years and years, obviously. They have time and the resources, it's been pointed out, to work these cases up properly. On Joe Santos, it was in late afternoon, I'm guessing from the evidence, there were witnesses. I talked a little bit about that with the Austin Police detective and that detective said, "Well, we got a partial license plate," or I think almost a whole license plate from the witness and, sure enough, it went back to Joe Santos' girlfriend or something like that.

So on cross-examination when I pointed out, "Well, did the witness, this witness see any faces or anything?"

"Well, jeez, she couldn't see -- you know, couldn't see, got the license plate but couldn't see very good otherwise." However, they did admit that she described two individuals at that shooting scene of Joe Santos who were between the ages of 20 and 25. My client does not look like he's between the ages of 20 and 25; he didn't five or six

years ago either. He's in his late 40's we've all heard about.

Now, my point about working the case up, did you hear from anybody in the Government that took a simple little line-up down to Ms. Callison [phonetic] and said, "Here's Jose Martinez's pictures," or, well, that'd be very suggestive and maybe they wouldn't have done that. They didn't do that, though. They didn't bring any sort of line-up up there. They bring up a line-up the way it's supposed to be done of any sort with six pictures on it, say, "Recognize anybody here?" No. If they would have done that, you'd know about it, okay? They didn't do that. So why not take the five or ten minutes to do that if they think that my client did that? Put him there.

You know, they've gotten all this elaborate stuff about, you know, they burned the trucks and they hide the guns, whatever. They had an eyewitness who they didn't even bother to go to with a line-up or photograph to say, "Can you recognize any of these people?" They just didn't do it.

So what do they have instead? Agent Carlisle said, "I don't want you to have" -- how did he say it? "I would never rely on one snitch," I guess, or, "I've never relied on one person I'm giving a deal to," whatever it is. So instead what they do, they rely on two or three of those people. He goes back to Trini and a couple other people and Trini says,

"Hey, man, if I get credit I'll tell you I was there and here's who did it, Jose Martinez."  That was his corroboration.

In that case, Trini got here and told you-all, "We went to the mall later and we did some shopping," right?  "Got some clothes."  Where are the receipts?  I mean, they've had years in this investigation.  Just get some -- all those stores have cameras, okay?  All those stores have security cameras.  All malls have cameras because there's an enormous shoplifting problem.  Did anybody go up there and try to see was Jose Martinez with Trini Riojas?  They didn't do it.

But, I mean, come on, a line-up?  They could have gone up to that Ms. Callison and said, "Are these the people you saw?"  They didn't do it.  So what do we have left?  We have Trini Riojas, stone-cold killer, you-all know it, he is.  Can't wait to get out.  And based on his word, he wants you to believe that Jose Martinez went up there with him.  That is the only murder in all of these cases that my client's alleged to have been directly involved in.  The only one.  And if it's so simple to prove or disprove that, the Government had done their job; but they didn't do that.  Instead, they relied on the easy way, "Hey, man, Trini's helping us, we'll just -- I believe him over Bugsy, I believe him over Frosty, whatever.  Yeah, we'll put him up there to say that Jose did it."

But Trini's own buddy, his own buddy, Jacob Garcia,

said, "I think Trini did it. That's how he does it, shoots them in the face. Trini did it."

At the end of the day, it's been a very, very I guess difficult case in the sense that you just have no credible -- maybe it's an easy case for you-all in the sense there's no credible evidence. There's nothing there that you can hang your hat on, especially when it comes to these murders because the people who ordered the hits, Joe Pena and Alex Guerrero, took deals. The people who performed the hits in every one of these cases -- not talking about Jose Martinez -- everyone in these cases took deals. So all you have from those people is this assertion that, "He agreed to it." How? He doesn't even have the authority. He can't even do that. There is no way he can even agree to that.

Do we have Government's Exhibit 2? That's my client. And never during this trial or from any witness have you heard about him having a Mexican Mafia tattoo. He doesn't have one. All these people you've seen paraded in here by the Government, what do they have in common? Mexican Mafia tattoo. I think every single one of them. I could be wrong but 99 percent of them have that.

And what do they tell you at great length, they're talking about, "Well, you know, you get these tattoos because blood in, blood out, when you make your first kill you get to get the tattoo." Well, maybe that part is true because my

client doesn't have one, he's never killed anybody. So maybe bits and pieces of this stuff may make sense to you-all. No tattoo. Not a member of the Mexican Mafia. The best they can do, other than their snitches, is talk about a couple of unrelated drug deals.

And I just want to clear something up for you-all for a minute. There was some talk about this prison thing that happened. And they said Alfredo Martinez had this conversation? That wasn't my client, just so you-all understand. He is Jose Martinez, the one they're all calling Bam Bam. He had nothing to do with this thing down in the prison, nobody's even saying that.

So what they have, then, are a couple of drug deals. They talked about this ledger that was found in '03, okay? And my client was driving the car, according to the officer, but was not in the passenger's seat, it was somebody else. And that's where the ledger was found. There has been no indication it's my client's handwriting, has anything to do with him. The ledger was found with somebody else.

And who went into the house? Not my client. Somebody else had gone into that house.

The other situation involves I think it was Joseph Huerta, and he's an old-time, he's a longtime drug dealer. He's the guy, if you remember, that said -- he had a lengthy history. I can't remember what all it was for, who knows, the

usual things. See, those are all mistakes that, you know, he says the wrong place and wrong time, not his fault, but he did have this conversation that's recorded so you're going to hear that, you already have heard it once, where he did have a situation with my client involving drugs. And that was in 2008. Not even part of the stuff they're talking about in 2003 and no mention is made of Mexican Mafia. Has nothing to do -- it deals with some other people not even part of this situation.

The Government has the ability, believe me, and who knows what they're going to do, they can prosecute my client for that case in a separate action. That does not make him a member of the Mexican Mafia. It does not have anything to do with all these other allegations. They're just throwing stuff out there, they're throwing it out there. You have to believe people like that drug dealer -- by the way, they talked about these victims. These are drug dealers these people are calling victims. I don't advocate violence for anybody but these are violent people, they're drug dealers like that one you saw that has a history for violence. These are the people we're talking about. Again, people that can't tell the truth.

Dahlia Flores or Dolly, whatever, yeah, it's pathetic, but they were saying, oh, they collected all this money from her. Well, I would hope so, whoever is collecting money from her, because they said she was the biggest heroin

dealer in Bexar County history. She's hoping for a deal, by the way. Biggest heroin dealer in Bexar County history, hoping for a deal.

What motivates these people to say what they say? I think you-all know. And if there were any physical evidence linking my client, they would present it. But the thing about it is, though -- and this is why I want to harp on this just a little bit more. On this Joe Santos thing, just go to the eyewitness and bring a line-up. And then we'd all -- all have to sit here and guess about it because your job, as jurors, is to hold the Government to their burden of proof. And, you know, they have a job to do, just like all of us do, whatever it is we do. And if they don't do it, it's not your fault.

And I think we talked about how there's a difference between guilty, not guilty and not proven. We don't have that third form here. That's what not guilty means, it means there's some smoke around, maybe there's a drug deal or something, but there wasn't anything that linked Jose Martinez to a murder, anything other than the uncorroborated snitchery we heard up here from these paid informants, these killers. The worst of the worst, people, the worst of the worst who are eager to get back out in this community.

So your verdict can send a lot of messages in a lot of different ways. And you need to think about that, about the way the case was handled, about the deals that were made

and why, I mean decide what the evidence is in this case. And I think you'll agree with me that there was not sufficient evidence to convict Jose Martinez of the conspiracy. Remember the conspiracy is agreements. Who said there were agreements? Bugsy, the guy who lied in his original statement to Carlisle and said, "I told them I had nothing to do with the Tony Rodriguez deal." Then he lied again in here and got some more trouble. That is the guy, and Jose Pena, Pancho, the Zeta guy, those are the people that are saying -- and Jacob Garcia, the whole group, the whole group that did all the killing. "Yeah, man, he agreed. By the way, he's got a green light on him." Yeah. "We haven't seen him, he's got a green light on him, but, yeah, he was up -- didn't object." Wow. That is not proof beyond a reasonable doubt.

So when you look at the verdict forms, Jose Martinez, you've got to look at this burden of proof. And I think when you do that you'll make the decision of not guilty on the conspiracy and also not guilty on the special issue -- well, not guilty is not guilty but the special issues? None of those have anything to do with Jose Martinez, they're all ordered by Joe Pena, ordered by Alex Guerrero and carried out by other people, not my client. He did not do those murders. He had no involvement with those murders.

And the Court's charge gives you those instructions to look at with accomplice witnesses. And I don't want to

bore you-all with reading it, hope I'm not boring you-all in general anyway, but in that instruction it talks about you're to use very, very special care with informants and accomplices. Why? You know why. Because these are the people that did it. They have motivation. They're motivated to save their own rear ends in any way they can to get out of prison. They're not scared. These guys that cap people left and right? They're not scared. Even goofy old Joe Castorano is not scared. The only thing they were scared of is they're going to stay locked up.

Addictive drugs, we talked a little bit about that. What effect does that have? These people, like Dolly Flores, here's another example how you know somebody's lying to you. "Flores, you've been dealing heroin for 30 years, whatever it is, but you never used, right?"

"No, Mr. Collins, I never would use heroin."

"Do you see this conviction you got for heroin possession, a small amount like personal use?"

"Yes."

"What about that?"

"Uh, I don't know." That's in the record. She is motivated, like everybody else, to say a certain thing to get out. To get out. That's not proof beyond a reasonable doubt, it just isn't.

There's also an instruction on plea agreements. You

can read that from the charge but it talks about what impact or what effect does that have. And, again, it is amazing to me, knowing -- we're going to get into this -- knowing none of us are idiots, that these guys will sit up there and say, "Oh, I'm just doing it, I don't hope, don't hope for anything." Now, as we got into it, a couple of them were at least a little bit more honest about it, but that was the position a lot of them took. But you know and we know that's not the truth.

Unanimity theory. I think that's kind of important. When you look at these acts, some people may say, "Well, I think X did Y but not Z." That's not enough, you have to all agree. You have to all agree on the individual acts for somebody to be convicted on a substantive RICO act. You have to agree that X did all of these things not, well, half of you think X did this, half of you think he did that. That doesn't work. If that happens, you have to promise me you-all get back there and say, "We don't have a verdict. We have to all agree that X did this bad act. We have to all agree to that bad act before we can move on." That's the instruction; you-all need to hold each other to it.

Now I think you've had time to look at all this. You're going to see that none of the evidence, none of the credible evidence -- and, again, there really isn't much, there may be no credible evidence, but no credible evidence

connects my client, Jose Martinez, to any of these actions. This is the worst of the worst. He's being accused of all these bad things by the people who did it and ordered it and he's got a green light on him. What a total cross-out for him.

This doesn't make any sense. He didn't do these things, he wasn't involved in them, and I ask you return a verdict of not guilty.

THE COURT: Thank you, Mr. Collins. Mr. Contreras, on behalf of the United States you can conclude argument not to exceed for a period of time of 40 minutes.

MR. CONTRERAS: Thank you, Your Honor. Please hear me. I want to, I guess, start by stating the obvious. You know why you're here. You're to see that justice is done. And in this case you're being called upon to see if you can't begin to address a whole series of wrongs and to confirm, face to face, what can only be described as incredible darkness, this enterprise known as the Texas Mexican Mafia. You're a federal jury, we're in the federal courthouse. And in this country there are federal courthouses all over. Some are very nice, oak paneled, leather chairs, they're all majestic. They all represent the law and justice.

But hear me when I tell you those buildings are only symbols for what is right and just because those buildings mean nothing unless we have a jury that will take that box and

will not be afraid to do what is right. You're an American jury. Americans are a little different, we do not back down. Others may attack our country all they want, but they will never understand the concept of the American jury and what it represents to us. And what it represents is truth and justice and strength and that you will not be afraid.

Oh, I understand it's very easy to say, "Well, you know, this is tough, I'd rather not do this, makes me a little nervous," and to shirk your duty. We've seen you, you're not going to do that. You were empaneled and the first thing you did was take an oath to do right by the law. You're seated and then we began to present evidence to you. This is evidence you now know that has been gathered over years by him, him, him and many, many unnamed police officers and agents from every agency you can imagine whose names you never heard, you never met, but whose product was brought to you. These are the men and women who did hundreds of hours of surveillance, who were unrelenting as they watched him, him and him terrorize south Texas.

Now these unsung heroes have done their job. They have brought what they have produced to you. And the Court has given you the law and made it perfectly clear what the law is in this case. These men are not accused, and we don't have to prove that a single one of them ever killed anybody. By now it should be perfectly clear who we targeted: the Texas

Mexican Mafia and its leadership and its most violent members. And it should be perfectly clear that we had at our disposal the most powerful weapon known to attack these gangs. It's known as the RICO conspiracy.

Ms. Green did an excellent job of explaining what we have to prove. And I apologize but defense counsel I cannot say the same thing about. If after Mr. Stenberg sat down you were wondering, "Did we just listen to the same trial?" I assure you you were not alone. All we have to prove is that there was an enterprise known as the Texas Mexican Mafia; did that. And all we have to prove is that these men, these members of the Texas Mexican Mafia, agreed that some other member, or maybe even themselves, would do at least two racketeering acts.

And what did we do, what did these men and these female agents bring you? They brought you two dozen murders. They brought you overwhelming evidence of extortion that is probably happening as I speak.

We presented you with evidence of literally hundreds of kilos of heron and cocaine. You have the evidence. You have the law. Do you have the conviction?

Defense counsel here says, "No, you can't convict these men." And let me just take a second to go over why defense counsel asserts that you should let these men go free. Mr. Garcia's counsel started with the murder of Floppy. And

that is good, let's talk about Floppy.

This was a guy who was a little bit slow. He had a nickname that he probably didn't pick, and he probably didn't like. So this guy who's a little bit slow makes a horrible mistake. He offends a member of the Texas Mexican Mafia. And what happened to Floppy? Let's talk about what happened to Floppy.

This man, that one right there, him, chased that man through a field in a dark place, as Ms. Ramos described it, with no one around to help him. He chased him through that field in the dark of night and hit him over and over and over and over again with a machete until Floppy grew silent and fell down. Him. You know he did it. I don't have to convince you of that, you know. And he dares say that Guadalupe Ramos is a liar? You saw her. She trembled when she walked to that chair. She walked in with sunglasses so nobody could see her cry. She sat so she wouldn't have to look in that direction. You saw it. You saw her testify. You know she told the truth.

Mr. Stenberg discussed other things, at length, long time, and what it demonstrates is a fundamental understanding of what conspiracy is. You've heard defense counsel say over and over again, "My client didn't shoot, didn't stab, didn't hit with a machete, didn't do this and didn't do that," and the law's response is, "So what? That's not what they're

charged with."

So when Mr. Price talks about -- and this is a unique defense. The defense is, "My client is a career criminal, has been locked up pretty much all his adult life." So when Mr. Price says he couldn't have done this, he was locked up, doesn't that demonstrate a fundamental misunderstanding of conspiracy law? What is it? It's an agreement by these persons, these members of the Mafia, to commit these series of acts. Whether he pulled the trigger or he pulled the trigger or he wielded the machete or he picked up the dime or he sold that ounce or bought that kilo or sent that person to Mexico or paid to have that car painted or whether that was his voice intercepted saying, "Where is the dope?" or whether it was that person picking up from Dolly Flores, it doesn't matter. It doesn't matter if you're in the middle of Huntsville State Prison. If you're in the Mafia and you're in agreement with the free world general that they're going to collect the money and send it to its members behind bars, guess what, that's an agreement. And most agreements in the criminal underworld are not reduced to writing, surprise, surprise.

But in this case there was something that was reduced to writing. It was the charter of the Texas Mexican Mafia and what they're about and how snitches will be dealt with.

Two of these witnesses, these victims, were bona fide Government witnesses. Federal informants. Who does that?

Who kills a federal witness? Who does that? What group do you have to be a member of that would have the temerity, the audacity to send a letter from jail saying, "Whack this guy, he's a federal informant"?

This is no third-world country. This is not Somalia. Who does that? What group is capable of that? It's seated right here. It's got to be stopped. You know, and it's real, real easy to say, "Well, gee, that's all fine and good but some of your witnesses, they've had legal problems in the past. They're killers."

And to that I say you're right. I would probably prefer and it would have been better that all these two dozens murders have been carried out, I don't know, at half time during a Spurs game or maybe at a academic meeting at a university so we'd have some other types of witnesses. That's just not the real world.

These witnesses that we presented, yes, they're killers, they're career criminals. But don't you understand when they attack them, they attack themselves. And it comes down to this. And, you know, I can talk -- I'm tired, it's been a while. My time is short, not unlike these victims who are believed to have been informing; maybe they were informing. But it comes down to this: Do you or do you not believe these witnesses, every single one of them?

You know in your heart of hearts this is real, this

really happened, that these people were really killed, that the Mafia did it, that these are members of the Mafia, high-ranking members; that the story about a 13 tattoo was incredibly insulting and stupid, if I might say; that you have sat as close as you ever will to a general of the Mafia throughout this trial. You heard these witnesses testify and you know they told the truth. You know that. And that's what it comes down to.

You know, they've tossed, made a lot of minor attacks on the Government's case, but don't lose sight of that, what I've just told you. I mean they've said things like, "Oh, Joe Castorano, he's a big liar," you know, "This blood in, blood out is nonsense and why isn't he dead," well, he's not dead because he's been locked up. You've heard testimony that when people with the green light are locked up they're kept in special wings to nobody else can get to them. Being locked up has saved his life. And the fact that there are so many Equis or ex-members still walking around does not mean that they will not get whacked at one time. You know, it's sort of like saying, "Well, Texas has 400 people on Death Row, they must not have a death penalty." Why don't you ask those people on Death Row.

You've heard about the people who could do exactly what the membership of the Mafia wanted them to do, who crossed the Mafia. These men, every one of them wanted to

live and none of them did. Let's be clear about one thing: Had they not been killed by these defendants, odds are I would have indicted them.

You see these cooperators are not our friends. And what ultimately happens to them will be decided by only one person, and that person has presided over this trial. And if you think that they're just going to walk out of here scot-free then we probably haven't done a very good job in presenting our case.

Ladies and gentlemen, you're not here to redeem their memory these people killed. You're here because today you're the law and you're justice. And today you say whether this will stand. Today you will say whether or not this wrong will be righted. Only you can say that. And you do that through your verdict.

You first will turn to the verdict form for Navajar. You will find him guilty. The evidence against him is overwhelming. And then you will turn to the specifics. You will be asked whether this general of the Mafia approved this person being hit. And the second form is whether you agree that at least two people at that prison would hit Neto Rodriguez. It's clear as day and it's commonsensical that of course he approved it. And they made a big deal about him saying, "Let's wait a while." That's like saying, you know, when you've agreed to buy a car if you hesitate and want to do

a little research you have not agreed to buy the car. This man is guilty as can be. That should take you no time at all.

And with all due respect to Mr. Collins, did a good job, the case against Bam Bam Martinez warrants no discussion. The evidence against him was so overwhelming that there's nothing more that needs to be said. The man was caught on tape discussing hitting this Neto Rodriguez and doing dope deals. He was identified from that chair, what, about ten times.

And that leaves us with Mr. Mike Garcia. You were told by defense counsel that there was no corroboration in this case, that we went solely by these crooks that we call them, these snitches. They didn't mention going out and getting a license plate of that car after they painted it when Mike Garcia did the murder of Roy Vera. They didn't mention him finding the car and taking pictures and demonstrating that the car had been painted very quickly. And they didn't mention how Agent Carlisle said this car had had no body work done. The color was changed very quickly.

And Scooby Contreras. You heard from multiple people what happened to that man and his role in it. Whether he pulled the trigger or not doesn't matter. And I hope that you understand what your role is today. These men, they're never going home again, the ones they killed.

The dime collection, year after year; the dope

distribution, kilo after kilo. How about saying enough is enough. How about showing that an American jury can stand down the Mafia any day. Thank you.

THE COURT: Okay, members of the jury, that concludes the case except for your deliberations. But before I retire, or you retire to the jury room to begin deliberations, I need to excuse the three alternate jurors. That's Juror No. 49 seated at Seat 14; Juror 51 seated at Seat 15; and Juror 52 seated at Seat 16. You three jurors are now excused from further responsibility to the case. I appreciate your being here and attentiveness. We always keep the alternate juror to the very, very end in case of the unlikely event that one of the regular jurors needs to be dispatched somewhere else.

So at this time I'll excuse you and thank you again, and the bailiff will walk you out.

**(Alternate jurors leave the courtroom.)**

THE COURT: For the rest of the jurors, you'll now retire to the jury room. You do have the three original verdicts as to each defendant and the foreperson shall have this, and this is the one that will be dated and signed with your number.

You will have a copy of the indictment. You will have the evidence, the exhibits rather, in the jury room. You can begin as soon as you elect one of yourself as your foreperson and we will be in recess pending receipt of the

verdict.

**(Recess; resuming - Jury out.)**

THE COURT: Okay, we asked you-all if you need your clients here and you-all said no; therefore they're not here at the moment when this note is read, or the Note 1, delivered at 3:27 this afternoon.

"Are audio transcripts available from the testimony? Can we have access to them? Specific requests: We also are requesting video and audio equipment to view the exhibits."

And then the proposed response is:

"You will have all the exhibits that were admitted into evidence, including any transcriptions of audio or video recordings. As I have instructed you, a transcript of the live testimony presented in this case will not be available to you. It's your own recollection and interpretation of the evidence that will control your deliberations. We will provide equipment for you to play the audio and video recordings that were admitted as exhibits."

Is that acceptable to the parties?

MR. CONTRERAS:  Yes to the Government.

MR. PRICE:  So agreed, no objection.

MR. STENBERG:  No objection from Mike Garcia.

MR. COLLINS:  No objection.

THE COURT:  Okay, I'll get this done now.  And when they request it, bring it in there.

THE CLERK:  Yes, sir.

THE COURT:  Okay, we'll be in recess.

**(Recess; resuming - Jury out.)**

THE COURT:  Two or three jurors did ask if they could leave now.  Apparently two of them have some other engagements or something, an anniversary of some kind.  But they told Gayle, not me, obviously.  So I'm going to let them go now and come back at nine.  And when they leave, Gayle and Jessica will transport the video equipment and everything in there.  Jessica knows how to use it.  She will, in the morning, ask them if they need her to show them how to use it and only that, and will specifically tell the jury, "Don't discuss anything while I'm here showing you this instrument," and then she will leave.

So two or three things.  Do you want me to -- not me but Gayle or Jessica -- dismiss them from the jury room; that is, you-all come back at 9 o'clock, the equipment will be here in the morning.  Do you want me to bring them in and tell them that?  And if you want me to bring them in and tell them that,

do you want your defendants here, or your clients, rather, here? What do you want, Mr. Price?

MR. PRICE: Just talk to them, Your Honor.

THE COURT: Without bringing them here?

MR. STENBERG: I would rather you bring them in and I take it we're not going to sequester the jury?

THE COURT: No, we don't do that in the great state of the United States.

MR. STENBERG: But can we bring them in and instruct them again --

THE COURT: Sure.

MR. STENBERG: -- not to discuss this case with anybody, don't have a relative or spouse talk about the case?

THE COURT: Sure.

MR. STENBERG: Because what their spouse thinks has nothing to do with the evidence or --

THE COURT: Exactly. That's fine.

MR. STENBERG: Thank you.

THE COURT: Okay.

MR. COLLINS: I've discovered that, Judge, maybe an instruction ought to be --

THE COURT: Okay, good. And then you-all are waiving your clients' necessity of being here?

MR. STENBERG: Yes.

MR. COLLINS: I'll waive it.

MR. PRICE: Yes, Your Honor.

THE COURT: Because otherwise it'll take another 40, 50 minutes, or 30 at least. Okay.

**(Jury in.)**

THE COURT: Okay, members of the jury, it's my understanding that you wish to leave now. I think my clerk told me one or two of you have some prior engagement this evening, I completely understand that and so do the lawyers. So I'm going to dismiss you now to return till 9 o'clock in the morning.

When you return, the video and other equipment necessary for your review if you want to use will be in the jury room. Either Jessica or Gayle, my two clerks, courtroom clerks, will be there to show you how to operate it in the event -- I couldn't operate it -- in the event one of your or all of you need it.

She'll show you, just to show you not the actual video but just to process it. While either of them or both of them are there, do not discuss anything, don't continue your deliberations, just let them show you and then they'll leave.

You'll note that the defendants are not in the courtroom. The law requires that the defendants be in the courtroom when the jury is here; however, I asked the parties if they excuse the necessity of their client being here so that we could move this thing along. Otherwise it would have

1708

taken another 20 minutes to get them down there and whatnot.

And so be here at 9 o'clock, the equipment will be there. Jessica or Gayle will probably show you how to use it. And I gave you the explanation as to the defendants.

No. 5, remember your instructions, do not discuss at all this case with anyone. If you go to an event or something tonight or go home and your spouse or loved one or children or whoever ask you anything about this you're not to discuss this case at all; at all, completely. I mean zero. It would be against your oath and wrong to each of the parties in this case if you were to do that, and I know you won't but I need to say that on the record.

So we'll see you at nine in the morning. Here's the other thing. Usually we'll hold you here until five or 5:30. If you come in tomorrow and want to adjourn earlier, that's fine. If you want to adjourn at five or 5:30, that's fine. If you want to work a little bit later than 5:30, whatever you want I'm going to do and they will have to do. So whatever you want. You're in charge of this case, you want to work as long as you want, want to work a little bit later, that's fine. Whatever you want, okay? So we'll see you at 9 o'clock in the morning.

**(Proceedings adjourned 4:40 p.m. to 5/20/10.)**

**(May 20, 2010, 1:25 p.m. - Jury out.)**

THE COURT: Before we get the jury in here, I should

tell you, Mr. Garcia, your lawyer, I don't know if you know this, Mr. Stenberg's son had a heart attack this morning and he's at the hospital. My court clerk called Mr. Stenberg and told him if we reached a verdict we would like to take the verdict and would it be agreeable with him, Mr. Stenberg, that the Court appoint a lawyer for you just to stand here with you to receive the verdict. And you should have someone here even though that lawyer, like Mr. Collins and Mr. Price, are not going to decide anything, they're just going to stand there with their clients to hear what the verdict is. Is that acceptable to you? Yes? Okay.

The lawyer I've appointed is Mr. McCrum, Scott McCrum. He's on his way, he'll be here in a while, you'll get to meet him. And, like I said, he's merely going to stand there with you to hear and receive the verdict, all right? And we'll be in recess till Mr. McCrum --

MR. COLLINS: May I add for the record, it's our understanding that Mr. Stenberg is -- it's a very, very serious condition.

THE COURT: Yes, it's very serious and I understand his son is not doing very well. He did tell the clerk to go ahead and appoint a lawyer, to let you know about it and have him stand here. So Mr. Stenberg knows exactly what we're doing and he agrees with that process. Okay? And you agree also? Okay, thank you, Mr. Garcia.

All right, we'll be in recess until the jury comes in.

**(Recess; resuming 1:30 p.m. - Jury in.)**

THE COURT: Okay, members of the jury, it's my understanding you have reached a verdict, is this correct? Okay. I just want to note for the record and so that you'll know, Mr. Stenberg, a family member had a health-related issue that he had to attend to and therefore the Court has appointed a standby counsel just to be with his client and receive the verdict. Mr. Stenberg knows that process, Mr. Garcia knows that process and has agreed to it.

If you'll hand the verdict to the bailiff, please. Before I read the verdict I want to thank each of you. I always thank a jury before I actually read the verdict. Otherwise it may appear that I'm thanking you for the specific verdict that you have reached. And so I do thank you. I know this took some time and I appreciate your attendance and participation in this process.

Okay, if each defendant will please rise. With respect to Mr. Jacinto Navajar:

"WE THE JURY FIND the defendant, JACINTO NAVAJAR, guilty."

With regard to the Special Issues, the jury has answered:

"With regard to Defendant JACINTO NAVAJAR, we, the jury, find that the Defendant

JACINTO NAVAJAR did agree that at least one member of the RICO conspiracy would attempt to murder Ernesto "Neto" Rodriguez; did agree that at least two members of the RICO conspiracy would conspire to murder Ernesto "Neto" Rodriguez; did agree that at least two members of the RICO conspiracy would conspire to interfere with commerce by extortion; did agree that at least two members of the RICO conspiracy would conspire to distribute at least one kilogram of heroin or at least five kilograms of cocaine."

It is dated and signed or noted by the foreperson. With respect to Mr. Garcia:

"WE THE JURY FIND the defendant, MIKE GARCIA, guilty as charged in Count One of the indictment."

With respect to the Special Issues:

"With regard to Defendant MIKE GARCIA, we, the jury, find that Defendant MIKE GARCIA did agree that at least one member of the RICO conspiracy would murder Roy Vera; did agree that at least two members of the

RICO conspiracy would conspire to murder Roy Vera; did agree that at least one member of the RICO conspiracy would murder Rudy 'Scooby' Contreras; did agree that at least two members of the RICO conspiracy would conspire to murder Rudy 'Scooby' Contreras; did agree that at least two members of the RICO conspiracy would conspire to interfere with commerce by extortion; did agree that at least two members of the RICO conspiracy would conspire to distribute at least one kilogram of heroin or at least five kilograms of cocaine."

Duly noted by the foreperson of the jury and dated this date.

With regard to Mr. Jose Martinez:

"WE, THE JURY, FIND the defendant, JOSE MARTINEZ, guilty as charged in Count One."

With regard to the Special Issues:

"With regard to Defendant JOSE MARTINEZ, we, the jury, find that Defendant JOSE MARTINEZ did agree that at least one member of the RICO conspiracy would murder Raymond 'Mon' 'Nochipa' Rodriguez; did agree that at least two members of the

RICO conspiracy would conspire to murder Raymond 'Mon' 'Nochipa' Rodriguez; did agree that at least one member of the RICO conspiracy would murder Mercy Brooks; did agree that at least two members of the RICO conspiracy would conspire to murder Mercy Brooks; did agree that at least one member of the RICO conspiracy would murder Tony Rodriguez; did agree that at least two members of the RICO conspiracy would conspire to murder Tony Rodriguez; did agree that at least one member of the RICO conspiracy would murder Juan 'Green' Perez; did agree that at least two members of the RICO conspiracy would conspire to murder Juan 'Green' Perez; did agree that at least two members of the RICO conspiracy would conspire to murder Roy Vera; did agree that at least one member of the RICO conspiracy would murder Joe Santos; did agree that at least two members of the RICO conspiracy would conspire to murder Joe Santos; did agree that at least two members of the RICO conspiracy would conspire to interfere

with commerce by extortion; did agree that at least two members of the RICO conspiracy would conspire to distribute at least one kilogram of heroin or at least five kilograms of cocaine."

It's noted by the foreman of the jury and dated this day.

Members of the jury, the jury clerk now is going to ask each of you is this your verdict with respect to each defendant. Your answer will be yes or no. The question again is is this your verdict regarding with respect to each of the three defendants.

THE CLERK: Juror No. 2, is this your verdict?

JUROR No. 2: Yes.

THE CLERK: Juror No. 3, is this your verdict?

JUROR No. 3: Yes.

THE CLERK: Juror No. -- I'm sorry -- yes, Juror No. 9, is this your verdict?

JUROR No. 9: Yes.

THE CLERK: Juror No. 11, is this your verdict?

JUROR No. 11: Yes.

THE CLERK: Juror No. 46, is this your verdict?

JUROR No. 46: Yes.

THE CLERK: Juror No. 16, is this your verdict?

JUROR No. 16: Yes.

THE CLERK: Juror No. 22, is this your verdict?

JUROR No. 22:  Yes.

THE CLERK:  Juror No. 28, is this your verdict?

JUROR No. 28:  Yes.

THE CLERK:  Juror No. 34, is this your verdict?

JUROR No. 34:  Yes.

THE CLERK:  Juror No. 35, is this your verdict?

JUROR No. 35:  Yes.

THE CLERK:  Juror No. 36, is this your verdict?

JUROR No. 36:  Yes.

THE CLERK:  Juror No. 42, is this your verdict?

JUROR No. 42:  Yes.

THE COURT:  Okay, if you-all will retire to the jury room just for a moment and anything else, Counselors?

MR. PRICE:  Nothing further, Your Honor.

MR. McCRUM:  No, Your Honor.

MR. COLLINS:  No, Your Honor.

THE COURT:  Nothing from the Government?

MR. CONTRERAS:  No, thank you.

THE COURT:  Okay, we'll stand in recess now.

**(End of trial proceedings.)**

**(August 4, 2010 - Sentencing)**

THE COURT:  We'll proceed now to the United States versus Jacinto Navajar, Cause No. 08-407.

MR. CONTRERAS:  Joey Contreras and Mary Green for the United States, ready.

MR. PRICE: Good morning, Your Honor. Steve Price for Mr. Navajar; ready.

THE COURT: Okay, if you and your client would come over to the podium. Mr. Navajar, have you had an opportunity to look and review the pre-sentence report with your lawyer?

DEFENDANT NAVAJAR: Yes, sir.

THE COURT: And do you understand the contents of the report?

DEFENDANT NAVAJAR: Yes, sir. It's all full of lies.

THE COURT: I'm sorry?

DEFENDANT NAVAJAR: It's all full of lies.

THE COURT: Okay. And, Counselor, do you have any objections?

MR. PRICE: Yes, sir. My client generally objects to the form and content of the PRS, but other than those, no specific objections.

THE COURT: Okay, the Court has thoroughly and in great detail reviewed the entire pre-sentence report and finds that your objections are not substantiated in any form, manner or shape and, therefore, that is denied. Do you have any other objections?

MR. PRICE: No, Your Honor.

THE COURT: Okay. The Court adopts the factual statements contained in the pre-sentence investigation report as to which there were no objections, and as to the

controverted factual statements, resolves the dispute as follows.

The Court finds that there is sufficient information to determine that Mr. Navajar should be held accountable for the murders of Gilbert "Solo" Enriquez and Robert Sanchez. The applicable guidelines in this case are Offense Level 43; History Category VI; a range of punishment of life; supervised release three to five years. There'll be no fine as recommended by the Probation Department. There is the $100 special assessment due immediately.

Any allocution by the Government?

MR. CONTRERAS: Did you say 33 or 43 Base Offense Level, Your Honor?

THE COURT: 43.

MR. CONTRERAS: 43. No allocution from the Government, we agree.

THE COURT: Okay. I'll now listen to allocution from both parties. The Government's indicated it has no further allocution of any kind. Mr. Price, do you or your client wish to proceed first?

MR. PRICE: Nothing from --

THE COURT: Okay, Mr. Price, anything?

MR. PRICE: Nothing, Your Honor.

THE COURT: All right. The Court has considered the guidelines in an advisory capacity and pursuant to the

Sentencing Reform Act, the policy statements, including any grounds for departure, and reviewing 18 U.S. 3553(a) factors has considered the guidelines as an initial benchmark and frame and reference and finds that the guideline range is appropriate in this case and sentences Jacinto Navajar to the custody of the Bureau of Prisons for life. Thereafter, if and when Mr. Navajar is released from custody, he shall be placed on supervised release for a term of five years.

The Court advises the defendant he does have the right to appeal, including any right to appeal the sentence. If you are unable to pay the cost of an appeal, you have the right to apply for leave to appeal informa pauperis. You must notify the Court in writing within ten days of the judgement of your intent to appeal.

The Court will order the pre-sentence report be sealed and made part of the record. Should the application of the guidelines be appealed, the pre-sentence report will be available for review for appellate review purposes only.

Anything else, Mr. Price?

MR. PRICE: Nothing further, Your Honor.

THE COURT: Okay, you're excused.

MR. CONTRERAS: Your Honor, the Government did file a motion late yesterday asking that this defendant be prohibited from communicating while in custody with any members of the Texas Mexican Mafia, and that the Court recommend that he be

designated in the highest security facility available in the United States, which is probably Florence, Colorado, administrative segregation.

THE COURT: Okay, that'll be contained.

MR. CONTRERAS: I drafted an order. If the Court will just have the Clerk to --

THE COURT: Do the order --

MR. CONTRERAS: Thank you.

THE COURT: -- and incorporate the language in the judgment. Okay, and will that apply to all three defendants?

MR. CONTRERAS: Yes, Your Honor.

THE COURT: Okay. All right, thank you, you're excused.

Now then proceeding to U.S. versus Mike Garcia, Cause No. 08-47. Mr. Garcia, have you had an opportunity to review, look at the pre-sentence report?

DEFENDANT GARCIA: Yes.

THE COURT: Yes?

MR. STENBERG: Yes.

THE COURT: And do you understand the contents, Mr. Garcia?

DEFENDANT GARCIA: Yes.

THE COURT: Yes. Any objections, Counselor?

MR. STENBERG: Yes, sir. May I approach?

THE COURT: Yes, you can approach. Okay.

MR. STENBERG: Basically, to sum that up for you, Your Honor, without you having to go through the paragraphs --

THE COURT: I can't hear you. What?

MR. STENBERG: Basically, to sum the August 4th, 2010 objections, the paragraphs that do not mention Mike Garcia, we're saying we don't admit, we don't deny, we just don't know.

THE COURT: Okay, they don't involve your client?

MR. STENBERG: Right. When we say we don't know whether or not things are true or not true, they do not mention my client in those paragraphs. That's Paragraphs 1 through 9, 11, 15 through 18, and 20 and 21. Then paragraphs that do mention my client, we do not admit to those, and that's Paragraphs 10, 12 through 14, 19, 23 and 61. And on 61, my client did plead no contest to a robbery but it was not an aggravated robbery. And it was his understanding by pleading nolo and getting a robbery instead of an aggravated robbery that -- because his contention was he didn't use a gun, he just grabbed the cash register.

THE COURT: Okay, would any of these objections, before we review them or comment on them, would any of them, if sustained would affect the guideline calculations?

MR. STENBERG: No as to respect to what I just mentioned, however, we do object to any consideration, whether by adjustment or otherwise, of the murder of Eduardo "Floppy"

Guajardo, and that's based upon his Sixth Amendment right to a jury trial and a jury finding, and we mention *Apprendi* there as a basis.

THE COURT: Right. Okay, that specific objection is overruled. Any other?

MR. STENBERG: And the only change that would make, it make the Paragraph 65 have eight rather than nine total criminal history points, which would not affect the end result.

THE COURT: Okay. Any comment by the Government?

MR. CONTRERAS: I got a little confused. He says that the criminal points are too high because of Paragraph 61? It says robbery not aggravated robbery, and I don't think it makes a difference anyway.

MR. STENBERG: No, it doesn't.

THE COURT: But, in any event --

MR. STENBERG: There's only with respect --

THE COURT: Excuse me.

MR. STENBERG: -- to Eduardo.

THE COURT: It wouldn't affect the guidelines in any event?

MR. CONTRERAS: Right. So I think it's moot. I think it's accurate as it is, though.

THE COURT: Right. Okay. The Court's reviewed the entire pre-sentence report in substantial, great detail and,

therefore, will overrule all objections. But, in any event, none of these objections even sustained would affect or impact the guideline calculations. Anything else, Mr. Stenberg?

MR. STENBERG: No, except I would like to have my objection attached to the pre-sentence --

THE COURT: Sure. To the record?

MR. STENBERG: Yes.

THE COURT: This objection? Sure, that'll be attached. Okay.

Okay, the Court adopts the factual statements contained in the pre-sentence investigation report as to which there were not objections, and as to the controverted factual statements, resolves the dispute as follows.

The Court finds there is sufficient information to determine that Mr. Garcia should be held accountable for the murder of Eduardo "Floppy" Guajardo. The applicable guidelines, then, are Offense Level 43; History Category VI; a range of punishment of life. If and when released from imprisonment, supervised release to be a term of five years. There'll be no fine as recommended by the Probation Department. $100 special assessment due immediately.

Any allocution by the Government?

MR. CONTRERAS: No, thank you, Your Honor.

THE COURT: Mr. Stenberg?

MR. STENBERG: Yes. We'd like to point out that Mike

Garcia did have a job --

THE COURT: He did have a what?

MR. STENBERG: -- a job as an electrician, did support his family, and we request maybe 25 years. He's 44, that'd put him out to 69. Not likely to live that long but it'd give him some hope.

THE COURT: I think God is the only one who's going to be able to give him hope. But, in any event, anything else?

MR. STENBERG: No, sir.

THE COURT: Mr. Garcia, would you like to say something, sir?

DEFENDANT GARCIA: No, sir.

THE COURT: No. Okay, any legal reason I cannot proceed?

MR. STENBERG: No, sir.

THE COURT: Okay. The Court's considered the guidelines in an advisory capacity and pursuant to the Sentencing Reform Act, the policy statements, including the grounds for departure, and reviewing the 18 U.S. Code Section 3553(a) factors, has considered the guidelines as the initial benchmark and frame of reference and finds the guideline range is appropriate in this case and, therefore, sentences Mike Garcia to the Bureau of Prisons for life. Thereafter, if and when released from prison, the defendant shall be placed on

supervised release for five years, to comply with all conditions of supervision.

In addition, this condition shall apply to all three defendants, that is, the defendant shall not associate with any member of the Texas Mexican Mafia or any other group, gang or organization defined as a criminal street gang under federal or state law.

The Court advises the defendant he does have the right to appeal, including right to appeal the sentence. If you are unable to pay the cost of appeal, you have the right to apply for leave to appeal informa pauperis. You must notify the Court in writing within ten days of judgment of your intent to appeal. The Court will order the pre-sentence report be sealed and made available -- rather be part of the record and available only for appellate review purposes.

Anything else, Mr. Stenberg?

MR. STENBERG: No, sir.

THE COURT: Thank you, you're excused. Now proceeding to U.S. versus Jose Martinez, Cause No. 08-CR-047. Okay, Mr. Martinez, let me ask you, sir, have you read or reviewed the pre-sentence report with your lawyer?

DEFENDANT MARTINEZ: Yes, I did, Your Honor.

THE COURT: And do you understand the contents of the report?

DEFENDANT MARTINEZ: I understand it.

THE COURT:  Okay.  Any objections, Counselor?

MR. COLLINS:  Your Honor, we object to the, just the general factual findings of the PSR and don't agree with those.

THE COURT:  Okay.  The Court has reviewed the pre-sentence report in great detail and substantially, finds no reasonable basis for sustaining your objection, Counselor, and therefore that is overruled.  Any other objections?

MR. COLLINS:  Judge, I do have a specific objection.  Paragraph 117 on Page 33.

THE COURT:  33?  Let me get there.

MR. COLLINS:  Yes, sir.

THE COURT:  Paragraph what?  What did you say?

MR. COLLINS:  Paragraph 117.

THE COURT:  Oh, 117.  Okay.

MR. COLLINS:  Yes, at the bottom of Page 33.

THE COURT:  Okay.

MR. COLLINS:  I talked to Probation a little bit about this briefly, but my client asserts he is an American, a U.S. citizen.  He was born in El Paso and not in Juarez, so to that extent we would object to that, the finding that he's not a U.S. citizen.

THE COURT:  Okay, your client's contending he's an American citizen versus Mexican citizen having been born in El Paso, Texas versus Juarez?

MR. COLLINS: Yes, sir.

THE COURT: Any comment?

MR. CONTRERAS: I think there's a basis. Mr. Dominguez checked on this and there is a basis for his conclusion. I think he needs to take it up with the Immigration officials.

THE COURT: Okay.

MR. CONTRERAS: But I think that paragraph just stated that it is natural reflection of the way INS categorizes him.

THE COURT: Well, is there any consequence whether it's changed or not given the likely sentence that he's going to receive?

MR. CONTRERAS: No, Your Honor.

THE COURT: Okay. I'll order the Probation Department to check with the Immigration authorities and to notify Mr. Collins of the Probation Department's finding and then, if necessary, Mr. Collins, you or your client can retain an immigration lawyer or some other lawyer, or some clinic dealing with immigration concerns.

MR. COLLINS: Thank you. Judge, I have one other.

THE COURT: Yes.

MR. COLLINS: In that same paragraph it says a/k/a Jose Delores Ahedo. We believe that is his true name, Jose Ahedo. So we would ask the Court --

THE COURT:  I'm sorry, you believe what?

MR. COLLINS:  I'm sorry.  We would ask the Court to make a finding that his true name is Jose Delores Ahedo.  It has that as an a/k/a but I believe that's his real name.

THE COURT:  Okay, what is your client's full legal name?

MR. COLLINS:  Jose Delores Ahedo.

THE COURT:  Gahedo [phonetic]?

DEFENDANT MARTINEZ:  Ahedo.

THE COURT:  Gahedo or Ahedo?

DEFENDANT MARTINEZ:  Ahedo, A-h-e-d-o.

MR. COLLINS:  It's reflected in the parenthetical, Judge, Ahedo, A-h-e-d-o.

THE COURT:  Okay.  All right.  Anything else?

MR. COLLINS:  No, sir.

THE COURT:  Okay.  There being no opposition to the factual statements contained in the report, the Court adopts the statements as a finding.  Any allocution by the Government?

MR. CONTRERAS:  No, thank you, Your Honor.

THE COURT:  Mr. Collins?

MR. COLLINS:  No, Your Honor.

THE COURT:  Mr. Martinez, any allocution?  Rather, would you like to say something?

DEFENDANT MARTINEZ:  I apologize for my behavior,

Your Honor.

THE COURT: Okay. Any legal reason I cannot proceed?

MR. COLLINS: No, Your Honor.

THE COURT: Okay. The Court's considered the guidelines in an advisory capacity and pursuant to the Sentencing Reform Act, the policy statements, including grounds for departure, and reviewing 18 U.S. Code 3553(a) factors, and has considered the guidelines as an initial benchmark and frame of reference and finds that the guideline range is appropriate in this case and sentences Jose Martinez to a period of life in the Bureau of Prisons. If and when released from prison, the defendant shall be placed on supervised release for five years, shall comply with all standard conditions in addition to the special condition attached to the other two defendants.

The Court advises the defendant you do have the right to appeal this sentence including any right to appeal the sentence. If you are unable to pay the cost of an appeal you have the right to apply to appeal informa pauperis. You must notify the Court in writing within ten days of judgment of your intent to appeal.

The Court will order the pre-sentence report sealed and made part of the record. Should the application of the guidelines be appealed, the pre-sentence report will be available for review for appellate purposes only.

Anything else, Counselor?

MR. COLLINS:  No, Your Honor.

THE COURT:  Okay, anything else from the Government?

MR. CONTRERAS:  No, thank you, Your Honor.

THE COURT:  Okay, you're excused.  Mr. Price, let me ask you one other thing.  I don't recall if I asked you if there was any legal reason that I could not have proceeded to sentencing.  Was there or is there any legal reason?

MR. PRICE:  No, Your Honor.

THE COURT:  All right.  Okay, then we're in recess.

**(Proceedings concluded.)**

UNITED STATES DISTRICT COURT    )

WESTERN   DISTRICT OF  TEXAS    )


I, MAURICE D. WEST, Official Court Reporter, United States District Court, Western District of Texas, do certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

I certify that the transcript fees and format comply with those prescribed by the Court and Judicial Conference of the United States.


30 September 2010                  /s/Maurice D. West
                                   MAURICE D. WEST
                                   Official Court Reporter
                                   United States District Court
                                   Western District of Texas